**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| A&E TELEVISION NETWORKS, LLC, | Index No.: |
| Plaintiff, | |
| - against - | **COMPLAINT** |
| BIG FISH ENTERTAINMENT, LLC, HALF MOON PICTURES, LLC, and REELZCHANNEL, LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff A&E Television Networks, LLC ("AETN" or "Plaintiff"), by its attorneys, Weil, Gotshal and Manges LLP, for its Complaint against Big Fish Entertainment, LLC, Half Moon Pictures, LLC ("Half Moon," and together with Big Fish Entertainment, LLC, "Big Fish"), and ReelzChannel, LLC ("REELZ") (collectively, "Defendants"), alleges as follows:

## NATURE OF ACTION

1.      This case concerns Defendants' brazen theft of AETN's intellectual property. AETN is the sole and exclusive owner in any and all rights to the hit series "*Live PD*," which aired on AETN's flagship A&E® network between 2016 and 2020 and showcased the policing of America by following several police departments from across the country in real time as they patrolled their communities, with hosts in studio guiding the action. Without any authorization from AETN, Big Fish (the show's former producer) created a clone of *Live PD* featuring the same primary hosts, content, format, segments, and more, and sold that virtually identical show to REELZ, a cable network seeking its first breakout hit, which then aired the show over AETN's repeated and vociferous objections. The lynchpin of Defendants' mass marketing of the show was that they were "bringing back" *Live PD* on a new network, co-opting AETN's hard-earned reputation and trading on its valuable intellectual property rights in the process. So far,

Defendants' plan has worked as intended: the infringing series has single-handedly drawn millions of viewers to REELZ, which was the 89th ranked television network in total viewers in 2021.[1] Facing such a blatant rip-off, AETN brings this action against Defendants for copyright infringement under the Copyright Act and for trademark infringement and unfair competition under the Lanham Act and New York law.

2.    In 2016, AETN hired Big Fish to produce *Live PD* as a work made-for-hire, with AETN owning all copyrights in the program and trademarks in the name of the show.  *Live PD* enjoyed tremendous success: it was the most popular program on A&E® and one of the most watched programs on all of cable television, and it spawned numerous authorized spin-offs, also owned by AETN, that also aired on A&E®.  In June 2020, amid nationwide protests against police brutality, AETN suspended production of new episodes of *Live PD* during that critical time in our nation's history.  AETN, however, has never relinquished or assigned its rights to create episodes of *Live PD* nor has it authorized anyone else to prepare derivative programs based upon *Live PD* except as works made-for-hire.

3.    In May 2022, in flagrant violation of AETN's intellectual property rights, Defendants and key individuals formerly associated with *Live PD*—including its host, Dan Abrams—announced in a calculated and carefully coordinated publicity blitz that they were "***bringing back***" *Live PD* and that Mr. Abrams was returning as its host.  Indeed, Mr. Abrams thanked the "***Live PD nation***" for "its patience" and exclaimed that "***[t]he show will be back*** on Friday and Saturday nights sometime later this summer!"  But Defendants were not "bringing back" AETN's show to AETN; instead, they co-opted AETN's intellectual property and planned

[1] *See* Michael Schneider, *Most-Watched Television Networks: Ranking 2021's Winners and Losers*, VARIETY, Dec. 30, 2021, https://variety.com/2021/tv/news/network-ratings-2021-top-channels-1235143630.

to air their cloned show on REELZ, an unrelated network.

4.       Notwithstanding cease-and-desist letters from AETN's outside counsel warning them not to infringe AETN's intellectual property rights, Defendants proceeded undeterred.  On July 22 and 23, 2022, REELZ aired the first two episodes of "*On Patrol: Live*," and subsequent episodes have aired on successive Friday and Saturday nights.  This infringing series is virtually identical to *Live PD*.  As more fully detailed below, *On Patrol: Live* copies nearly every aspect of *Live PD*: it covers the same, crime-related subject matter through the same format (*i.e.*, a live series following police units around the country in real time, with hosts in studio curating and guiding the action, and pre-produced packages about cops/areas/hot cases during moments of quiet); it features the same primary studio host and co-host, who describe the unfolding action using the exact same catchphrases they used on *Live PD* while dressed as they often were dressed on *Live PD*; it has live feeds in multiple cities following several of the same police departments as *Live PD* and even some of the same individual officers; it utilizes similar percussive opening and closing music; it copies the same program segments (*e.g.*, "Crime of the Week," "Missing," and "Wanted"); it displays the officers' locations and their activity the same way; it transitions from scene to scene in the same way; episodes end in the same way, with footage of a police interaction continuing to play in the upper-middle part of a screen, while credits flash underneath in white font, with police lights flashing in the background; and it even airs during the same time slots (Friday and Saturday nights from 9 PM-12 AM).

5.       In short, as one media reviewer of both shows put it, "*Live PD* is back on the air" because "*On Patrol: Live* is *Live PD*."[2]   This impression is no accident.  It is the result of

---

[2] *See* Brittany Frederick, *On Patrol: Live Doesn't Quite Live Up to Live PD—Yet*, CBR.com, July 23, 2022, https://www.cbr.com/on-patrol-live-reelz-live-pd/.

Defendants' deliberate decisions to extensively copy the selection and arrangement of the creative elements of *Live PD* so as to mimic its look and feel, to market and promote their infringing version as the return of *Live PD*, and to trade on AETN's brand and goodwill.

6.      By explicitly copying *Live PD* in preparing episodes of *On Patrol: Live*, and by distributing, transmitting, performing and causing third parties to perform episodes of *On Patrol: Live*, Defendants have willfully infringed AETN's copyrights and contributed to infringement by third-party distributors, such as satellite television services, cable system operators, internet-based television services, and other multichannel video programming distributors (collectively, "MVPDs") that are transmitting the Defendants' infringing episodes to their subscribers.

7.      Defendants also have infringed AETN's trademarks and engaged in acts of unfair competition in violation of both federal and New York law.   AETN owns various trademarks related to the *Live PD* franchise (including without limitation, US Trademark Registration No. 5,478,306 for the word mark "LIVE PD"), as well as various pending and allowed trademark applications, and has used the LIVE PD mark continuously since 2016 in connection with entertainment services, including a multimedia television series.

8.      Defendants intentionally have confused the public into believing that *On Patrol: Live* is *Live PD* and is associated with AETN's brand.   As detailed below, Defendants and *Live PD*'s former principals openly and repeatedly have referred to *Live PD* as "returning" and "coming back" on REELZ.   These public statements were not gaffes or misstatements; they were part and parcel of Defendants' bad-faith strategy of capitalizing on AETN's reputation, trading on AETN's goodwill, and passing off *On Patrol: Live* as the same product as *Live PD*.   The intended substantial actual confusion among the public has resulted and is documented.

9.      Defendants' unauthorized actions have caused, and are continuing to cause, AETN

to suffer monetary damages, including, *inter alia*, through lost licensing revenue, and irreparable injury, including, *inter alia*, through incalculable harm to AETN's brand, reputation, and consumer goodwill.

## PARTIES

10.     Plaintiff AETN is a Delaware limited liability company with its principal place of business in New York, New York.  AETN, doing business as A+E Networks®, is a global media and entertainment brand that creates, develops, and purchases content worldwide for its portfolio of well-known cable programming channels, including its flagship A&E® network.

11.     Upon information and belief, Defendant Big Fish is a New York limited liability company with its principal place of business in New York, New York.  Big Fish is a content production company that produces television programming and other multimedia digital works that have been aired and distributed in New York and throughout the United States, including, as relevant here, *Live PD*, and through its production arm, Half Moon, *On Patrol: Live*.

12.     Upon information and belief, Defendant Half Moon is a Delaware limited liability company registered to do business in New Jersey with its principal place of business in Beverly Hills, California.  Upon information and belief, Half Moon is a production arm of Big Fish focused on producing crime and investigative series, such as *On Patrol: Live*, which have been aired and distributed in New York and throughout the United States.

13.     Upon information and belief, Defendant REELZ is a Delaware limited liability company registered to do business in New York with its principal place of business in Albuquerque, New Mexico.  REELZ is a cable and satellite entertainment network that airs and distributes programming content, both directly through its REELZ NOW app and through MVPDs in New York and throughout the United States, including *On Patrol: Live*.

5

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.

15.     This Court has personal jurisdiction over Big Fish because Big Fish is domiciled in New York and has its principal place of business in New York.

16.     This Court has personal jurisdiction over Half Moon because, upon information and belief, Half Moon has regularly conducted and continues to conduct and do business in the state of New York and in this District.  Upon information and belief, Half Moon also has contractual relationships with Big Fish and REELZ, including with respect to *On Patrol: Live*. Further, upon information and belief, principals of Half Moon are also principals of Big Fish, and both have communicated with REELZ in New York, including with respect to the production and airing of *On Patrol: Live*.  Moreover, Half Moon's conduct, which constitutes copyright infringement, trademark infringement, and unfair competition, has occurred and continues to occur in this District, and has caused and continues to cause AETN to suffer harm in this District.

17.     This Court has personal jurisdiction over REELZ because REELZ has regularly conducted and continues to regularly conduct and do business in the state of New York and in this District.  Upon information and belief, REELZ also has contractual relationships with Big Fish and/or Half Moon, including with respect to *On Patrol: Live*.  Further, upon information and belief, REELZ has communicated extensively with principals of Big Fish, Half Moon, and/or *On Patrol: Live* who are located in New York, including with respect to the production and airing of *On Patrol: Live*.  In addition, REELZ's conduct, which constitutes copyright infringement, trademark infringement, and unfair competition, has occurred and continues to occur in this District, and has caused and continues to cause AETN to suffer harm in this District.  REELZ also airs and

distributes programming content, including *On Patrol: Live*, in New York, both directly through its REELZ NOW app and through MVPDs.

18.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) because Defendants are subject to personal jurisdiction here and a substantial part of the events or omissions giving rise to the claims herein occurred in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1400(a) and (b).  And venue is also proper because AETN and Big Fish entered into a "Series Agreement" (defined below), which is governed by New York law, and in which they agreed that any proceedings relating to the Series Agreement shall be commenced and prosecuted exclusively in this District.

## FACTUAL ALLEGATIONS

### I.     AETN'S COPYRIGHT OWNERSHIP RIGHTS IN THE *LIVE PD* SERIES

19.     AETN exclusively owns the copyrights in the *Live PD* series under the United States Copyright laws and it has registered the copyrights in 24 representative episodes (the "Registered Episodes").  A list of the Registered Episodes is attached hereto as Exhibit A and incorporated by reference herein.  Exhibit A identifies by number the Certificates of Copyright Registration issued to AETN.  True and correct copies of the Certificates of Copyright Registration are attached hereto as Exhibit B and incorporated by reference herein.  True and correct copies of the Registered Episodes will be lodged with the Court as Exhibit C hereto and are incorporated herein by reference.

20.     In 2016, AETN hired Big Fish to produce episodes of *Live PD*, each three hours in commercial telecast length, along with a one-hour "Cut Down Version" of each episode.  AETN and Big Fish are parties to a "Series Agreement" dated as of July 29, 2016 (together with any amendments thereto, the "*Live PD* Series Agreement").

21.     Pursuant to the *Live PD* Series Agreement, AETN has exclusive, 100% ownership in any and all rights to the *Live PD* series (including, *inter alia,* all originally shot footage, newly created elements, the format, and the title) in perpetuity, including copyrights and trademarks. AETN also has the right to use and exploit all of the above in any manner and in any media.[3]

22.     Also under the *Live PD* Series Agreement, the *Live PD* Series and all elements thereof are considered works made-for-hire under the Copyright Act.  Moreover, Big Fish alternatively assigned to AETN all of its rights in the *Live PD* Series and agreed that AETN would have all rights, title, and interest therein, including the exclusive right to use, convey, and authorize others to use them for any purpose and in any media throughout the world in perpetuity.

23.     The *Live PD* Series Agreement prohibited Big Fish from authorizing the telecast of any program produced by Big Fish substantially similar in content and format to the *Live PD* Series for a one-year period commencing on delivery of the final episode without AETN's prior written consent.  This does not authorize or grant a license to Big Fish to do anything, much less to "bring back" *Live PD* or create a virtually identical derivative program based upon *Live PD*.  Nor is REELZ a party to the *Live PD* Series Agreement.

24.     In sum, AETN is the sole owner in perpetuity of any and all rights in the *Live PD* series, including all copyrights and trademarks, and enjoys the sole and exclusive right to exploit the *Live PD* series, including the Registered Episodes.

## II.     AETN'S TRADEMARKS IN THE LIVE PD MARK

25.     As set forth above, AETN, a prominent media company, serves as a vital source for distinctive, high-quality, and original television programming.  AETN and its affiliated media

---

[3] The fact of AETN's copyrights and trademarks in the *Live PD* Series are also now a matter of public record.  *See supra* ¶ 19 and *infra* ¶¶ 27-28.

brands (including the globally famous network The History® Channel) have become synonymous with groundbreaking, provocative, and high-quality television.  Consumers know that AETN and its programming, and the trademarks and service marks associated with this programming, are valuable.

26.     AETN owns numerous federal trademarks registered on the Principal Register in the United States Patent & Trademark Office ("PTO") associated with television and other forms of audiovisual entertainment, including various trademarks related to AETN's *Live PD* franchise. On or about September 20, 2016, AETN applied to register the mark LIVE PD as a word mark covering various entertainment services, including "a multimedia program series featuring subjects of general human interest distributed via various platforms across multiple forms of transmission media," an "ongoing television series featuring subjects of general human interest," and a related website featuring the same.

27.     On or about May 29, 2018, the PTO issued a certificate of registration for AETN's mark LIVE PD for the same services, as U.S. Patent & Trademark Office Reg. No. 5,478,306.  A true and correct copy of the PTO registration certificate evidencing AETN's ownership of the trademark LIVE PD and a printout from the PTO's website setting forth the status of the mark is attached hereto as Exhibit E.  This registration is valid, subsisting, and in full force and effect.

28.     AETN also has common law rights in the LIVE PD mark in connection with various entertainment, goods, and other services, including the following:

- On June 3, 2019, AETN applied for the mark LIVE PD (serial number 88/456775) in connection with various "entertainment services," including "providing visual and audio performances by actors and celebrities, [and] ongoing television program content in the field of law enforcement, policing, police patrols and public encounters with law enforcement….organizing live events in the field of law enforcement….conducting programs and events featuring information on law enforcement, policing, police patrols and public encounters with law enforcement….producing and providing ongoing

audiovisual television and multimedia programs in the field of law enforcement, policing, police patrols and public encounters with law enforcement….and providing televised, online and personal appearances by hosts, entertainers, spokespersons, canines and celebrities"; and

- On June 14, 2019, AETN applied for the mark LIVE PD (serial number 88/473933) in connection with various goods and services, including "printed matter" (*i.e.*, "novels, short stories, books, magazines, pamphlets, newsletters, articles and brochures based on a television series in the field of general human interest") and "printed materials" (*i.e.*, "a series of fiction and non-fiction books based on a television series, activity books, novels, graphic novels, picture books, coloring books; calendars and other items, namely, children's activity books, stickers, posters").[4]

29.     Since 2016, AETN continuously has used the LIVE PD mark in commerce throughout the United States in connection with the distribution, promotion, marketing, and advertising of the *Live PD* series.  For example, AETN has continuously made available many dozens of clips from the *Live PD* series—as well as its spin-off programs—on A&E®'s official "playlist" channel on YouTube (which has 8.66 million subscribers), on which it prominently displays the LIVE PD mark.  These video clips are incredibly popular: collectively, they have been viewed hundreds of millions of times.

30.     Due to AETN's exclusive and extensive use and advertising of the LIVE PD mark, the mark has acquired enormous value and recognition as the source of a premier television series in the United States.  The LIVE PD mark is well-known to the consuming public as identifying and distinguishing AETN exclusively and uniquely as the source of the high-quality, live police television programming to which it has been applied.

**III.     *LIVE PD* AIRS ON THE A&E® NETWORK FROM 2016-2020**

31.     *Live PD* first aired on AETN's A&E® network on October 28, 2016.  In total, the

---

[4] Printouts from the PTO's website reflecting AETN's allowed applications with serial numbers 88/456775 and 88/473933 are also incorporated within Exhibit E.

*Live PD* series spanned four seasons and 298 episodes. *Live PD* was groundbreaking as it was the first and only television series to feature the work of law enforcement in real time in such a sustained fashion.

32.     A documentary series, *Live PD* showcased the policing of America, following police departments and sheriff's offices from across the country in real time as they patrolled their communities. Episodes of *Live PD* incorporate carefully selected footage from cameras mounted on the dashboards of police vehicles ("dash cams") along with "fixed rig" and handheld cameras that are curated to show the work of a mix of urban and rural law enforcement forces on Friday and Saturday nights. Dan Abrams was the host of *Live PD* and, together with co-host Sgt. Sean "Sticks" Larkin, provided insight and analysis into the video footage of law enforcement officers and their interactions with citizens, including criminal suspects, witnesses, and others.

33.     Through AETN's efforts and actions to develop and promote *Live PD*, the series became a popular and highly successful show. In 2018, the show's second season, *Live PD* was the No. 1 show on all of TV (excluding sports) 28 times in the key demographic of "Adults 25-54." The show was particularly successful that year on over-the-top ("OTT") platforms, video-on-demand ("VOD"), and digital video recorders ("DVR"): it finished 2018 as the most-viewed show of the year on each of those platforms. In 2019, *Live PD* was the most watched program on ad-supported cable television during prime time on Friday and Saturday nights. In 2020, *Live PD* rose to among the top spots in all of cable, drawing a total of about 3 million viewers per weekend. *Live PD*'s success catapulted A&E® to at times rank No. 1 across all broadcast and cable networks on Friday and Saturday nights in primetime in the key "Adults 18-49" and "Adults 25-54" demographics.

34.     Indeed, the *Live PD* series proved so successful that it spawned numerous spin-

offs, including *Live PD: Rewind*, *Live PD: Police Patrol*, *Live PD: Roll Call*, *Live PD Presents: Women on Patrol*, *Live PD Presents: PD Cam*, *Live Rescue, Live PD Presents: Top Ten Police Vehicles*, and *Live PD: Wanted*.  Each of these derivative programs was explicitly authorized by AETN, created on behalf of AETN as works made-for-hire, and AETN is the exclusive owner of all related copyrights and trademarks for each of these programs.

35.     Due to AETN's efforts to develop and promote *Live PD* and authorized spin-offs that also incorporated the LIVE PD mark as part of the title, the LIVE PD mark has likewise gained widespread recognition and became famous.

36.     The general public associates *Live PD* with AETN, which has promoted the LIVE PD mark not only through television advertisements, but also online, in print, and through other media to educate consumers in the United States and around the world that they could view *Live PD* and authorized spin-offs on AETN's A&E® network.  As a result, the LIVE PD mark has become specifically valuable to AETN, possessing strong secondary meaning among consumers.

## IV.   DEFENDANTS ANNOUNCE THAT THEY ARE "BRINGING BACK" *LIVE PD* ON REELZ

37.     In May 2022, without securing any of the necessary rights from AETN required to create new episodes of *Live PD* or to develop a new spin-off, Defendants coordinated a multi-media blitz proclaiming "the return," "relaunch," and "revival" of *Live PD* on REELZ, a competing television network.

38.     As a result of Defendants' calculated, misleading effort to trade on AETN's brand and the goodwill associated with its LIVE PD mark in marketing and promoting *On Patrol: Live*, numerous articles in the press reported that REELZ is "bringing back" *Live PD* to television.  The Wall Street Journal's headline read: "***Live PD* is coming back this summer as '*On Patrol Live.*'**"[5]

---

[5] *See* Joe Flint, *'Live PD' Is Coming Back on TV This Summer as 'On Patrol: Live'*, WALL ST. J., June 8, 2022,

Several other articles informed the public that REELZ was "reviving" *Live PD*.[6]   Still others described *Live PD* as making a "return" on REELZ.[7]   As The Atlanta Journal-Constitution reported, "A&E's former hit series '*Live PD*' will soon be live once again," because "[t]he series is coming to REELZ."[8]

39.     Indeed, that was exactly what was happening.  *On Patrol: Live* is produced by the same producer as *Live PD* (*i.e.*, Big Fish, acting through its production arm, Half Moon); it has the same executive producers as *Live PD* (*i.e.*, John Zito); and it brings back the same host and co-host as *Live PD* (*i.e.*, Dan Abrams and Sean "Sticks" Larkin, respectively), as well as a prior featured participant in *Live PD* (Curtis Wilson) as the third host.

40.     Defendants and others associated with *On Patrol: Live* deliberately fostered the misperception that *On Patrol: Live* was a continuation of *Live PD* by repeatedly using the LIVE PD mark to promote their new show.  Mr. Abrams, who is an executive producer on the infringing series, was particularly vocal in proclaiming *On Patrol: Live* to be the same show as *Live PD*.  On June 8, 2022, at 8:51 AM, Mr. Abrams announced on Twitter that "***Live PD* is coming back**" and that "**the show will be back** on Friday and Saturday nights sometime later this summer!"[9]

---

https://www.wsj.com/articles/live-pd-is-coming-back-on-tv-this-summer-as-on-patrol-live-11654691401.  All emphases herein are added unless noted otherwise.

[6] *See, e.g.*, Michael Schneider, *'Live PD' To Be Revived on Reelz This Summer as 'On Patrol: Live,' Hosted by Dan Abrams*, VARIETY, June 8, 2022, https://variety.com/2022/tv/news/live-pd-return-reelz-dan-abrams-1235288210/; Alex Weprin, *'Live PD' Revived at Reelz, Producer Dan Abrams Says "Environment Has Changed" Since 2020 Cancellation*, THE HOLLYWOOD REPORTER, June 8, 2022, https://www.hollywoodreporter.com/tv/tv-news/live-pd-revived-reelz-on-patrol-live-1235161208/.

[7] *See, e.g.*, Denise Petski, *'Live PD' to Return as 'On Patrol: Live' On Reelz*, DEADLINE, June 8, 2022, https://deadline.com/2022/06/live-pd-return-on-patrol-live-reelz-dan-abrams-1235040651/; Greta Bjornson, *'Live PD' to Return on Reelz, Will Be Renamed 'On Patrol: Live'*, DECIDER, June 9, 2022, https://decider.com/2022/06/09/live-pd-returning-renamed-on-patrol-live/.

[8] *See* Hunter Boyce, *'Live PD' Returns As 'On Patrol: Live' On New Network*, THE ATLANTA JOURNAL-CONSTITUTION, July 20, 2022, https://www.ajc.com/life/live-pd-returns-as-on-patrol-live-on-new-network/2RYSWCMWHRGV7HKOE4AM4VV3NA.

[9] *See* Dan Abrams (@danabrams), Twitter (June 8, 2022, 8:51 AM),



41.     A few minutes later, Mr. Abrams "thank[ed] the #livepdnation" for its "patience" as they awaited the return of *Live PD*.[10]

42.     The following month, on July 18, 2022, Mr. Abrams again took to Twitter before embarking on a "promotional tour" for *On Patrol: Live* to exclaim that it is "hard to believe **we are almost back**!!"[11]

43.     The next day, July 19, 2022, Mr. Abrams linked to a New York Post article noting that "*'**Live PD' is back as 'On Patrol: Live*'* two years after being canceled."[12]

44.     Indeed, the *Live PD* host has been planning for this return all along.  On July 22, 2022, Mr. Abrams told Entertainment Weekly that he has been planning for "[t]he *Live PD* team … **coming back to TV**" ever "since the date it was canceled."[13]  As early as January 1, 2021, Mr.

https://twitter.com/danabrams/status/1534518543168987136.

[10] *See* Dan Abrams (@danabrams), Twitter (June 8, 2022, 9:00 AM), https://twitter.com/danabrams/status/1534520779253207040.

[11] Dan Abrams (@danabrams), Twitter (July 18, 2022, 8:49 AM), https://twitter.com/danabrams/status/1549013399249555457.

[12] Dan Abrams (@danabrams), Twitter (July 19, 2022, 10:01 PM), https://twitter.com/danabrams/status/ 1549575067713019910.

[13] Kristen Baldwin, *On Patrol: Live Executive Produce Answers Burning Questions About the New Version of Live PD*, ENTERTAINMENT WEEKLY, July 22, 2022, https://ew.com/tv/on-patrol-live-reelz-premiere-burning-questions/.

Abrams told "all of those in the #livepdnation asking" that "the answer is yes…I am confident that **#LivePD will be back in 2021**. More to come…"[14]

45.      John Zito—an executive producer of both shows—told Entertainment Weekly that REELZ "**believe[s] in the show in its original format** and what the show was all about …. **there was not a lot of talk about bringing back the show in a completely different way**."[15]

46.      REELZ's official Twitter account "re-tweeted" the various articles and headlines informing the public that *Live PD* would be "returning" on REELZ.

47.      REELZ's press release announcing the purportedly "new" series emphasized that it was "from the producers of *Live PD*," and quoted Mr. Abrams as "thrilled" that "**our team is finally back together**."[16]

48.      On information and belief, these public statements mirrored what REELZ was stating privately to advertisers and media industry personnel.  In one such presentation to one of the nation's largest media marketing and advertising agencies from May, 2022, REELZ laid bare its intent to trade on AETN's show and branding in proclaiming that "REELZ ADDS #1 TV SHOW TO OUR PROGRAM LINEUP."  Referencing the then-"working title" of the program as *"PD Live"*—an obvious inversion of AETN's *Live PD*—REELZ was making the pitch that an *already successful* "#1 TV SHOW" was coming back on television with "ALL NEW LIVE EPISODES":

---

[14] *See* Dan Abrams (@danabrams), Twitter (Jan. 1, 2021, 10:30 AM), https://twitter.com/danabrams/status/1345029565362659331.

[15] *See* Baldwin, *supra* n. 13.

[16] https://www.prweb.com/releases/from_the_producers_of_live_pd_on_patrol_live_w_t_heads_to_television_this_summer_on_reelz/prweb18726092.htm (June 8, 2022).



49.     Defendants' publicity tour had its desired effect: social media was abuzz in the lead-up to and following the debut of *On Patrol: Live*, with fans and others touting "We're Back" and thanking "our loyal family still riding strong":



50.     On Facebook, for example, an admin changed the name of a "fan group" (with nearly 137,000 members) devoted to "A&E LIVE PD" to "Reelz – On Patrol Live," with the "icon"

for the group continuing to feature a picture of Messrs. Abrams and Larkin from the A&E "Upfront" presentation in 2019:



## V.  AETN SENDS MULTIPLE CEASE AND DESIST LETTERS TO DEFENDANTS, WHICH DEFENDANTS IGNORE

51.     Deeply troubled by Defendants' clearly stated intention to "bring back the show"— as repeatedly expressed throughout their highly coordinated advertising campaign, which traded on AETN's goodwill, reputation, and investments in *Live PD*—AETN's outside counsel sent letters in June and July, 2022 to Big Fish and REELZ.  These letters reminded Defendants of AETN's copyrights in the *Live PD* series and trademarks in the LIVE PD mark, and demanded that "all parties cease and desist from referring to REELZ 'bringing back the show' or other similar comments,"  and that REELZ "cease and desist from continuing to pursue airing" the proposed show.

52.     Big Fish and REELZ ignored these letters, other than to engage in a transparent attempt at window-dressing by changing the name of the proposed show from "*PD Live*" to *"On Patrol: Live.*"  But this subterfuge was itself telling: Defendants left in the word "Live," which is

17

the predominant part of both titles and which is not merely descriptive, but is rather a unique component of the *Live PD* series—the first show in television history to feature law enforcement activity *in real time* in such a sustained fashion.  And by adding the word "Patrol," which the public already associates with AETN's popular spin-off *Live PD: Police Patrol*, Defendants were plainly attempting to trade on AETN's brand and confuse the public about the nature and origins of the show.

**VI.**    *ON PATROL: LIVE* **AIRS ON REELZ, INFRINGING AETN'S RIGHTS**

53.    On July 22 and 23, 2022, REELZ aired the first two episodes of *On Patrol: Live*, its infringing derivative version of AETN's *Live PD.*

54.    These episodes confirmed that Defendants' *On Patrol*: *Live* is merely a continuation of *Live PD* in flagrant violation of AETN's intellectual property rights.

55.    REELZ has since aired additional new episodes of *On Patrol: Live* on July 29 and 30, 2022, August 5 and 6, 2022, August 12 and 13, 2022, August 19 and 20, 2022, and August 26 and 27, 2022.  These episodes, like the first two, are virtually indistinguishable from *Live PD*, and thus likewise infringe AETN's copyrights.  True and correct copies of episodes two and three of *On Patrol: Live* will be lodged with the Court as Exhibit D, and incorporated herein by reference.

56.    Just like AETN's *Live PD*, Defendants' infringing version is a crime-related series showcasing the policing of America, following police and sheriff departments from across the country in real time—**including several of the very same departments featured on *Live PD***— as they patrol their communities.  Just like *Live PD*, Defendants' infringing version incorporates carefully selected live footage from dash cams along with fixed rig and handheld cameras, and features curated video clips that show the work of a mix of urban and rural forces on Friday and Saturday nights.  And just like *Live PD*, Defendants' infringing version is hosted in studio by Mr.

Abrams and co-hosted by Sgt. Larkin.  They give the same exact type of insight—down to the same "catchphrases"—into the unfolding footage.

57.    The similarities between the two shows are striking, innumerable, and readily apparent.  They include:

- Both shows begin with near-identical percussive, fast-paced music playing while a black screen displays an introductory teaser in white letters with nearly identical content.  The theme music plays and the disclaimer is displayed every time each show comes back from commercials.

- Both shows toggle between footage of live or pre-packaged police patrol action and studio commentary by the show's hosts discussing the unfolding action.

- Mr. Abrams is the primary host, and Sgt. Larkin the co-host, of both shows.

- Each show also features a third host, which, for *On Patrol: Live*, is Deputy Sheriff Curtis Wilson of the Richland County Police Department, a former recurring participant on multiple episodes of *Live PD* hailing from a police department featured on both shows.  According to press reports, Defendants wanted original *Live PD* analyst Tom Morris Jr. to return as the third co-host, and the only reason that did not happen was that "[t]he timing just didn't work out."[17]

- In both shows, the three hosts are dressed similarly and situated around a table, with Mr. Abrams on the left, Sgt. Larkin in the middle, and the third host on the right.

- The studio in which the hosts sit features large TV screens on the walls and blue and red lights behind the screens.

- In both shows, Mr. Abrams narrates the action on the screen and uses many of the exact same catchphrases.

- As noted above, both shows feature several of the same law enforcement departments, including Richland County Sheriff's Department (SC), Berkeley County Sheriff's Office (SC), Nye County Sheriff's Office (NV), and Volusia County Sheriff's Office (FL), and *On Patrol: Live* even brings back some of the same individual officers (*e.g.,* Master Deputy Addy Perez and now-Captain Danny Brown of the Richland County Sheriff's Department).

---

[17] *See* Michael Starr, *'Live PD' is back as 'On Patrol: Live' two years after being canceled*, THE NEW YORK POST (July 19, 2022), https://nypost.com/2022/07/19/live-pd-is-back-as-on-patrol-live-two-years-after-being-canceled/.

- Both shows include "Crime of the Week" and "Missing" segments.  During the "Missing" segment, both shows cut to Angeline Hartmann of the National Center for Missing and Exploited Children for a description of the circumstances behind the missing person.

- Both shows include a segment featuring footage of a previously committed crime while one of the hosts explains the crime and describes the suspect whom police officers are looking for.  The segment is called "Wanted" on *Live PD* and "Wanted List" on *On Patrol: Live*.

- Both shows display the location of the law enforcement action in a rectangular box at the lower left-hand corner of the screen.  When officers speak to the camera, the shows both flash the officer's name and department in the lower left-hand corner.

- Both shows feature descriptions of the events in the lower left-hand corner (*e.g.*, "evading police") with the location of the event beneath the description.

- Both shows display the exact same "earlier in" tagline on the top corner of the screen when airing pre-recorded footage.

- Both shows at times utilize dual screens, particularly during car chases, with footage of the road displayed in a larger screen in the upper right-hand and middle of the TV screen and a smaller, overlapping screen in the lower left-hand corner displaying the officer in the car.

- When introducing footage for the first time from a specific location, both shows display a similar U.S. map on the screen that shows the viewer where the event is taking place.

- Both shows also use the same or nearly identical camera angles; motion theory (*i.e.*, how the graphics are zoomed in and out); process to settle on and highlight a location; and palette when featuring the U.S. map (including color choices, how the colors are used, and the relationship between the chosen colors).

- Both shows use strikingly similar logos that draw on the same marks, iconographies, and hierarchies.

- When transitioning from one location to another, both shows first flash a screen with the city or county and state of the second location before cutting to law enforcement footage.

- Both shows end virtually identically, with footage of law enforcement action playing in a rectangular box in the middle of the screen while the credits flash beneath the footage in white letters and police lights flash on dark pavement in the background.

20

- The time slots (and thus the time period covered by the live action) of both shows are the same—9:00 PM to 12:00 AM on Friday and Saturday nights.

58.     Just a few representative examples of the striking similarities between *Live PD* and *On Patrol: Live* are depicted below (and a more fulsome comparison can be undertaken by comparing representative episodes of *Live PD*, which will be lodged with the Court as Exhibit C hereto, with two representative episodes of *On Patrol: Live*, which will be lodged with the Court as Exhibit D hereto):

*Live PD* **Introduction**[18]                  ***On Patrol: Live* Introduction**

***Live PD* Hosts**
**Abrams, Larkin, and Morris**                  ***On Patrol: Live* Hosts**
**Abrams, Larkin, and Wilson**

---

[18] This message—accompanied by distinctive percussive music—is shown repeatedly throughout both shows, including when each show returns from commercial breaks.

***Live PD* Depicting a "Traffic Stop"**
**in Berkeley County, SC**

***On Patrol: Live* Depicting a "Traffic Stop"**
**in Berkeley County, SC**



***Live PD* Depicting "Shots Fired"**
**in Richland County, SC**

***On Patrol: Live* Depicting "Shots Fired"**
**in Richland County, SC**



59.    As detailed above, *On Patrol: Live* also features the same segments as *Live PD*—including "Crime of the Week," "Missing," and "Wanted" (which *On Patrol: Live* calls "Wanted List").  A few representative examples of these copied segments follows:

*Live PD*'s "Crime of the Week" Segment



*On Patrol: Live's* "Crime of the Week" Segment



*Live PD*'s "Missing" Segment



*On Patrol: Live's* "Missing" Segment



*Live PD*'s "Wanted" Segment



*On Patrol: Live*'s "Wanted List" Segment



60.     Also as detailed above, both shows utilize pre-packaged videos of prior law enforcement action, with both shows displaying the exact same "earlier in" tagline on the top corner of the screen.  A representative example from each show depicting earlier footage from "Earlier in Richland County" follows:

*Live PD* Depicting Footage
**"Earlier in Richland County, SC"**



***On Patrol: Live* Depicting Footage**
**"Earlier In Richland County, SC"**



61.     Media critics reviewing the first two episodes of *On Patrol: Live* immediately recognized Defendants' show for what it is: "**<u>a clone of A&E's *Live PD*</u>**."[19]  As one reviewer put it, "*On Patrol: Live* just ended television's worst-kept secret—**<u>*Live PD* is back on the air</u>**.  Sure, it's got a new name and a new network in Reelz, but the reality TV series is **<u>*almost exactly the same show*</u>**" as *Live PD*.[20]  The review continued: "*Live PD* Nation likely spotted a half-dozen similarities between the two series.  They have the same format of following police departments and sheriff's offices around the country with live cameras.  They followed two of the same departments in Richland County, South Carolina and Nye County, Nevada.  They had the same 'Crime of the Week' and 'Missing' segments.  The shows had the same host, Dan Abrams, using

---

[19] *See* Frederick, *On Patrol: Live Doesn't Quite Live Up to Live PD—Yet*, *supra* n. 2.

[20] *Id.*

27

some of the exact same phrases that he used to narrate *Live PD* with. Abrams was joined by the same commentator, Sean 'Sticks' Larkin (formerly of the Tulsa Police Department).  Even the theme music sounded very close to the *Live PD* theme.  Make no mistake: ***On Patrol: Live* is *Live PD*** . . . ."[21]

62.     Defendants successfully created widespread consumer confusion about whether AETN was the source of Defendants' unauthorized derivative works.  For example, consumers watching the first episodes of *On Patrol: Live* took to social media in droves to express confusion, and, in some instances, appreciation to REELZ for "bringing back *LIVE PD*":

- "Ok. I'm confused. Is *Live PD* back on the air? If so, how do I watch?"[22]

- "*Live PD* back!!!"[23]

- "*Live PD* returns tonight. Hell yeah."[24]

- "Dan Abrams really got *Live PD* back on the air disguised under a new name and on a new channel."[25]

- "Watching *Live PD*. Yeah, yeah ok. *On Patrol* whatever! @danabrams, this is the best Friday night in years! Glad to have you back!"[26]

- "So awesome to be spending Friday & Saturday nights watching *Live PD* again.  I missed it!"[27]

---

[21] *Id.*

[22] Carlon Gray, Facebook (July 30, 2022, 2:50 PM), https://www.facebook.com/groups/207593763141526/.

[23] @howdareyoublah, Twitter (July 30, 2022, 10:07 PM),
https://twitter.com/howdareyoublah/status/1553562958067863552.

[24] @GamingWithNuke, Twitter (July 22, 2022, 8:04 PM),
https://twitter.com/GamingWithNuke/status/1550632802022002688.

[25] @robynnisabyrd, Twitter (July 24, 2022, 1:34 AM),
https://twitter.com/robynnisabyrd/status/1551078435014864896.

[26] @JenSimmonsBooks, Twitter (July 23, 2022, 1:53 AM),
https://twitter.com/JenSimmonsBooks/status/1550720700276563968.

[27] @Heartie1990, Twitter (July 23, 2022, 9:44 PM), https://twitter.com/Heartie1990/status/1551020450636976128.

- "I'm glad you kept the integrity of the original show by not compromising. *Op live* has the exact same format as *Live PD* only they changed the name."[28]

- "@ReelzChannel Happy to have found your channel and enjoying *LIVE PD*."[29]

- "Once it actually began after the technical issues, I liked it, no noticeable changes from *Live PD* except for the one new host."[30]

63.     REELZ benefited greatly from its infringing conduct and from trading on AETN's reputation, goodwill, and investments in *Live PD*.  On July 27, 2022, REELZ announced that 3.5 million unique viewers watched the first telecasts of *On Patrol: Live*, despite a technical issue that delayed the debut broadcast by 70 minutes.  This was a massive audience for the network, which propelled REELZ into a top 25 cable network position for the first time ever.  *On Patrol: Live* was the most-watched show on cable in the key demographic of "Adults 25-54" on July 22 and 23, 2022.  And in its second week, the show made REELZ the second most watched network among all ad-supported broadcast and cable networks during its live showings.

## CLAIM I

### Direct Copyright Infringement in Violation of 17 U.S.C. §§ 101, *et seq.*

64.     AETN realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 63 above.

65.     AETN is the sole and exclusive owner of any and all copyright rights in the *Live PD* series, including copyrights in the Registered Episodes, and therefore is entitled to the

---

[28] @KaidaBarbknecht, Twitter (July 24, 2022, 12:52 PM),
https://twitter.com/KaidaBarbknecht/status/1551248863767437315.

[29] @LarryMeeker7, Twitter (July 24, 2022, 7:13 PM),
https://twitter.com/LarryMeeker7/status/1551344830202232834.

[30] @NancyNc10, Twitter (July 23, 2022, 5:47 PM), https://twitter.com/NancyNc10/status/1550960707587522562.

exclusive rights under copyright law associated therewith, including all rights set forth in 17 U.S.C. § 106.

66.     Defendants unquestionably had access to the *Live PD* series, including each of the Registered Episodes*,* through, *inter alia*: (i) Big Fish, which formerly produced the *Live PD* series for AETN as a work made-for-hire and currently produces *On Patrol: Live* for REELZ; (ii) John Zito, the former executive producer of *Live PD* and the current executive producer of *On Patrol: Live*; (iii) Mr. Abrams, the former host of *Live PD* and current host and an executive producer of *On Patrol: Live*; and (iv) Sgt. Larkin, the former host of *Live PD* and current host of *On Patrol: Live*.

67.     The Copyright Act vests AETN with the exclusive rights, *inter alia*, "(1) to reproduce the copyrighted work in copies…; (2) to prepare derivative works based upon the copyrighted work; (3) to distribute copies … of the copyrighted work to the public by sale…;" and "(4) … to perform the copyrighted work publicly."  17 U.S.C. § 106(1)-(4).

68.     Big Fish and Half Moon have intentionally and unlawfully infringed AETN's copyrights by, *inter alia*, copying and/or preparing derivative works based upon *Live PD*, including as embodied in the Registered Episodes, without authorization from AETN.

69.     REELZ has intentionally and unlawfully infringed AETN's copyrights by, *inter alia*, transmitting, distributing and/or publicly performing infringing episodes of *On Patrol: Live* without authorization from AETN.

70.     Defendants knowingly copied *Live PD* in preparing episodes of *On Patrol: Live*. As a result, *On Patrol: Live* is not just substantially similar to *Live PD* as embodied in the Registered Episodes, it is virtually identical.  As shown through all of the obvious similarities alleged and depicted above, among many other similarities, *On Patrol: Live* has the same look and

feel as the Registered Episodes and the rest of the *Live PD* series, as *On Patrol: Live* contains and features the same format, theme, music, settings, segments, and two of the same hosts. Moreover, *On Patrol: Live* copies the selection and arrangement of these elements as they appear in the Registered Episodes and other episodes of *Live PD*.

71. Defendants' infringement was willful. In June and July 2022—prior to the debut of *On Patrol: Live*—outside counsel for AETN sent Defendants multiple cease and desist letters warning them that their actions were violating AETN's copyrights and trademarks and demanding that they refrain from producing, airing, or distributing the new episodes or marketing their program as the return of *Live PD*.

72. Despite receiving AETN's cease and desist letters, Defendants ignored them and proceeded nonetheless. Big Fish reproduced and prepared, and REELZ distributed and performed, Episode 1 of *On Patrol: Live* on July 22, 2022, Episode 2 on July 23, 2022, Episode 3 on July 29, 2022, Episode 4 on July 30, 2022, Episode 5 on August 5, 2022, Episode 6 on August 6, 2022, Episode 7 on August 12, 2022, Episode 8 on August 13, 2022, Episode 9 on August 19, 2022, Episode 10 on August 20, 2022, Episode 11 on August 26, 2022, and Episode 12 on August 27, 2022. REELZ has also aired repeats of each of the above episodes and intends to continue airing additional episodes.

73. REELZ has also distributed *On Patrol: Live* on an "on-demand" basis through its REELZ NOW® app, which is an online video service offered through participating TV providers that makes full episodes of REELZ programming, including *On Patrol: Live*, available for streaming.

74. Defendants' conduct as alleged above constitutes copyright infringement pursuant to 17 U.S.C. § 501, *et seq.*

75.     Defendants' direct infringement of AETN's copyrights is knowing and willful.

76.     Defendants' actions in reproducing, preparing, distributing, performing, and airing programming to millions of individuals across the United States that infringes upon AETN's copyrights in the *Live PD* series, including the Registered Episodes, has already caused and will continue to cause substantial and irreparable harm to AETN.

77.     Unless permanently enjoined from reproducing, preparing, distributing, performing, and airing such infringing programming, Defendants will continue to infringe on AETN's copyrights in the *Live PD* series, including the Registered Episodes, and cause additional irreparable harm for which there is no adequate remedy at law.  AETN is entitled to permanent injunctive relief remedies pursuant to 17 U.S.C. § 502.

78.     As a direct and proximate result of Defendants' infringement of the *Live PD* series, including the Registered Episodes, AETN has been damaged by such infringement including, *inter alia*, through lost licensing revenue and other opportunities to exploit the *Live PD* series, and Defendants have profited and are continuing to profit from such infringement, all in an amount to be proven at trial.  Accordingly, AETN is entitled to actual damages and any additional profits of Defendants pursuant to 17 U.S.C. § 504.  Because Defendants are engaging in new acts of infringement on at least a weekly basis and such infringement is willful, AETN, at its election, as an alternative to an award of actual damages and Defendants' profits, is entitled to recover the maximum amount of statutory damages available under 17 U.S.C. § 504(c)(2) for each infringed work.

79.     Because Defendants are engaging in new acts of infringement on at least a weekly basis, AETN is entitled to recover its costs, including its attorneys' fees, in prosecuting this action, pursuant to 17 U.S.C. § 505.

<u>**CLAIM II**</u>

**Contributory Copyright Infringement in Violation of 17 U.S.C. §§ 101, et seq.**

80.     AETN realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 79 above.

81.     Third-party MVPDs that telecast or stream infringing episodes of *On Patrol: Live* to their subscribers are violating AETN's exclusive right of public performance.

82.     By unlawfully copying and/or preparing derivative works based upon *Live PD* to create infringing episodes of *On Patrol: Live*, and by transmitting infringing episodes to third-party MVPDs for those third-party MVPDs to telecast or stream to their subscribers, Defendants are knowingly and materially contributing to infringing public performances by numerous third-party MVPDs.

83.     Defendants know that third-party MVPDs have not been authorized by AETN to publicly perform episodes of *On Patrol: Live* that infringe AETN's copyrights in the *Live PD* series, including the Registered Episodes.

84.     Defendants' knowing and material contribution to infringement of AETN's copyrights by third-party MVPDs constitutes separate and distinct acts of copyright infringement for which Defendants are liable to AETN.

85.     Defendants' actions in facilitating and materially contributing to public performances by third-party MVPDs that infringe upon AETN's copyrights in the *Live PD* series, including the Registered Episodes, has already caused and will continue to cause substantial and irreparable harm to AETN.

86.     Unless permanently enjoined from supplying such infringing programming to third-party MVPDs, Defendants will continue to contribute to infringement of AETN's copyrights

in the *Live PD* series, including the Registered Episodes, and cause additional irreparable harm for which there is no adequate remedy at law.   AETN is entitled to permanent injunctive relief remedies pursuant to 17 U.S.C. § 502.

87.     As a direct and proximate result of Defendants' knowing and material contribution to infringement of the *Live PD* series, including the Registered Episodes, by third-party MVPDs, AETN has been damaged by such infringement including, *inter alia*, through lost licensing revenue and other opportunities to exploit the *Live PD* series, and Defendants have profited and are continuing to profit from such infringement, all in an amount to be proven at trial.   Accordingly, AETN is entitled to actual damages and any additional profits of Defendants pursuant to 17 U.S.C. § 504.   Because Defendants are contributing to new acts of infringement on at least a weekly basis and such infringement is willful, AETN, at its election, as an alternative to an award of actual damages and Defendants' profits, is entitled to recover the maximum amount of statutory damages available under 17 U.S.C. § 504(c)(2) for each infringed work.

88.     Because Defendants are contributing to new acts of infringement on at least a weekly basis, AETN is entitled to recover its costs, including its attorneys' fees, in prosecuting this action, pursuant to 17 U.S.C. § 505.

## CLAIM III

**Intentionally Inducing Copyright Infringement in Violation of 17 U.S.C. §§ 101, et seq.**

89.     AETN realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 88 above.

90.     By creating infringing episodes of *On Patrol: Live*, and by transmitting infringing episodes to third-party MVPDs for those third-party MVPDs to telecast or stream to their subscribers, Defendants are intentionally inducing infringing public performances by numerous

third-party MVPDs.

91.     Defendants know that third-party MVPDs have not been authorized by AETN to publicly perform episodes of *On Patrol: Live* that infringe AETN's copyrights in the *Live PD* series, including the Registered Episodes.   On information and belief, REELZ has falsely represented to third-party MVPDs that their transmissions of *On Patrol: Live* will not infringe AETN's rights as part of Defendants' efforts to induce public performances of *On Patrol: Live* by third-party MVPDs that infringe AETN's copyrights in the *Live PD* series, including the Registered Episodes.

92.     Defendants' intentional inducement of infringement of AETN's copyrights by third-party MVPDs constitutes separate and distinct acts of copyright infringement for which Defendants are liable to AETN.

93.     Defendants' actions in intentionally inducing public performances by third-party MVPDs that infringe upon AETN's copyrights in the *Live PD* series, including the Registered Episodes, has already caused and will continue to cause substantial and irreparable harm to AETN.

94.     Unless permanently enjoined from supplying such infringing programming to third-party MVPDs, Defendants will continue to induce infringement of AETN's copyrights in the *Live PD* series, including the Registered Episodes, and cause additional irreparable harm for which there is no adequate remedy at law.   AETN is entitled to injunctive relief pursuant to 17 U.S.C. § 502.

95.     As a direct and proximate result of Defendants' intentional inducement of infringement of the *Live PD* series, including the Registered Episodes, by third-party MVPDs, AETN has been damaged by such infringement including, *inter alia*, through lost licensing revenue and other opportunities to exploit the *Live PD* series, and Defendants have profited and are

continuing to profit from such infringement, all in an amount to be proven at trial. Accordingly, AETN is entitled to actual damages and any additional profits of Defendants pursuant to 17 U.S.C. § 504. Because Defendants are inducing new acts of infringement on at least a weekly basis and such infringement is willful, AETN, at its election, as an alternative to an award of actual damages and Defendants' profits, is entitled to recover the maximum amount of statutory damages available under 17 U.S.C. § 504(c)(2) for each infringed work.

96.    Because Defendants are inducing new acts of infringement on at least a weekly basis, AETN is entitled to recover its costs, including its attorneys' fees, in prosecuting this action, pursuant to 17 U.S.C. § 505.

## <u>CLAIM IV</u>

**Trademark Infringement in Violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114(1)**

97.    AETN realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 96 above.

98.    AETN owns a valid federal registration for LIVE PD, Reg. No. 5,478,306, which is entitled to protection under the Lanham Act in connection with entertainment services and related services. As alleged above, evidence of AETN's ownership of the LIVE PD mark is attached hereto as Exhibit E in the form of a true and correct copy of the PTO registration certificate for AETN's LIVE PD mark and a printout from the PTO's website showing that the registration is valid, subsisting, and unrevoked.

99.    AETN also owns common law rights in the mark LIVE PD, including as set forth in paragraph 31 above, which are referred to collectively with AETN's federally registered trademark as "AETN's Marks."

100.   AETN has expended substantial time, money, and resources distributing, promoting, marketing, and advertising the *Live PD* series and AETN's Marks associated therewith.

101.   AETN's Marks are in full force and effect.  AETN has never abandoned them, nor has AETN ever abandoned the goodwill of its businesses in connection thereto.  For example, AETN continues to use and prominently display AETN's Marks on A&E®'s official "playlist" channel on YouTube, which has 8.66 million subscribers and is also available to the public generally.  Collectively, these clips have been viewed hundreds of millions of times.  AETN intends to continue to preserve and maintain its rights with respect to AETN's rights.

102.   Defendants' unauthorized use of AETN's Marks in connection with the promotion, advertising, and transmission of *On Patrol: Live*—a virtually identical series to *Live PD*—constitutes trademark infringement in violation of 15 U.S.C § 1114(1), as such use has caused and will continue to cause the consuming public to be confused, mistaken or deceived into believing that AETN has granted Defendants the right to use AETN's Marks and/or that AETN is otherwise associated, affiliated, or connected with Defendants' infringing series, all to the damage and detriment of AETN's reputation and good will.

103.   LIVE PD is distinctive and has become associated in the minds of the public with AETN's Marks, the AETN brand, and high-quality AETN programming.

104.   LIVE PD and the goodwill of the business associated with it in the United States are of great and significant value to AETN.

105.   AETN's Marks and Defendants' infringing marks are in competitive proximity to one another, as they are both used in connection with, *inter alia*, a multimedia television series depicting the field of law enforcement, policing, police patrols and public encounters with law enforcement.

106.    Defendants acted willfully and intentionally to confuse the public, including by using AETN's Marks in publicly promoting the infringing series.  For example, and as detailed above, REELZ's official Twitter account "re-tweeted" the various articles and headlines informing the public that *Live PD* would be "returning" on REELZ, and REELZ's press release announcing the infringing series emphasized that it was "from the producers of *Live PD*."  Moreover, REELZ was telling advertisers and media industry personnel, including one of the nation's largest media marketing and advertising agencies, that it was adding the "#1 TV show to our program lineup," that "all new live episodes" of that "#1 TV show" would be airing on REELZ, and that the "working title" of the program was "*PD Live*," which is simply an inverted form of AETN's LIVE PD mark.

107.    Defendants' subsequent attempt, following a cease-and-desist letter from AETN's outside counsel, at a cosmetic "fix" by changing the name of the infringing series to *On Patrol: Live* from its "working title" of "*PD Live*" merely betrays their bad faith.  Indeed, Defendants tellingly left in the word "Live," which is the predominant part of both titles and which is not merely descriptive, but is rather a unique component of the *Live PD* series—the first show in television history to feature law enforcement activity ***in real time*** in such a sustained fashion.  And, by adding the word "Patrol" to the title, Defendants were attempting to trade on the popularity of the *Live PD* franchise, given that the spin-off "*Live PD: Police Patrol*" likewise utilized the word "Patrol" in its title, and that the LIVE PD mark pertains to an "ongoing television program content in the field of … police patrols."  None of Defendants' feeble attempts to tinker with the title negates the documented actual confusion in the market that has resulted from their use of a confusingly similar mark in connection with their sale of goods and services.  For example, scores of consumers who have watched the infringing series have taken to social media to express their

confusion about the source of programming, and, in some instances, appreciation to REELZ for "bringing back *LIVE PD*."

108.    REELZ has also diminished AETN's Marks and its brand by using them in connection with inferior television programming (as exemplified by the technical issues that delayed REELZ from airing the premiere episode of the infringing series for 70 minutes).

109.    Defendants are and have been at all relevant times aware of AETN's prior use, and/or ownership of AETN's Marks.  Thus, Defendants' conduct, as described above, is willful, intentional, and designed specifically to permit Defendants to profit from such misuse in violation of AETN's rights in AETN's Marks.

110.    As a result of this trademark infringement and Defendants' unlawful acts, AETN has sustained and continues to sustain damages in an amount to be determined at trial, plus interest, costs and attorneys' fees.

111.    Defendants' conduct has caused and will continue to cause irreparable injury to AETN.  Unless Defendants are enjoined from infringing AETN's Marks, AETN will incur continuing damages in an amount to be proven at trial.

112.    AETN's remedy at law for such infringement is not adequate, and AETN is entitled to injunctive relief as well as damages and other remedies available under federal trademark law.

## CLAIM V

**Violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a): Unfair Competition**

113.    AETN realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 112 above.

114.    Since at least 2016, AETN has consistently used AETN's Marks to promote its high-quality programming.  AETN has invested considerable time, effort, and expense in the

creation, advertising, and promotion of the multimedia television series *Live PD* and AETN's Marks.

115.   By virtue of its longstanding use of AETN's Marks, AETN developed a valuable reputation for quality and goodwill associated with their multimedia television series *Live PD*, which showcased the policing of America, following police departments from across the country in real time as they patrol their communities with studio hosts guiding the action.  Consumers recognize and associate this particular form of televised live police patrol action as originating from AETN.

116.   Defendants have at all relevant times had knowledge of AETN's Marks and the goodwill and business reputation associated with AETN's Marks.  Accordingly, Defendants have engaged in bad faith by electing to use AETN's Marks despite this knowledge.

117.   Defendants' use of and attempts to trade on AETN's Marks, either exactly or in the form of colorable imitations, has caused substantial and documented actual confusion, mistake, and deception and will continue to cause a likelihood of confusion, mistake, and deception by creating the false and misleading impression that *On Patrol: Live* is connected or affiliated with, or sponsored, approved, or authorized by AETN.

118.   REELZ's technical issues in airing the premiere of *On Patrol: Live* on July 22, 2022 have further devalued AETN's Marks.  Viewers, expecting to see a well-run "reboot" of *Live PD,* were instead left to endure a 70-minute minute delay, consisting of several minutes of a black screen, followed by commercial loops, and the reruns of a different REELZ show.  These technical problems understandably caused "confusion and frustration" among viewers.[31]

---

[31] *See* William Earl, *'Live PD' Reboot 'On Patrol: Live': Series Premiere Delayed 70 Minutes Due to Technical Difficulties*, VARIETY, July 23, 2022, https://variety.com/2022/tv/news/on-patrol-live-delay-technical-difficulties-1235323701/; Kristen Baldwin, *On Patrol: Live Series Premiere On Reelz Delayed After Technical Disaster*,

119.    Defendants have further diminished AETN's Marks and its brand by using them in connection with inferior television programming.  For decades, AETN has built its reputation and goodwill by creating only the highest quality of programming for consumers.  While critics were struck by the obvious and unmistakable similarities between the shows, they also found it "doesn't quite live up to *Live PD*," given that, among other things, REELZ "doesn't have the reality TV experience or resources like A&E."[32]  When viewing an inferior product bearing AETN's Marks, such as *On Patrol: Live*, and believing it to be authorized by AETN, consumers' opinion of the quality of the services offered in connection with AETN's Marks has been and will be diminished.

120.    Defendants' intentional and willful use of AETN's Marks constitutes unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and their conduct has caused irreparable harm to AETN and an incalculable loss of goodwill and damages, and will continue to do so unless permanently enjoined.

121.    As a direct result of Defendants' false designation of origin and unfair competition—including without limitation their representations to the public that they were "bringing back" *Live PD* on REELZ—AETN has sustained and continues to sustain damages in an amount to be determined at trial, and Defendants have obtained profits and have been unjustly enriched.

122.    As Defendants have acted and continue to act with knowledge of AETN's rights, Defendants are intentionally and willfully engaging in unfair competition and AETN is entitled to recover the profits Defendants have enjoyed through their conduct, actual damages, enhanced

---

ENTERTAINMENT WEEKLY, July 22, 2022, https://ew.com/tv/on-patrol-live-reelz-technical-difficulties/.

[32] *See* Frederick, *On Patrol: Live Doesn't Quite Live Up to Live PD—Yet*, *supra* n. 2.

profits and damages, costs, and reasonable attorneys' fees.

## CLAIM VI

**Trademark Infringement in Violation of New York Common Law**

123.    AETN realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 122 above.

124.    As alleged above, AETN has obtained common law trademark rights for AETN's Marks by the good faith use in New York State and elsewhere in the United States of AETN's Marks in connection with, *inter alia*, entertainment services, including a multimedia television series, since at least 2016.

125.    AETN's Marks are in full force and effect.  AETN has never abandoned them, nor has AETN ever abandoned the goodwill of its businesses in connection thereto.  On the contrary, AETN continues to use and prominently display AETN's Marks on A&E®'s official "playlist" channel on YouTube, where AETN has amassed hundreds of millions of views of video clips from the *Live PD* series.  AETN intends to continue to preserve and maintain its rights with respect to AETN's trademark rights.

126.    LIVE PD is distinctive and has become associated in the minds of the public with AETN's Marks, the AETN brand, and high-quality AETN programming.

127.    LIVE PD and the goodwill of the business associated with it in the United States are of great and significant value to AETN.

128.    Defendants' unauthorized use of AETN's Marks in connection with the promotion, advertising, and transmission of *On Patrol: Live*—a virtually identical series to *Live PD*—constitutes trademark infringement in violation of New York law.

129.     AETN's Marks and Defendants' infringing marks are in competitive proximity to one another, as they are both used in connection with, *inter alia*, a multimedia television series depicting the field of law enforcement, policing, police patrols and public encounters with law enforcement.

130.     Defendants are and have been at all relevant times aware of AETN's prior use, and/or ownership of AETN's Marks.  Thus, Defendants' conduct, as described above, is willful, intentional, and designed specifically to permit Defendants to profit from such misuse in violation of AETN's rights in AETN's Marks.

131.     Defendants acted willfully and intentionally to confuse the public, including by using AETN's Marks in publicly promoting the infringing series.  For example, and as detailed above, REELZ's official Twitter account "re-tweeted" the various articles and headlines informing the public that *Live PD* would be "returning" on REELZ, and REELZ's press release announcing the infringing series emphasized that it was "from the producers of *Live PD*."  Moreover, REELZ was telling advertisers and media industry personnel that it was adding the "#1 TV show to our program lineup," and referenced the then-"working title" of the program as *"PD Live,"* which is simply an inverted form of AETN's LIVE PD mark.

132.     Defendants' subsequent attempt, following a cease-and-desist letter from AETN's outside counsel, at a cosmetic "fix" by changing the name of the infringing series to *On Patrol: Live* from its "working title" of "*PD Live*" merely betrays their bad faith and does not negate the documented actual confusion in the market that has resulted from Defendants' use of a confusingly similar mark in connection with their sale of goods and services.  For example, scores of consumers who have watched the infringing series have taken to social media to express their confusion about

the source of programming, and, in some instances, appreciation to REELZ for "bringing back *LIVE PD*."

133.    REELZ's technical issues in airing the premiere episode of *On Patrol: Live* on July 22, 2022, resulting in a 70-minute delay, have further devalued AETN's Marks.

134.    Defendants' unauthorized acts constitute common-law trademark infringement of AETN's proprietary rights in AETN's Marks.

135.    As a result of this trademark infringement and Defendants' unlawful acts, AETN has sustained and continues to sustain damages in an amount to be determined at trial, plus interest, costs and attorneys' fees.

136.    Defendants' conduct has caused and will continue to cause irreparable injury to AETN. Unless Defendants are enjoined from infringing AETN's Marks, AETN will incur continuing damages in an amount to be proven at trial.

137.    AETN's remedy at law for such infringement is not adequate, and AETN is entitled to injunctive relief as well as damages.

138.    Accordingly, AETN is entitled to, among other relief, an award of actual damages, Defendants' profits, punitive damages in an amount to be determined at trial, as well as injunctive relief permanently barring Defendants from any further use of AETN's Marks.

<u>**CLAIM VII**</u>

**Unfair Competition in Violation of New York Common Law**

139.    AETN realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 138 above.

140.    Since at least 2016, AETN has consistently used AETN's Marks to promote its high-quality programming.  AETN has invested considerable time, effort, and expense in the

creation, advertising, and promotion of the multimedia television series *Live PD* and AETN's Marks.

141.    Through their misuse of AETN's Marks, which has been deliberate and in bad faith, Defendants have maliciously appropriated the goodwill that AETN has built in its brand.

142.    Defendants' use of AETN's Marks, either exactly or in the form of colorable imitations, and their representations to the public that they were "bringing back" *Live PD* on REELZ, has caused substantial actual confusion, mistake, and deception and will continue to cause a likelihood of confusion, mistake, and deception by creating the false and misleading impression that *On Patrol: Live* is connected or affiliated with, or sponsored, approved, or authorized by AETN.

143.    Defendants' acts have been—and continue to be—performed intentionally, maliciously, fraudulently and willfully for the purpose of deceiving the public, including AETN's viewers, into using, purchasing, and/or viewing Defendants' goods and services, particularly the multimedia television program *On Patrol: Live*, based on the false belief that those goods and services are associated with AETN.

144.    REELZ's technical issues in airing the premiere of *On Patrol: Live* on July 22, 2022 have further devalued AETN's Marks.  Viewers, expecting to see a well-run "reboot" of *Live PD,* were instead left to endure a 70-minute delay, consisting of several minutes of a black screen, followed by commercial loops, and the reruns of a different REELZ show.  These technical problems understandably caused "confusion and frustration" among viewers.

145.    As alleged above, Defendants have further diminished AETN's Marks and its brand by using them in connection with inferior television programming.  When viewing an inferior product bearing AETN's Marks, such as *On Patrol: Live*, and believing it to be authorized by

AETN, consumers' opinion of the quality of the services offered in connection with AETN's Marks has been and will be diminished.

146. With knowledge of AETN's renown and distinction, Defendants intended to trade, have traded, and upon information and belief, will continue to trade on the goodwill and brand recognition of AETN's Marks.

147. Defendants' acts are performed to the detriment and damage of AETN and to the unjust enrichment of Defendants.

148. Defendants' bad faith and malicious misappropriation of AETN's Marks constitutes common law unfair competition under New York law and has caused and will continue to cause impairment of the recognition of AETN's Marks, and diminution of the value thereof.

149. As a direct and proximate result of Defendants' misleading and deceptive conduct, AETN has been harmed and will continue to suffer both irreparable harm as well as monetary damages. AETN will continue to suffer harm unless the Court enjoins Defendants from continuing to use AETN's Marks.

150. Accordingly, AETN is entitled to, among other relief, an award of actual damages, Defendants' profits, punitive damages in an amount to be determined at trial, as well as injunctive relief permanently barring Defendants from any further use of AETN's Marks.

## PRAYER FOR RELIEF

WHEREFORE, AETN respectfully requests judgment against Defendants as follows:

A. That AETN be awarded compensatory and consequential damages according to proof on each of its Claims for Relief in an amount to be proven at trial;

B. That AETN be awarded, at its election, statutory damages (enhanced for willful infringement) or actual damages as a result of Defendants' violations under Claims I, II, and III;

C.      That Defendants account for, disgorge, and pay over to AETN all profits Defendants realized as a result of Defendants' unlawful acts complained of herein.

D.      For a permanent injunction against Defendants and any and all others acting in concert or participation with Defendants from further unauthorized reproduction, preparation of derivative works, distribution, and public performance of the *Live PD* series, including the Registered Episodes, and from otherwise infringing on AETN's copyrights in the *Live PD* series, including the Registered Episodes.

E.      For a permanent injunction against Defendants and any and all others acting in concert or participation with Defendants from further unauthorized use of AETN's Marks, or any reproductions, counterfeits, copies, and/or colorable imitations of them, and from otherwise infringing on AETN's marks.

F.      For punitive and/or exemplary damages.

G.      For costs, attorneys' fees, and pre-judgment interest as permitted by law.

H.      For such additional and further relief as the Court may deem proper, just, and equitable.

## DEMAND FOR JURY TRIAL

AETN hereby demands a trial by jury to decide all issues triable in this case.

Dated: New York, New York
   August 30, 2022     Respectfully submitted,

           */s/ David L. Yohai*
           David L. Yohai
           Benjamin E. Marks
           Randi W. Singer
           David E. Yolkut
           Fredrick T. Rhine

           WEIL, GOTSHAL & MANGES LLP
           767 Fifth Avenue
           New York, NY 10153
           Phone:  (212) 310-8000
           Fax:  (212) 310-8007
           david.yohai@weil.com

           *Attorneys for Plaintiff AETN*