UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x
                                 :

A&E TELEVISION NETWORKS, LLC,       :
                                 :

          Plaintiff,            :
                                 :

          v.                   :    Civil Action No. 1:22-cv-07411
                                 :

BIG FISH ENTERTAINMENT, LLC,      :    **ORAL ARGUMENT REQUESTED**
HALF MOON PICTURES, LLC, and      :
REELZCHANNEL, LLC,               :
                                 :

          Defendants.        :
———————————————————————— x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

Orin Snyder
Alexandra Perloff-Giles
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Tel: (212) 351-4000
OSnyder@gibsondunn.com
APerloff-Giles@gibsondunn.com

Jay P. Srinivasan
Ilissa Samplin
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel: (213) 229-7354
JSrinivasan@gibsondunn.com
ISamplin@gibsondunn.com

*Counsel for Defendants*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................... 3

ARGUMENT ............................................................................................................................ 5

    I.       A&E's Copyright Claims Should Be Dismissed. ........................................................ 5

          A.    Failure To Allege Copying of *Protectable* Expression Compels Dismissal. ............ 5

          B.    A&E Fails To Allege Any Protectable Elements Were Copied. ............................. 6

          C.    A&E Fails to Allege Any Creative Compilation or Arrangement Was Copied. ...... 12

          D.    The Series Agreement Confirms A&E Understood the Format of *Live PD* Was Not Copyrightable. ........................................................................................................... 15

    II.      A&E's Trademark Claims Should Be Dismissed. .................................................... 17

          A.    A&E Has Not Alleged Infringement Of A Protectable Mark. ................................ 17

          B.    A&E Has Failed To Plausibly Allege Likelihood Of Consumer Confusion. .......... 18

    III.    The Court Should Dismiss A&E's Unfair Competition Claims. ............................... 23

CONCLUSION ...................................................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**

*1-800 Contacts, Inc. v. WhenU.Com, Inc.*,
  414 F.3d 400 (2d Cir. 2005)......................................................................................18

*Abdin v. CBS Broad. Inc.*,
  971 F.3d 57 (2d Cir. 2020)......................................................................................5, 6

*Allen v. Scholastic Inc.*,
  739 F. Supp. 2d 642 (S.D.N.Y. 2011).......................................................................16

*Arista Records LLC v. Lime Grp. LLC*,
  784 F. Supp. 2d 398 (S.D.N.Y. 2011).......................................................................16

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...................................................................................................25

*Bethea v. Burnett*,
  2005 WL 1720631 (C.D. Cal. June 28, 2005) ...........................................................8

*Blakeman v. Walt Disney Co.*,
  613 F. Supp. 2d 288 (E.D.N.Y. 2009) ........................................................................6

*Brennan's, Inc. v. Brennan's Rest., LLC*,
  360 F.3d 125 (2d Cir. 2004).....................................................................................17

*CBS Inc. v. Liederman*,
  866 F. Supp. 763 (S.D.N.Y. 1994), *aff'd*, 44 F.3d 174 (2d Cir. 1995)....................20

*CES Publ'g Corp. v. St. Regis Publ'ns, Inc.*,
  531 F.2d 11 (2d Cir. 1975).......................................................................................17

*Closed Loop Marketing, Inc. v. Closed Loop Marketing, LLC*,
  589 F. Supp. 2d 1211 (E.D. Cal. 2008)....................................................................17

*Comput. Access Tech. Corp. v. Catalyst Enters., Inc.*,
  2001 WL 34118030 (N.D. Cal. June 13, 2001) ..........................................................7

*Croak v. Saatchi & Saatchi, N. Am., Inc.*,
  174 F. Supp. 3d 829 (S.D.N.Y. 2016).......................................................................16

*Dick Clark Co., Inc. v. Alan Landsburg Prods., Inc.*,
  1985 WL 1077775 (C.D. Cal. June 13, 1985), *aff'd*, 800 F.2d 1145 (9th Cir. 1986)...............8

*Esquire, Inc. v. Ringer*,
  591 F.2d 796 (D.C. Cir. 1978) ....................................................................................9

*Faulkner v. Nat'l Geo. Enters. Inc.*,
   409 F.3d 26 (2d Cir. 2005)...................................................................................16

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
   499 U.S. 340 (1991)........................................................................................5, 12

*Genesee Brewing Co. v. Stroh Brewing Co.*,
   124 F.3d 137 (2d Cir. 1997).................................................................................25

*Gottlieb Dev. LLC v. Paramount Pictures Corp.*,
   590 F. Supp. 2d 625 (S.D.N.Y. 2008)...................................................................24

*Hayuk v. Starbucks Corp.*,
   157 F. Supp. 3d 285 (S.D.N.Y. 2016)...................................................................16

*Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*,
   823 F.3d 153 (2d Cir. 2016)...........................................................................22, 23

*Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*,
   456 U.S. 844 (1982)......................................................................................17, 18

*Kaye v. Cartoon Network Inc.*,
   297 F. Supp. 3d 362 (S.D.N.Y. 2017)...................................................................16

*Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*,
   150 F.3d 1042 (9th Cir. 1998) .............................................................................17

*Lapine v. Seinfeld*,
   31 Misc. 3d 736 (Sup. Ct. N.Y. Cnty. 2011) .......................................................24

*Lopez v. Adidas Am., Inc.*,
   2020 WL 2539116 (S.D.N.Y. May 19, 2020) ......................................................20

*Lopez v. Gap, Inc.*,
   883 F. Supp. 2d 400 (S.D.N.Y. 2012)...................................................................23

*Lopez v. Nike, Inc.*,
   2021 WL 128574 (S.D.N.Y. Jan. 14, 2021) .........................................................18

*Luftu Murat Uckardesler v. Azteca Int'l Corp.*,
   2010 WL 11515298 (C.D. Cal. May 14, 2010) ......................................................8

*Matthew Bender & Co. v. West Publ'g Co.*,
   158 F.3d 693 (2d Cir. 1998).................................................................................16

*McDonald v. West*,
   138 F. Supp. 3d 448 (S.D.N.Y. 2015)...............................................................7, 10

*Mena v. Fox Ent. Grp.*,
  2012 WL 4741389 (S.D.N.Y. Sept. 29, 2012)................................................12, 16

*New York Univ. v. Galderma Lab'ys, Inc.*,
  689 F. App'x 15 (2d Cir. 2017) .........................................................................16

*Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*,
  269 F.3d 114 (2d Cir. 2001)........................................................................19, 25

*OffWhite Prods., LLC v. Off-White LLC*,
  480 F. Supp. 3d 558 (S.D.N.Y. 2020)..........................................................18, 23

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
  602 F.3d 57 (2d Cir. 2010)...............................................................................5, 6

*Pino v. Viacom, Inc.*,
  2008 WL 704386 (D.N.J. Mar. 4, 2008).............................................................11

*Polaroid Corp. v. Polarad Electronics Corp.*,
  287 F.2d 492 (2d Cir. 1961)..............................................................................18

*Purohit v. Legend Pictures, LLC*,
  448 F. Supp. 3d 382 (D. Del. 2020)....................................................................7

*Satava v. Lowry*,
  323 F.3d 805 (9th Cir. 2003) ............................................................................15

*Sira v. Morton*,
  380 F.3d 57 (2d Cir. 2004).............................................................................3, 4

*Star Indus., Inc., v. Bacardi & Co.*,
  412 F.3d 373 (2d Cir. 2005).........................................................................19, 21

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
  588 F.3d 97 (2d Cir. 2009)................................................................................18

*Tiffany (NJ) Inc. v. eBay Inc.*,
  600 F.3d 93 (2d Cir. 2010)................................................................................21

*Turner v. Temptu Inc.*,
  586 F. App'x 718 (2d Cir. 2014) .......................................................................24

*Walker v. Time Life Films, Inc.*,
  784 F.2d 44 (2d Cir. 1986)........................................................................6, 7, 10

*Walkie Check Productions, LLC v. ViacomCBS Inc.*,
  2022 WL 2306943 (S.D.N.Y. June 27, 2022) ..........................................13, 14, 15

*Weight Watchers Int'l, Inc. v. Noom, Inc.*,
    403 F. Supp. 3d 361 (S.D.N.Y. 2019)...........................................................................22, 23

*Whimsicality, Inc. v. Rubie's Costume Co.*,
    891 F.2d 452 (2d Cir. 1989)....................................................................................................9

*Williams v. A&E Television Networks*,
    122 F. Supp. 3d 157 (S.D.N.Y. 2015)....................................................................................2, 10

*Williams v. Crichton*,
    84 F.3d 581 (2d Cir. 1996)......................................................................................................5

*Wolstenholme v. Hirst*,
    271 F. Supp. 3d 625 (S.D.N.Y. 2017).....................................................................................25

*Zalewski v. Cicero Builder Dev., Inc.*,
    754 F.3d 95 (2d Cir. 2014)......................................................................................................7

*Zella v. E.W. Scripps Co.*,
    529 F. Supp. 2d 1124 (C.D. Cal. 2007) ...................................................................................8

*Zikakis v. Staubach Retail Servs., Inc.*,
    2005 WL 2347852 (S.D.N.Y. Sept. 26, 2005)........................................................................24

## STATUTES

15 U.S.C. § 1114...........................................................................................................................23

15 U.S.C. § 1125...............................................................................................................18, 23, 24

## REGULATIONS

37 C.F.R. § 202.1(a).....................................................................................................................10

Defendants Big Fish Entertainment LLC ("Big Fish"), Half Moon Pictures LLC ("Half Moon"), and REELZChannel, LLC ("REELZ") respectfully submit this memorandum in support of their motion to dismiss Plaintiff A&E Television Networks, LLC's ("A&E") complaint.

## PRELIMINARY STATEMENT

A&E filed this meritless lawsuit to profit off a hit television show it does not own. For years, A&E reaped substantial profits from *Live PD*—an unscripted television show that followed police on patrol, which was developed and produced by Big Fish. In 2020, A&E decided to cancel the show, wrongly believing that the public's interest in live police programs had waned. After A&E rebuffed Big Fish's efforts to reboot *Live PD* at A&E, Big Fish moved on and developed *On Patrol: Live*, eventually striking a deal with REELZ to air the program on its network. After *On Patrol: Live* became an instant success on REELZ, debuting as the #1 cable show in the coveted 25-54 demographic, A&E's decision appears short-sighted and foolish. To save face, A&E now tries to enlist the Court to award profits from a show it did not want, but there is no viable claim here, let alone under the copyright, trademark, or unfair competition laws.

A&E has not alleged that Defendants' new show copies a *single* original element from *Live PD*. To the contrary, all of the elements A&E identifies—taken individually or together—are nothing more than unprotectible stock features of police ride-along shows, and often of news programming more generally. For example, A&E alleges that both shows "toggle" between live or pre-packaged footage and studio commentary, Compl. ¶ 57, describing the standard format for news broadcasts. A&E also alleges both shows open with "percussive, fast-paced music" and include "Wanted" and "Missing" segments. Such music is a standard, unoriginal method of conveying suspense, and every police department across the country deals with "Wanted" and "Missing" persons. A&E knows as well as any litigant that "collection[s] of stock ideas and *scènes*

1

*à faire* commonly found in reality television shows" are not protectable.  A&E's Reply in Supp. of Mot. to Dismiss, *Williams v. A&E Television Networks*, No. 14-cv-9894, ECF No. 41 at 9 (S.D.N.Y. July 1, 2015).  A&E itself advanced this argument when it sought dismissal in this Court of similarly baseless copyright claims brought over its reality television show, *Married at First Sight*.  *See Williams v. A&E Television Networks*, 122 F. Supp. 3d 157, 162-63 (S.D.N.Y. 2015).  A&E also knew when it began working with Big Fish that the format of an unscripted television show following police on patrol was far from original; since *Cops* first aired in 1989, there have been dozens of unscripted shows following police and other first responders on the job.  That is why A&E bargained for a contractual right to prevent Big Fish from developing and producing a show "substantially similar in content and format" to Live PD for a different network for one year after Live PD's cancellation.  A&E understood that after that one-year embargo period ended, Big Fish was free to produce a "'live' television series following police units around the country" for REELZ or any other network.

A&E's trademark claims are likewise meritless.  These claims are predicated on the public domain word "live," the only common element of the two show titles.  A&E, of course, does not hold a monopoly on the word "live" used in connection with live television programming.  Far from being an indicator of source, the word "live" is routinely used in show titles to convey a live format (e.g., *Saturday Night Live*, *Live With Regis and Kathie Lee*, etc.).  In any event, there is no plausible allegation of likelihood of confusion.  The complaint recognizes Defendants are conveying to the public that *On Patrol: Live* is aired on a *different* channel than *Live PD* so that viewers will tune into the correct channel.

Finally, A&E's unfair competition claims fail because A&E has not alleged any aspect of Defendants' advertising or promotion was false or misleading.  A&E also has not alleged bad faith,

a mandatory element of an unfair competition claim under New York law.  And to the extent the unfair competition claim is based on allegations Defendants "imitat[ed]" and "misappropriat[ed]" A&E's intellectual property, such claims are preempted by copyright law.

A&E is free to air another live police show.  A&E also is free to air reruns of old *Live PD* episodes.  A&E is not free, however, to use the copyright and trademark laws to stop *Live PD*'s creators from taking their talents elsewhere, after A&E turned its back on them, merely because it came to regret that choice.  A&E's lawsuit should be dismissed in full, with prejudice.

## FACTUAL BACKGROUND

Defendant Big Fish is a content production company that, along with its production arm, Defendant Half Moon, produces unscripted and documentary television programming.  Compl. ¶¶ 11, 39.  Plaintiff A&E is a media and entertainment brand, with the A&E network as its flagship channel.  *Id.* ¶ 10.  In 2016, Big Fish developed a live, unscripted television show titled *Live PD* that "follow[ed] police departments and sheriff's offices from across the country in real time as they patrolled their communities."  *Id.* ¶¶ 20, 32.  A&E wanted to air *Live PD* on its network, and the parties entered into a Series Agreement to memorialize their relationship.  *Id.* ¶¶ 18, 20-23.

The Series Agreement, dated July 29, 2016, assigned to A&E the copyrightable and trademarkable rights in the program—"e.g., all originally shot footage, interviews, and commissioned music," "the title," "any associated Internet domain names," "the shooting script," "publicity materials," and "outtakes."  Ex. 1 (Series Agreement) ¶ 2(a);[1] *see* Compl. ¶¶ 19, 26. Because the parties recognized that the concept of the show was *not* protectable, A&E negotiated

---

[1]  The Court may consider the Series Agreement on this Motion because A&E's "complaint explicitly refers to and relies upon" it, and therefore the Series Agreement is "incorporated by reference" into the Complaint. *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004); *see* Compl. ¶¶ 18-23.  The Series Agreement is governed by New York law. Ex. 1 at ¶ 25(a).  Citations to Ex. __ refer to exhibits to the Declaration of Orin Snyder in Support of Defendants' Motion to Dismiss.

a one-year embargo on Big Fish's right to produce a live police show for another network. Compl. ¶ 23. Pursuant to that contractual provision, for up to one year after A&E aired the final episode of *Live PD*, A&E's prior consent was required before Big Fish could air a similar show—"i.e., a 'live' television series following police units around the country, with hosts in studio to guide the action, and pre-produced packages about the cops/areas/hot cases during moments of quiet"—on another network. Ex. 1 at ¶ 2(f); *see* Compl. ¶ 20. Meanwhile, during that one-year period, A&E had the sole right to negotiate with Big Fish to bring the show back on its channel.

*Live PD* first aired on A&E's network on October 28, 2016, and continued its run for four seasons and 298 episodes. Compl. ¶ 31. In June 2020, amid protests over police brutality, A&E cancelled *Live PD*. *Id.* ¶ 2; *see id.* ¶¶ 38 n.6, 57 n.17, 43, 44 (referring to show being "cancelled"). Nearly two years later, in May 2022—long after the one-year embargo period expired— Defendants announced they were launching a new police series on REELZ. *Id.* ¶ 3. REELZ is a cable and satellite television network that airs and distributes television programming. *Id.* ¶ 13.

On June 7, 2022, A&E sent REELZ a cease-and-desist letter, *id.* ¶ 71, stating that "the airing on your network of a proposed television show using the name 'PD Live' . . . would infringe on the name and series Live PD." Ex. 2, at 1.[2] There is no allegation Defendants distributed or aired a show using the name "*PD Live*." In fact, A&E acknowledged in a follow-up cease-and-desist letter, dated July 20, 2022, "that the name of the show ha[d] evolved to 'On Patrol: Live.'" *Id.* Ex. 3. On July 22, 2022, the first episode of *On Patrol: Live* aired on REELZ. Compl. ¶ 4. In neither letter did A&E contend that Big Fish had violated the one-year embargo provision.

---

[2] The Court may consider these cease-and-desist letters because the "complaint explicitly refers to and relies upon" them. *Sira*, 380 F.3d at 67; *see* Compl. ¶¶ 4, 51-52, 71-72, 107, 132.

**ARGUMENT**

**I.   A&E's Copyright Claims Should Be Dismissed.**

    **A.   Failure To Allege Copying of *Protectable* Expression Compels Dismissal.**

To state a claim for copyright infringement, the plaintiff must plausibly allege "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996) (same). "To satisfy the second element, a plaintiff must demonstrate that: (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and *the protectable elements of plaintiff's work*." *Abdin v. CBS Broad. Inc.*, 971 F.3d 57, 66 (2d Cir. 2020) (emphasis added) (cleaned up).

Unprotectable elements are "free for the taking," and include "facts and ideas," *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349 (1991), as well as "scènes à faire"— "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic," *Abdin*, 971 F.3d at 67. In assessing substantial similarity when a work incorporates both protectable and unprotectable elements, courts apply a "more discerning observer test: They "must attempt to extract the unprotectable elements from . . . consideration and ask whether the protectable elements, standing alone, are substantially similar." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 66 (2d Cir. 2010). Put differently, courts look to "whether any alleged 'similarities are due to protected aesthetic expressions original to the allegedly infringed work, or whether the similarity is to something in the original that is free for the taking.'" *Id.* at 67.

As the Second Circuit has held—and as A&E itself explained when moving to dismiss copyright infringement claims concerning its own unscripted television show—"[i]t is 'entirely appropriate for a district court" to decide substantial similarity "as a matter of law, 'either because

the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar.'"  Mem. in Supp. of Mot. to Dismiss, *Williams v. A&E Television Networks*, ECF No. 33 at 9 (S.D.N.Y. May 20, 2015) ("A&E *Williams* Brief") (quoting *Peter F. Gaito*, 602 F.3d at 63-64).  "Indeed, many courts in the Second Circuit have done so."  *Id.* (citing *Blakeman v. Walt Disney Co.*, 613 F. Supp. 2d 288, 298 (E.D.N.Y. 2009) (collecting cases)).

### B. A&E Fails To Allege Any Protectable Elements Were Copied.

The only alleged similarities between *On Patrol: Live* and *Live PD* are unprotectable elements that courts repeatedly have held are "free for the taking."  *King Zak Indus.*, 2017 WL 6210856, at *4.  Unscripted police shows have been on the air for decades.  Shows like *Cops* (1989-2022), *Police Videos* (1998-2012), *Disorderly Conduct: Video On Patrol* (2006), and *The Shift* (2009), among many others,[3] depict real police officers on the job.  The concept of an unscripted police show is not copyrightable and A&E does not contend otherwise.  Equally unprotectable are elements that "necessarily result from the choice of [that police] setting or situation," *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986), or that "follow naturally from [the] theme" of an unscripted police show "rather than from an author's creativity."  *Abdin*, 971 F.3d at 71.  As the Second Circuit observed in *Walker*, a landmark copyright case also

---

[3]  Other examples of television shows involving ride-alongs with police or other law enforcement or emergency responders—in some cases interspersed with hosts in studio—include *Border Live* (Discovery Channel) and *First Responders Live* (FOX), both essentially knock-offs of *Live PD* to which A&E never objected, as well as *Busted Live* (MTV); *Alaska State Troopers* (National Geographic); *Police POV*, *Bait Car*, *Party Heat*, *Speeders*, and *Over the Limit* (all TruTV); *Police Women of Dallas*, *Police Women of Broward County*, *Police Women of Memphis*, and *Police Women of Cincinnati* (all TLC); *Real PD: Kansas City* (Investigation Discovery); *Animal Cops*, *Rugged Justice*, *Darkwood Justice*, *Lone Star Law*, *Northwoods Law*, and *Louisiana Law* (Animal Planet); *Real Stories of the Highway Patrol* (syndicated); *World's Wildest Police Videos* (FOX / Spike); *Campus PD* (G4); *Southern Justice*, *Navajo Cops*, *Kentucky Justice*, and *Border Wars* (all National Geographic Channel); and *Boston's Finest* (AMC).

involving two works about the police, "[f]oot chases and the morale problems of policemen, not to mention the familiar figure of the Irish cop, are venerable and often-recurring themes of police fiction." *Walker*, 784 F.2d at 50 (quoted in A&E *Williams* Brief at 8).

The Complaint here alleges approximately twenty similarities between *Live PD* and *On Patrol: Live*. Compl. ¶ 57. Every one of these purported similarities is "standard[] in the treatment" of an unscripted police show, *Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 102 (2d Cir. 2014), or otherwise insufficient to state a claim. In other words, "[n]one of Plaintiff's unprotectable ideas is clothed in any protectable expression." A&E *Williams* Brief at 12. As detailed here, each similarity alleged in A&E's Complaint involves only unprotectable material:[4]

*1.* A&E alleges both shows have similar "percussive, fast-paced" theme music that plays at the beginning, alongside a basic disclaimer noting suspects are presumed innocent until proven guilty. Compl. ¶ 57. A&E does not allege any copyrighted composition was copied—because it was not. Instead, A&E tries to make out a copyright infringement claim based on the mere tempo and style of the shows' different theme songs. But "percussive, fast-paced" music is *scènes à faire* to convey suspense in any action-filled show, including one involving police chases. *See McDonald v. West*, 138 F. Supp. 3d 448, 454 (S.D.N.Y. 2015) ("basic building blocks of music, including tempo" are not protectible). Likewise, a disclaimer "in white letters" against a "black screen"—to ensure maximum legibility—is "highly unoriginal," and thus not protectable. *Comput. Access Tech. Corp. v. Catalyst Enters., Inc.*, 2001 WL 34118030, at *16 (N.D. Cal. June 13, 2001) ("CATC's ninth cited similarity, that alpha-numeric characters appear in black sans-serif font in a single line centered horizontally and vertically within the segment is highly unoriginal; they are merely numbers and letters appearing on a computer screen in a single font

---

[4] The order of this list corresponds to Plaintiffs' bulleted list of alleged similarities (Compl. ¶ 57).

and centered within a box."); *see also, e.g.*, *Purohit v. Legend Pictures, LLC*, 448 F. Supp. 3d 382, 388-89 (D. Del. 2020) ("serif font with white text on a colored background" and use of "a curly 'S,' and a descending stroke of the 'R'" deemed "unprotectable" elements "in the public domain").

*2.* A&E alleges "[b]oth shows toggle between footage of live or pre-packaged police patrol action and studio commentary by the show's hosts discussing the unfolding action." Compl. ¶ 57. Virtually any live news show—about crime, politics, or anything else—toggles between live coverage and commentary. There is nothing original about this standard, widely used format of television programming. "To permit copyrighting" of this format "would exhaust the possibilities of others' producing [live news] shows." *Dick Clark Co., Inc. v. Alan Landsburg Prods., Inc.*, 1985 WL 1077775, at *3 (C.D. Cal. June 13, 1985), *aff'd*, 800 F.2d 1145 (9th Cir. 1986).

*3 & 4.* A&E alleges Dan Abrams is the primary host and Sean Larkin the co-host of both shows, and that each show also features a third co-host, different for each show. Compl. ¶ 57. The three-host format—used by shows ranging from MSNBC's "Morning Joe" to "CNN This Morning"—is not original, copyrightable expression. *See Luftu Murat Uckardesler v. Azteca Int'l Corp.*, 2010 WL 11515298, at *7 (C.D. Cal. May 14, 2010) ("Copyright does not protect the idea of a host.") (cleaned up)); *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1134 (C.D. Cal. 2007) ("stock elements," including a "host," are "unprotected scenes a faire"). A&E also does not own a copyright in Dan Abrams as a television host—while hosting *Live PD* on A&E, he also served as Chief Legal Analyst for ABC News, and currently hosts other unscripted television programs. *See Bethea v. Burnett*, 2005 WL 1720631, at *13 (C.D. Cal. June 28, 2005) ("Plaintiffs cannot copyright the idea of having a well-known business leader, or even more specifically Donald Trump, host a reality television program."). Copyright law is not a backdoor to a non-compete.

*5.* A&E alleges that, "[i]n both shows, the three hosts are dressed similarly and situated

around a table, with Mr. Abrams on the left, Sgt. Larkin in the middle, and the third host on the right."  Compl. ¶ 57.  But screenshots in the Complaint show the hosts dressed completely differently across the shows (and across episodes of the same show)—for example, in a *Live PD* episode, Mr. Abrams wore a pale blue button-down dress shirt, while for *On Patrol: Live* he wore a short-sleeved navy shirt and jeans.  *See id.* ¶ 59.  Nor are the hosts necessarily seated in the same order across the shows, as shown in these screenshots from videos submitted with the Complaint.

 

Even if the three hosts had worn the same clothes and sat in the same order every time on both shows, there is no copyright claim because there is nothing protectable about their attire or the order in which they sit.  *See, e.g.*, *Whimsicality, Inc. v. Rubie's Costume Co.*, 891 F.2d 452, 455 (2d Cir. 1989) ("We have long held that clothes, as useful articles, are not copyrightable.").

6.  A&E alleges "the studio in which the hosts sit features large TV screens on the walls and blue and red lights behind the screens."  Compl. ¶ 57.  Countless news programs, from *SportsCenter* to the *Today Show*, are filmed in studios where TV presenters sit in front of large screens so they can react and respond to the footage.  *Cf. Esquire, Inc. v. Ringer*, 591 F.2d 796, 803 (D.C. Cir. 1978) (shape of a television set that cannot be separated from its utilitarian aspects is not copyrightable) (quoting H. REP. NO. 1476, 94TH CONG., 2D SESS. 55 (1976)).  And the choice of "blue and red lights" is typical for TV studios generally (for example, election night coverage) and is *scènes à faire* for a show about police (whose cars feature red and blue flashing lights).

7.  A&E alleges that, "[i]n both shows, Mr. Abrams narrates the action on the screen and

uses many of the exact same catchphrases."  Compl. ¶ 57.  There is nothing copyrightable about the act of narration.  TV presenters and hosts routinely narrate the action viewers see on the screen. That is stock television.  A&E does not identify a single "catchphrase" Mr. Abrams uses across the shows.  Even if it had, no copyright claim would lie because A&E cannot claim copyright over slogans and phrases common to the English language.  "Words and short phrases such as name, titles, and slogans" are not copyrightable, 37 C.F.R. § 202.1(a), and "[l]onger phrases are also not protectable if they are common or cliché."  *McDonald*, 138 F. Supp. 3d at 454.

*8.*  A&E alleges "both shows feature several of the same law enforcement departments" and "some of the same individual officers."  Compl. ¶ 57.  The choice to focus on a particular police department is not copyrightable, as the Second Circuit emphasized in holding that the movie "Fort Apache: The Bronx" did not infringe the copyright in a book titled "Fort Apache," although both depicted police officers in NYPD's 41st precinct in the Bronx.  *See Walker*, 784 F.2d at 50.

*9 & 10.*  A&E alleges both shows include "Crime of the Week," "Missing," and "Wanted" or "Wanted List" segments.  Compl. ¶¶ 57-59.  Virtually every police department in the country has a "Most Wanted" list and a missing persons list.  Segments on these topics are *scènes à faire* for a police or crime show, as underscored by Dateline's Missing in America podcast and television shows like *America's Most Wanted*, *The Hunt with John Walsh*, *Disappeared*, and *Missing*. Likewise, the depiction of a "traffic stop" or "shots fired," *id.* ¶ 58, "would necessarily appear in any program documenting" police life and "are also, therefore, unprotectable *scènes à faire*." *Williams*, 122 F. Supp. 3d at 163 (holding that "[a]ctivities like grocery shopping, spending time with friends and family, decorating a new home, and visiting an amusement park" are *scènes à faire* in a show "documenting a newly married couple's everyday life").  The entire genre of police shows would be wiped out if these basic aspects of police activity were protectable.

10

*11-16 & 18-19.*  A&E alleges various formatting similarities, such as "descriptions of the events" or "the officer's name and department in the lower left-hand corner," an "'earlier in' tagline on the top corner of the screen when airing pre-recorded footage," and similar "camera angles."  Compl. ¶ 57.  Again, these are stock features of television shows, and unscripted shows in particular.  The name of the person on the screen and their title are typically featured at the bottom of the screen; "previously recorded" or "earlier in" tags show that a segment of a live news program was pre-recorded; and car chases are shot so that viewers can both see the officer in the car and experience the chase from the officer's perspective, looking through the windshield.  *Id.*; *see Pino v. Viacom, Inc.*, 2008 WL 704386, at *5 (D.N.J. Mar. 4, 2008) (dismissing copyright claim because hosts providing commentary, spotlights on contestants, and shots of athletic fields "flow necessarily from the idea of a sports-themed reality show") (cited in A&E *Williams* Brief at 10 n.7).  Under A&E's theory, ESPN SportsCenter would need to stop playing highlight reels because CBS Sports does the same, and all unscripted programs other than the very first one would need to stop confessional interviews with contestants.  That is not the law.

*17.*  A&E alleges both shows use "strikingly similar logos that draw on the same marks, iconographies, and hierarchies."  Compl. ¶ 57.  This conclusory allegation—which is a trademark, rather than copyright, allegation—is not supported by any specific factual allegation about either show's logo.  Where the Complaint does show textual iconographies, as in the screen shots of the "Crime of the Week" segments, the iconographies differ significantly as between the shows.  *See id.* ¶ 59 (screenshots of *Live PD* and *On Patrol: Live*'s "Crime of the Week" segments).

*20.*  A&E alleges the "time slots (and thus the time period covered by the live action) of both shows are the same."  *Id.* ¶ 57.  A time slot is not copyrightable.  To the extent A&E means to suggest the similar timing of filming for both shows reflects a choice to focus on nighttime

police activity, that also is nothing more than an idea (and an unoriginal one, as crime is more likely to happen at night than in the morning), not protectable expression.

In short, all of A&E's examples of elements allegedly "copied" from *Live PD*, to the extent they are even similar, are either stock features of police life or basic elements of an unscripted television or news program. As the court held in *Rodriguez v. Heidi Klum Co.*, a "panel of judges composed of fashion industry experts, a design workroom with sewing machines, . . . professional models, . . . weekly episodes and the setting of New York" are all unprotectable elements because they "necessarily flow from the uncopyrightable idea of a fashion reality show." 2008 WL 4449416, at *5 (S.D.N.Y. Sept. 30, 2008). The same is true here. The allegedly similar elements of *Live PD* and *On Patrol: Live* "necessarily flow from the uncopyrightable idea of a [police] reality show." *Id.* They are "free for the taking." *King Zak Indus.*, 2017 WL 6210856, at *4 (quoting *Horizon Comics*, 246 F. Supp. 3d at 941).[5]

### C. A&E Fails to Allege Any Creative Compilation or Arrangement Was Copied.

Having failed to identify any protectable elements copied from *Live PD*, A&E falls back on the more general allegation that "*On Patrol: Live* has the same look and feel as . . . the *Live PD* series." Compl. ¶ 70. This allegation cannot save A&E's copyright claims.

In certain circumstances, "the selection and arrangement" of preexisting, unprotected elements may itself be sufficiently original and creative to warrant protection. *Feist Publ'ns.*, 499 U.S. at 349. But "the total concept and feel inquiry . . . is not carte blanche to rest findings of infringement on vague or amorphous determinations," which "would invite an abdication of analysis or end up erroneously protecting ideas." *Mena v. Fox Ent. Grp.*, 2012 WL 4741389,

---

[5]  A&E's allegation that "it has registered the copyrights in 24 representative episodes" of *Live PD*, Compl. ¶ 19, is not relevant to this Motion. Defendants do not dispute that individual episodes on the whole may constitute protectable expression, or that A&E could prevent REELZ or another network from airing episodes of *Live PD*.

at *6 (S.D.N.Y. Sept. 29, 2012).  For example, in *Castorina v. Spike Cable Networks*, the court held that a sports-themed reality show did not infringe a treatment for a reality show similar in both content—"the portrayal of professional athletes v. amateur sports fans in competition"—and format—e.g., the use of "quick shots" to express "panic, tension, relief or failure" or "short bios of the players and why they were selected"—because those similarities were unprotectable *scènes à faire*.  784 F. Supp. 2d 107, 108-09, 111-12 (E.D.N.Y. 2011).  Just as the plaintiffs there did not "own an enforceable copyright in the basic concept of a sports reality show," A&E does not own a copyright in the "basic concept" of a live unscripted police show—"even though the 'value of an unscripted program may lie almost entirely' in that idea."  *Id.* at 111.

This Court's ruling in *Walkie Check Productions, LLC v. ViacomCBS Inc.*, 2022 WL 2306943 (S.D.N.Y. June 27, 2022), demonstrates why this case should be dismissed under Rule 12(b)(6).  The plaintiff production company developed the concept of a House Party show and shared with the defendants a detailed treatment for 12 episodes while the parties negotiated a potential launch of the show on BET.  *Id.* at *2.  The defendants then turned around and launched their own "House Party" series without crediting or involving the plaintiff.  *Id.* at *3.  The plaintiff sued for copyright infringement, alleging that the BET show was virtually identical to its own treatment, and this Court denied the defendants' motion to dismiss.  *Id.* at *1, 6.  On the question of protectability, the Court held that, although the elements at issue were not themselves individually protectable, the combination, or "sum total," of "artistic choices" in the plaintiff's treatment constituted an original and protectable work under the Copyright Act.  *Id.* at *9.  In so holding, the Court focused on the "sum total" of the following unprotectable "creative choices" made by the plaintiff: "(i) livestreaming from mobile devices; (ii) real-time interaction and distribution via social media; (iii) an organic and unscripted format; (iv) a hybrid

13

aspect ratio that switches between a selfie-style vertical aspect ratio and a more traditional horizontal aspect ratio; and (v) intimate viewer access." *Id.* On the question of substantial similarity, the Court held that "the incompleteness of the record preclude[d] dismissal of Plaintiff's copyright claim." *Id.*

The protectability analysis produces the opposite conclusion here, where the unoriginal elements at issue have been combined, as they are in *On Patrol: Live*, time and again. Virtually every nightly news program features "fast-paced music," multiple hosts "situated around a table," with "large TV screens on the walls," as the show "toggle[s] between footage of live or pre-packaged . . . action and studio commentary by the show's hosts," who "narrate[] the action on the screen." Compl. ¶ 57. And countless cop shows have combined such elements in the context of police tropes like "wanted" and "missing" persons. *Id.* Whereas the defendants in *Walkie Check* did not, and could not, argue that the key constituent elements of the House Party show had ever been combined in the same manner before, the producers of *Cops* and other unscripted police programs have been combining these conventional, unoriginal, and functional aspects of police activity and unscripted television for decades. The familiar combination at issue here is no more original than any constituent element. Further, the Court in *Walkie Check* was understandably concerned that the defendants appeared to have brazenly ripped off the plaintiff's original treatment. Here, *Defendants* are the ones who created the show and contractually negotiated for the right to air the show after the one-year exclusivity period ended.

On substantial similarity, the Court in *Walkie Check* was restricted by the fact that it had only a fraction of the episodes before it, and that each one had an entirely "different focus and feel," without even "any consistent theme between the episodes" of the defendants' show. *Walkie Check*, 2022 WL 2306943, at *9. The "diversity and inconsistency among the episodes," coupled

with the incompleteness of the record, made it impossible to determine whether "Defendants livestreamed an episode that was substantially similar to Plaintiff's work." *Id.* at *9-10. This is not an issue here. A&E itself paints all episodes of *On Patrol: Live* with the same brush, alleging Defendants copied only elements that exist across all episodes. *See* Compl. ¶ 57. The consistency between all episodes of *Live PD* and all episodes of *On Patrol: Live* is what's at issue—a sameness attributable to the *generic* format and combination of elements alleged.

In short, "[b]ecause the quantum of originality [A&E] added in combining these standard and stereotyped elements must be considered 'trivial' . . . , [A&E] cannot prevent [Defendants] from combining them." *Satava v. Lowry*, 323 F.3d 805, 812 (9th Cir. 2003). Any "choices in selecting, coordinating and arranging stock elements are largely inherently functional to the idea of a [live cop show], not original creative expressions of any particular idea." *Castorina*, 784 F. Supp. 2d at 112 (cleaned up). Creative expression would be chilled if no other entertainment company could ever again combine these stock elements in a familiar fashion. Such a ruling would call into question the entire genre of unscripted police shows, as well as news programming more generally. That is not the intent or effect of the Copyright Act.

### D. The Series Agreement Confirms A&E Understood the Format of *Live PD* Was Not Copyrightable.

A&E's made-for-litigation position that the format and other stock elements of a live cop show are copyrightable is not only wrong under the case law, but also belied by the plain text of the Series Agreement A&E signed. Section 2(f) of the Series Agreement provides:

> Producer [Big Fish] is prohibited from authorizing the telecast of any program(s) produced by Producer substantially similar in content and format to the Series (i.e., a 'live' television series following police units around the country, with hosts in studio to guide the action, and pre-produced packages about the cops/areas/hot cases during moments of quiet) until the end of the one (1) year period commencing on delivery of the telecast master of the final Episode produced and delivered by Producer hereunder without [A&E's] prior written consent, except as specifically permitted pursuant to the terms hereof.

Ex. 1 at ¶ 2(f); *see* Compl. ¶ 23.  A&E knew the only way to prevent Big Fish from creating a show with a similar format was through an exclusivity provision—not copyright law.

The year-long embargo period in the Series Agreement compels only one inference:  the parties understood that after the exclusivity period expired, they would return to the *status quo ante*, where Big Fish was free to produce a "substantially similar . . . 'live' television series following police units around the country" for any other network.  Ex. 1 at ¶ 2(f); *see New York Univ. v. Galderma Lab'ys, Inc.*, 689 F. App'x 15, 16 (2d Cir. 2017) ("The best evidence of the parties' intent is the parties' writing.") (cleaned up).  And nowhere in the "multiple cease and desist letters" A&E sent Defendants before filing this action did A&E complain that Defendants violated the exclusivity period.  Compl. ¶¶ 51-52; Exs. 2 & 3.

If A&E regrets its decision to cancel *Live PD*, it remains free to re-run *Live PD* episodes or create a new and competing live police show.  Because the "lack of substantial similarity turns on the works themselves and not on the artfulness or sufficiency of the pleading," leave to amend would be futile, and this Court should dismiss all of A&E's copyright claims with prejudice.  *Kaye v. Cartoon Network Inc.*, 297 F. Supp. 3d 362, 371 (S.D.N.Y. 2017); *accord, e.g.*, *Croak v. Saatchi & Saatchi, N. Am., Inc.*, 174 F. Supp. 3d 829, 839 (S.D.N.Y. 2016); *Hayuk v. Starbucks Corp.*, 157 F. Supp. 3d 285, 293 (S.D.N.Y. 2016); *Mena*, 2012 WL 4741389, at *15; *Allen v. Scholastic Inc.*, 739 F. Supp. 2d 642, 665 (S.D.N.Y. 2011).[6]

---

[6]  For the reasons set forth above, A&E cannot maintain a direct copyright infringement claim against Defendants because it cannot plausibly allege any protectable material was copied. Because "there can be no contributory infringement absent actual infringement," A&E's secondary liability claims—for contributory copyright infringement and inducing copyright infringement— fail too.  *Faulkner v. Nat'l Geo. Enters. Inc.*, 409 F.3d 26, 40 (2d Cir. 2005) (citing *Matthew Bender & Co. v. West Publ'g Co.*, 158 F.3d 693, 706 (2d Cir. 1998)); *see also, e.g.*, *Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 423 (S.D.N.Y. 2011) ("To recover on a claim based on secondary liability, a plaintiff must first establish direct infringement by the relevant third party.").

## II.     A&E's Trademark Claims Should Be Dismissed.

A&E's trademark claims—based on its allegation that Defendants infringed A&E's LIVE PD mark in connection with their promotion, advertising, and transmission of *On Patrol: Live*— also should be dismissed.  To state a claim for trademark infringement, "a plaintiff must show, first, that its mark merits protection, and second, that the defendant's use of a similar mark is likely to cause consumer confusion."  *Brennan's, Inc. v. Brennan's Rest., LLC*, 360 F.3d 125, 129 (2d Cir. 2004).  The only similar portions of the two shows' respective titles—the word "Live"—is not protectable, and A&E has no plausible claim of consumer confusion in any event.

### A.   A&E Has Not Alleged Infringement Of A Protectable Mark.

A&E alleges the word "Live" is "unique" and protectable, Compl. ¶ 52, and Defendants infringed by also using the word "Live" in the title of their show. *Id.* ¶ 107.  A term that "answers the question 'what are you'" about a product is "generic" and not protectable.  *Closed Loop Marketing, Inc. v. Closed Loop Marketing, LLC*, 589 F. Supp. 2d 1211, 1219 (E.D. Cal. 2008); *see CES Publ'g Corp. v. St. Regis Publ'ns, Inc.*, 531 F.2d 11, 13 (2d Cir. 1975) ("To allow trademark protection for generic terms, i.e., names which describe the genus of goods being sold, . . . would grant the owner of the mark a monopoly, since a competitor could not describe his goods as what they are.").  Because "Live" does nothing more than "give the general name of the product"— here, live footage—A&E has no protectable, exclusive right to use "Live" in connection with a real-time broadcast.  *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n.8 (9th Cir. 1998).

"Live" is at most a descriptive term not eligible for trademark protection unless it has acquired secondary meaning—that is, unless "the primary significance of a product feature or term is to identify the *source* of the product rather than the product itself."  *Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 851, n.11 (1982) (emphasis added).  A&E does not, and cannot, allege

the "the primary significance of" the word "Live" "is to identify" A&E as "the source" of *Live PD*. *Id*. *Live PD* stands in a long line of shows produced by many different sources whose names include the word "live" (e.g., *Saturday Night Live*, *Live With Regis and Kathie Lee*, etc.).

 A&E's trademark claims fail as a matter of law on this basis alone.

  **B.   A&E Has Failed To Plausibly Allege Likelihood Of Consumer Confusion.**

 A&E's trademark claims fail for the independent reason that A&E has not plausibly alleged Defendants' use of "Live" in the title of their new show or references to *Live PD* (as in the alleged tweets, *see* Compl. ¶¶ 46, 106, 131) are "likely to cause confusion as to the affiliation, connection, or association of [Defendants] with [A&E], or as to the origin, sponsorship, or approval of [Defendants'] goods, services, or commercial activities by [A&E]." *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 406-07 (2d Cir. 2005) (quoting 15 U.S.C. § 1125(a)(1)(A)).

 To assess likelihood of confusion, courts in this Circuit apply the eight-factor test set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961): "(1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may 'bridge the gap' by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009). Likelihood of confusion can be readily assessed at the motion to dismiss stage. *See, e.g.*, *OffWhite Prods., LLC v. Off-White LLC*, 480 F. Supp. 3d 558, 563 (S.D.N.Y. 2020); *Lopez v. Nike, Inc.*, 2021 WL 128574, at *7-11 (S.D.N.Y. Jan. 14, 2021), *report and recommendation adopted*, 2021 WL 2207451 (S.D.N.Y. Feb. 16, 2021). The inquiry "focus[es] on the ultimate question of whether consumers are likely to be confused," and, while no single factor is necessarily dispositive, "any one factor may prove to be so." *Nora*

*Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 119 (2d Cir. 2001).

Here, seven of the eight *Polaroid* factors weigh in Defendants' favor.

<u>*Strength and similarity of the marks.*</u>   The similarity of the marks begins and ends at the word "Live."   LIVE PD—principally comprised of the generic word "Live"—is a weak mark.

<u>*Proximity of the products and their competitiveness with one another.*</u>   A&E allegedly canceled *Live PD* in 2020 and never resumed it.   Compl. ¶¶ 1, 43.   Because A&E does not allege *Live PD* and *On Patrol: Live* have ever aired simultaneously, the two shows are not alleged to have ever competed with one another in the television marketplace.

<u>*Likelihood that senior user may 'bridge the gap' by developing a product for sale in the market of the alleged infringer's product.*</u>   Bridging the gap "refers to 'the likelihood that the senior user,'" here, A&E, "will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so."   *Nike*, 2021 WL 128574, at *9 (quoting *Star Indus., Inc., v. Bacardi & Co.*, 412 F.3d 373, 387 (2d Cir. 2005)).   A&E alleges it did not exercise its option to continue producing and airing *Live PD*.   Compl. ¶¶ 1, 43.   And A&E does not allege it wishes to do so in the future by reviving *Live PD* or establishing a similar program under a different moniker.

<u>*Actual consumer confusion.*</u>   A&E's claimed examples of confusion—that one reviewer wrote "*On Patrol: Live* is *Live PD*," *id.* ¶ 61, and that some consumers pointed out similarities between the "original show" and *On Patrol: Live*, *id.* ¶ 62—do not actually describe confusion and, even if they did, would amount to a handful of non-actionable "anecdotes of confusion," at best.   *Nora Beverages*, 269 F.3d at 124.   Such "*de minimis* evidence" is "insufficient to raise triable issues."   *Id.*   For starters, these alleged comments "evidence *consumer knowledge*, not confusion," because they necessarily reflect that consumers understood that the two shows were, in fact, separate programs.   *Id.* (emphasis added) ("To the extent [individuals] knew of the existence of

[Defendant's] show as separate and distinct from Plaintiff's show, they evidence consumer knowledge, not confusion."); *Lopez v. Adidas Am., Inc.*, 2020 WL 2539116, at *11 (S.D.N.Y. May 19, 2020) ("customers' enquiries to plaintiff as to whether plaintiff and defendant are affiliated or connected . . . reveals that the questioner had the difference in mind or else would not have bothered even to enquire'") (quotations omitted).

The alleged 2021 tweet from Mr. Abrams on which A&E relies for alleged confusion, *see* Compl. ¶ 44, was published over a year before *On Patrol: Live* aired and, thus, before any consumer confusion could have occurred.  *See CBS Inc. v. Liederman*, 866 F. Supp. 763, 768 (S.D.N.Y. 1994), *aff'd*, 44 F.3d 174 (2d Cir. 1995) (finding "no realistic opportunity for actual confusion because defendants' restaurant ha[d] not yet opened").

Further, consumers necessarily had to understand the shows were coming from different sources to find the new show on REELZ as opposed to A&E's channel, and the Complaint alleges Defendants told audiences that *On Patrol: Live* was coming from a different source.  Compl. ¶ 37. A&E does not allege any consumer mistakenly tuned into A&E to watch *On Patrol: Live*; did not know they were watching *On Patrol: Live* when they tuned in on REELZ; or mistakenly believed that A&E was the source of *On Patrol: Live* even though it was airing on REELZ.

*The imitative mark was adopted in bad faith*.  There is no allegation that Defendants "adopted" an "imitative mark," much less in bad faith.  *On Patrol: Live* is a distinct title, and Defendants demonstrated good faith in adopting it.  Defendants originally considered using *PD Live* as the working title of their new show, but after A&E sent them a letter raising concerns about the potential for confusion, *see* Ex. 2, Defendants changed the name to *On Patrol: Live*, which is the title by which the public has known the show since it was announced.  Compl. ¶ 107; Ex. 3.

*Sophistication of consumers*.  The relevant consumer group here—fans of *On Patrol: Live*

and *Live PD*, "[u]nhurried . . . in the relaxed environment" of their homes as they make decisions about how to spend up to three hours of their time—are the kind of niche, "sophisticated" consumers who likely would not confuse the two shows. *Star Indus.*, 412 F.3d at 390. The allegations are that *Live PD* was cancelled by A&E in June 2020, and off the air for over two years before *On Patrol: Live* aired on REELZ. Compl. ¶¶ 2, 53. The press A&E cites about the launch of *On Patrol: Live* reminded viewers that *Live PD* had been canceled. *Id.* ¶¶ 43-44. Thus, viewers of *On Patrol: Live* (or any other cop show) today know they are not watching *Live PD*. And one of the sources A&E cites to ostensibly show consumer confusion shows the opposite: the title of the review *On Patrol: Live Doesn't Quite Live Up to Live PD—Yet, id.* ¶ 5 n.2, demonstrates that viewers of *On Patrol: Live* are sophisticated enough not only to notice that these are distinct shows but to evaluate the differences between them.

A&E has argued Defendants' purported use of the LIVE PD mark "creates a 'likelihood of confusion' as to [the] origin or sponsorship" of *On Patrol: Live*. Pl.'s Resp., ECF No. 36 at 3. A&E ignores the long line of cases in the Second Circuit recognizing competitors may need to use their competitors' marks to identify competing products under the doctrine of nominative fair use. The doctrine "allows a defendant to use a plaintiff's trademark to identify the plaintiff's goods so long as there is no likelihood of confusion about the source of the defendant's product or the mark-holder's sponsorship or affiliation." *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 102 (2d Cir. 2010). In cases involving nominative use, courts consider, in addition to the *Polaroid* factors:

> (1) whether the use of the plaintiff's mark is necessary to describe both the plaintiff's product or service and the defendant's product or service, that is, whether the product or service is not readily identifiable without use of the mark; (2) whether the defendant uses only so much of the plaintiff's mark as is necessary to identify the product or service; and (3) whether the defendant did anything that would, in conjunction with the mark, suggest sponsorship or endorsement by the plaintiff holder, that is, whether the defendant's conduct or language reflects the true or accurate relationship between plaintiff's and defendant's products or services.

21

*Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 156 (2d Cir.

2016).  Each factor makes clear Defendants made, at most, nominative use of A&E's mark.

*First*, there is no way to identify *Live PD* without using its name, particularly given the

*many* unscripted shows about policing over the years identified earlier in this Motion.  *See Weight*

*Watchers Int'l, Inc. v. Noom, Inc.*, 403 F. Supp. 3d 361, 380 (S.D.N.Y. 2019) ("It would not be

possible to refer to Weight Watchers without its mark—the name 'Weight Watchers' itself.").

*Second*, A&E does not allege Defendants used the LIVE PD mark excessively.  Courts

consider whether the alleged infringer "step[ped] over the line into a likelihood of confusion by

using the senior user's mark too prominently or too often, in terms of size, emphasis, or repetition."

*Int'l Info.*, 823 F.3d at 168.  A&E does not allege Defendants used the LIVE PD mark other than

to "'re-tweet[]' the various articles and headlines informing the public that *Live PD* would be

'returning' on REELZ" and to correctly identify *On Patrol: Live* as a new series "from the

producers of *Live PD*."  Compl. ¶ 131.  While A&E alleges Defendants said they were "bringing

back" *Live PD*, its Complaint makes clear this allegation derives from *third-party* articles and

social media posts reasonably comparing the two programs.  *Id.* ¶ 38 ("numerous articles in the

press report[ing] that REELZ is 'bringing back' *Live PD* to television"); *id.* ¶ 40 (Dan Abrams

tweeting that *Live PD* is coming back as *On Patrol: Live*).  A&E does not allege Defendants

advertised *On Patrol: Live* as being the same as *Live PD* or associated with A&E, or that the LIVE

PD mark was featured prominently in any of Defendants' advertisements for *On Patrol: Live*.

*Third*, A&E does not allege Defendants did anything to suggest A&E sponsored or

endorsed *On Patrol: Live*.  Quite the opposite.  Tweets tagged the REELZ Twitter account, *e.g.*

*id.*, and referenced A&E's cancellation of *Live PD*, *e.g. id.*, ¶¶ 43-46.  The uses of the LIVE PD

mark detailed in the Complaint "do not suggest [A&E] has either sponsored or endorsed [*On*

*Patrol: Live*]: they assert that [*On Patrol: Live*] is a different" show than *Live PD*. *Weight Watchers*, 403 F. Supp. 3d at 380. And A&E cannot prevent REELZ from noting *On Patrol: Live* is "from the producers of *Live PD*," Compl. ¶ 106, as that reflects the "true [and] accurate relationship" of Big Fish and Half Moon to *Live PD*. *Int'l Info.*, 823 F.3d at 156.

In sum, the LIVE PD mark is not strong, the only similarity between the titles is the word "Live," which is generic (or, at most, descriptive and without secondary meaning), and A&E's alleged examples of consumer confusion show the opposite: Audiences are alleged to *know* these shows come from different sources. A&E cannot show source confusion as a matter of law, and therefore has no plausible infringement claim. *See Weight Watchers*, 403 F. Supp. 3d at 380.

Because "any claim of trademark protection" based on common use of the term "live" "would be substantively deficient," leave to amend would be futile, and any dismissal should be with prejudice. *Lopez v. Gap, Inc.*, 883 F. Supp. 2d 400, 414 (S.D.N.Y. 2012).

## III.   The Court Should Dismiss A&E's Unfair Competition Claims.

A&E's claims for unfair competition are not actionable for several independent reasons.

A&E fails to adequately allege the elements of a false designation of origin claim under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125, or New York common law. "The *prima facie* case required for [trademark claims under 15 U.S.C. § 1114(1) and false designation of origin claims under 15 U.S.C. § 1125(a)(1)(A)] is the same." *OffWhite Prods.*, 480 F. Supp. 3d at 563. To state a claim under the Lanham Act for trademark infringement, unfair competition, and false designation of origin, a plaintiff must establish that: (1) he owns a valid mark; (2) defendant used the protected mark in commerce, without plaintiff's consent; and (3) "defendant's use of that mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods." *Nike*, 2021 WL 128574, at *4 (citation omitted). Moreover, "the standards for common law

trademark infringement and unfair competition are 'virtually identical' to the standards for trademark infringement and unfair competition under the Lanham Act, except that the New York common law claims 'require[] an additional showing of bad faith.'" *Id.* at *14.[7]  A&E's failure to plausibly allege likelihood of confusion dooms its federal and state law unfair competition claims.

A&E's state law unfair competition claim fares no better if misappropriation, rather than false designation of origin, is the predicate.  *See* Compl. ¶ 148.  To state a claim for misappropriation under New York law, a plaintiff must (1) establish that a legal relationship existed between the parties and (2) establish that the idea allegedly misappropriated is novel. *Turner v. Temptu Inc.*, 586 F. App'x 718, 721-22 (2d Cir. 2014).  "Novelty of an idea is an essential element of the New York tort of misappropriation."  *Zikakis v. Staubach Retail Servs., Inc.*, 2005 WL 2347852, at *3 (S.D.N.Y. Sept. 26, 2005).  The concept of an unscripted police patrol show is far from novel; it is "merely 'a variation on a basic theme' available in the public domain."  *Id.*

A&E's state law claim fails for two additional reasons.  First, the claim, premised as it is on allegations of "imitation[]" and "malicious appropriation," Compl. ¶¶ 139-50, is preempted by federal copyright law.  Courts routinely dismiss unfair competition claims as preempted when they sound in misappropriation or copying.  *See, e.g.*, *Gottlieb Dev. LLC v. Paramount Pictures Corp.*, 590 F. Supp. 2d 625, 637 (S.D.N.Y. 2008) (collecting cases); *Lapine v. Seinfeld*, 31 Misc. 3d 736, 751 (Sup. Ct. N.Y. Cnty. 2011) ("[M]isappropriation claims grounded solely in the use of a plaintiff's protected expression are preempted.").  "[T]o survive preemption, the plaintiff must

---

[7]  A&E does not specify whether it asserts an unfair competition claim under Section 1125(a)(1)(A) or Section 1125(a)(1)(B) of the Lanham Act.  Section 1125(a)(1)(B) requires a showing that the defendant misrepresented "the nature, characteristics, qualities, or geographic origin" of the plaintiff's goods or services "in commercial advertising or promotion."  15 U.S.C. § 1125(a)(1)(B). A&E has not alleged that any aspect of Defendants' advertising or promotion was misleading or untruthful.

allege that the confusion forming the basis for the unfair competition claim was created by some act other than copying." *Wolstenholme v. Hirst*, 271 F. Supp. 3d 625, 642 (S.D.N.Y. 2017). Where, as here, "the only source of alleged confusion stems from" alleged similarities between the plaintiff's product and the defendant's product, "the claim is preempted." *Id.* at 642-43.

Second, in addition to the requisite elements for a Lanham Act unfair competition claim, New York law imposes an additional requirement of bad faith. *See, e.g.*, *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 149 (2d Cir. 1997) (state law unfair competition claim "not viable without a showing of bad faith"). "[C]onclusory allegations that [Defendants] acted in bad faith," *see* Compl. ¶¶ 8, 107, 116, 132, 141, 148, "are 'not entitled to [an] assumption of truth.'" *Nike*, 2021 WL 128574, at *11 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). In fact, A&E's allegations demonstrate *good* faith on the part of Defendants: Defendants waited for the one-year embargo to be lifted before pursuing their new series and changed the title of the series after A&E raised concerns that the working title would cause confusion. Defendants have no incentive to deceive audience members as to the source of *On Patrol: Live*—quite the opposite. Defendants' goal is for *On Patrol: Live* to reach audiences across the globe, a goal it can achieve only if the consuming public understands what the show is and where to find it (i.e., that it differs from *Live PD* and can be found on the REELZ channel). "[T]he intent to compete by imitating the successful features of another's product is vastly different from the intent to deceive purchasers as to the source of [one's own] product." *Nike*, 2021 WL 128574, at *10 (quoting *Nora Beverages*, 269 F.3d at 124). A&E's failure to plausibly allege intent to deceive or bad faith further dooms its state law unfair competition claim.

**CONCLUSION**

The Complaint should be dismissed with prejudice.

Dated:   December 9, 2022          Respectfully submitted,
         New York, NY


                                    GIBSON, DUNN & CRUTCHER LLP


                                    By:   */s/ Orin Snyder*
                                          Orin Snyder
                                          Alexandra Perloff-Giles
                                          OSnyder@gibsondunn.com
                                          APerloff-Giles@gibsondunn.com
                                          200 Park Avenue
                                          New York, NY 10166-0193
                                          Tel: (212) 351-4000

                                          Jay P. Srinivasan
                                          Ilissa Samplin
                                          333 South Grand Avenue
                                          Los Angeles, CA 90071-3197
                                          Tel: (213) 229-7354
                                          JSrinivasan@gibsondunn.com
                                          ISamplin@gibsondunn.com

                                          *Counsel for Defendants*