```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK


A&E TELEVISION NETWORKS, LLC      : Docket #:
                                    1:22-CV-07411-kpf
                      Plaintiff,  :

      -against-                   :

BIG FISH ENTERTAINMENT, LLC,      : New York, New York
et al.,
                                    October 27, 2022

                      Defendants.

-------------------------------:Pre-motion Conference

                    PROCEEDINGS BEFORE
            THE HONORABLE KATHERINE POLK FAILLA
                  UNITED STATES DISTRICT



APPEARANCES:

For Plaintiff:      WEIL, GOTSHAL & MANGES, LLP
                    BY:  DAVID YOHAI, ESQ.
                         RANDI WOLKENBREIT SINGER, ESQ.
                         FREDRICK THOMAS RHINE, ESQ.
                    767 Fifth Avenue
                    New York, New York 10153


For Defendant:      GIBSON, DUNN & CRUTCHER, LLP
                    BY:  ORIN SNYDER, ESQ.
                         JAMES PINCHAK, ESQ.
                         ILISSA STACY SAMPLIN, ESQ.
                    200 Park Avenue
                    New York, New York 10166


Transcription Service: Marissa Mignano Transcription
                       Phone:  (631) 813-9335
                       E-mail:marissamignano@gmail.com


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

<u>INDEX</u>

<u>E X A M I N A T I O N S</u>

| <u>Witness</u> | <u>Direct</u> | <u>Cross</u> | Re-<br><u>Direct</u> | Re-<br><u>Cross</u> |
|---|---|---|---|---|
| None | | | | |

<u>E X H I B I T S</u>

| Exhibit<br><u>Number</u> | <u>Description</u> | <u>ID</u> | <u>In</u> | Voir<br><u>Dire</u> |
|---|---|---|---|---|
| None | | | | |

Proceedings

1          THE CLERK:  Your Honor, this is in the

2     matter of A&E Television Networks, LLC, v. Big Fish

3     Entertainment, LLC, et al.

4          Counsel, please state your name for the

5     record, beginning with plaintiff.

6          MR. YOHAI:  My name is David Yohai.  I'm

7     here with my colleagues, Randi Singer and Fredrick

8     Rhine for the plaintiff, A&E Television Networks.

9          THE COURT:  Good morning, sir, and good

10    morning to each of your team.  This is Judge Failla.

11    Thank you.

12         Representing the defendants this morning,

13    please.

14         MR. SNYDER:  Good morning, Your Honor.  It

15    is Orin Snyder from Gibson Dunn representing the

16    defendants, accompanied by my colleagues, Ilissa

17    Samplin and James Pinchak.

18         THE COURT:  Thank you.  And good morning to

19    each of you as well.

20         This is our initial pretrial conference in

21    the case, and based on some submissions I've

22    received from the parties, I understand that it is

23    as well a premotion conference.

24         Mr. Yohai, part of the reason that I have

25    pre-motion conferences is to see whether the

Proceedings

1  nonmoving party believes that there is an amendment

2  to his or her pleadings that might obviate some of

3  the bases for a motion.  In this case, I'm not sure

4  that there is, but I did want to hear from you as to

5  whether it was your current intention to stand on

6  the existing pleading or whether it was your

7  intention to seek leave to amend.

8       MR. YOHAI:  Your Honor, it is our intention

9  to stand on the existing pleading at this point.

10       THE COURT:  Okay.  Then I won't be asking

11  you about how you'd like to amend it.

12       Sir, I do want to hear from Mr. Snyder

13  because he represents the moving parties in this

14  case.  But before I did so, I do think I want to

15  understand perhaps a little bit better than I do as

16  a result of reading the party submissions, what

17  specifically your clients believe are protectable

18  components of the show that have been violated or

19  infringed upon by the defendant's show.  So

20  recognizing that I am to consider things

21  holistically, I still want to understand precisely

22  what you believe is protectable.

23       MR. YOHAI:  Your Honor, a few things I

24  would say.  First of all, this is an atypical case,

25  in that it is not a case where we just have a

Proceedings

1    treatment against the show that actually aired.

2    This is a case where the defendants marketed the

3    show as bringing back our show, and that is bringing

4    back the entirety of our show.

5           Why is that?  Because they are using not

6    just three hosts in the studio, they're using the

7    same three hosts in the studio.

8           Why is that?  Because they're not just

9    doing prepackaged segments.  They're using the same

10   prepackaged segments, Crime of the Week, The Wanted

11   segment.

12          Why is that?  Because they're not just

13   using any police departments, they're using many of

14   the same police departments.

15          And so, Your Honor, when you look at this

16   show in its totality, it is a clone of our show.

17   And so to the extent that the show had any

18   copyrightable interest at all, which we clearly

19   believe it did, since they assigned to us all

20   copyrights and trademarks, this is our show.  Every

21   element of the show is the same.  They've made no

22   effort to change anything.  And that's the problem

23   here.  And that's why we think it is protectable in

24   terms of the entire look and feel of the show.  It

25   looks the same, it feels the same, the pace of the

Proceedings

1    show is the same.  Dan Abrams is using the same

2    language when he introduces the segments.  They've

3    taken our same hosts, and the entire show feels the

4    same.  So that's why we think, if anything, it's

5    protectable.  It has to be this, otherwise the

6    copyright laws would have no meaning since they took

7    the entirety of the show.

8         THE COURT:  All right.  Please pause right

9    there, sir.  Thank you.

10        I'm not sure that I would be finding in

11   your favor based on the pace of the show.  So I

12   think we should put that one to the side.  Are you

13   suggesting that the titles -- I think you are, but I

14   want to understand this -- that the titles are

15   somehow confusingly similar.

16        MR. YOHAI:  Your Honor, we think when they

17   advertised that they were bringing back our show,

18   meaning when they said Live PD is back as On Patrol

19   Live, that they were intentionally trying to create

20   the confusion between the two shows.  We recognize

21   that the word "live" in and of itself is

22   descriptive.  But in this context, where they're

23   saying we are bringing back the show, we do think

24   it's confusingly similar.  And if you look at all

25   the factors, not just the word "live", but all of

Proceedings

1    the factors, there's evidence of consumer confusion.

2    There's evidence that they were intentionally trying

3    to confuse the two shows to trade on our goodwill.

4          And this was deliberate.  They knew that

5    our show was a big success.  We wouldn't be here if

6    they had created another show called, for example,

7    Police on the Beat and had different hosts, and --

8    for example -- I'll give you another example.  Cops

9    was a prior show that exists.  Cops doesn't have any

10   hosts in a studio, and they certainly don't have Dan

11   Abrams and Sticks Larkin doing the show, and they

12   certainly don't have Crime of the Week.  The cops

13   themselves are narrating the action.

14         We wouldn't be here if this was just any

15   police show.  We're here because they are

16   specifically trading on us.  And also, On Patrol is

17   not even unique to them since we had a derivative

18   work called On Patrol.  So we think the collective

19   of what they've done here does, in fact, both

20   violate our copyrights and our trademarks.

21         THE COURT:  All right.  I mean, I

22   appreciate, sir, that no matter what I ask you,

23   you're going to tell me that I should consider these

24   things in their totality.  But is it really the case

25   that as a result of the agreement that you had with

Proceedings

1    the defendants, that Mr. Abrams and his colleagues

2    could never appear on another show of this type?  Or

3    is it simply that they could never appear on another

4    show that Big Fish did?  I mean, I'm trying to tease

5    this out as to what precisely is the protectable

6    element?

7          Is your problem that Big Fish conscripted

8    the same hosts or involved the same hosts?  I mean,

9    if Mr. Abrams and others had gone to another entity

10   and done all of this, would that still be a

11   violation, you believe, of your copyright

12   protections?

13         MR. YOHAI:  Well, Your Honor, if Dan Abrams

14   had gone to another entity and they didn't link it

15   to our show and say we were bringing back our show

16   back and they didn't hire not just Dan Abrams, but

17   they hired Sticks Larson, and they hired a third

18   host who was on our show, and -- Your Honor, and

19   they didn't have the exact same segments that they

20   have in our show, and they didn't have the exact

21   same flow of the show, you know, where they're

22   opening in the studio and then they're cutting to

23   the same police departments, if any of these things

24   were different or they made any attempt to make this

25   different, that would be potentially a new -- a new

Proceedings

1    work.  But they didn't.  What they really did was

2    they said, we have a great idea.  Let's just steal

3    this show and put it on their network and trade in

4    on our goodwill.  We're not trying to tie up Mr.

5    Abrams or Mr. Larkin permanently, but we're just

6    suggesting that if they're going to do a new show,

7    it ought to be a new show, not our clone show.

8           THE COURT:  All right.  Please understand,

9    I did, in fact, preface my question by asking you to

10   disaggregate things.  And again, you aggregated

11   things.  So perhaps, no matter what question I ask,

12   you're going to aggregate things.  But I am trying

13   to figure out precisely what is the protectable

14   elements, and you just keep telling me the

15   agglomeration of them is the set of protectable

16   elements.

17          So -- all right.  Mr. Snyder, let me speak

18   to you, please, sir.  Because it is you who wishes

19   to make the motion.  I'm fairly confident that I'm

20   not going to be able to persuade you not to make the

21   motion.  But having now seen the submission from

22   plaintiff's counsel that was filed last evening, let

23   me hear your reactions to it.  Thank you.

24          MR. SNYDER:  Thank you, Judge.  And I will

25   give you my reactions to the submission and also to

Proceedings

1   the comments we just heard.

2          Let me start in proximity to the comments

3   we just heard.  And able counsel, whom I respect,

4   did his best to defend the complaint, but his

5   comments, I think, confirm and buttress the

6   dismissibility of this case under Rule 12(b)(6).

7          Counsel said this was an atypical case.

8   It's a very typical case in the television industry

9   involving unscripted or reality TV where there is a

10  contractual arrangement, such as the one Your Honor

11  referred to, that has with it a one-year embargo or

12  some period of embargo where there is a period of

13  repose during which the owner or the creator of the

14  program can't shop it to another network.  And what

15  happened here, of course, is A&E's consent was

16  required before Big Fish could shop another

17  unscripted live police show to another network,

18  which gave A&E one year to figure out what business

19  decision it wanted to make with respect to the

20  program and under the contract.  In fact, Live PD

21  ended in 2020 and the one-year embargo period

22  commenced and A&E made a business decision to let

23  the one-year embargo, right, it had against my

24  client lapse.  And then we went, as we're allowed to

25  under the contract, and contracted for future shows

Proceedings

1    on the new network.

2         The contract explicitly allows Big Fish to

3    do this.  It says that we are free after a year to

4    produce another show, "substantially similar in

5    content and format to the Live PD series."  So this

6    is standard in the industry, whether it's Project

7    Runway going to another network or whether it's a

8    Live Police show.  And so that was a business

9    decision that A&E made not to contract for future

10   shows on this format similar.  And it's not a

11   coincidence that the contract says substantially

12   similar because, of course, that is copyright

13   language.  And so it was clear under the contract

14   what the parties intended.  You can do a clone show.

15   What we can't do is use the copyrightable material

16   that A&E owns, which is the footage and the other

17   music and the other elements that are original to

18   the film of the A&E show.

19        And so there's no contractual breach claim

20   because we did what we were allowed to do once we

21   became a free agent.  And Your Honor is right.  I

22   mean, under their theory, Dan Abrams and Big Fish

23   can never produce and sell another reality show

24   about cops on the beat.  And no one owns a copyright

25   in the concept of a live unscripted police show.

Proceedings

```
 1            And as I'll now respond directly to the
 2   letter, all of the elements that they say are
 3   protectable individually or even in the aggregate
 4   are stock concepts for an unscripted police show far
 5   from original.  And in the letter they say we
 6   cherrypicked what were the stock generic scène à
 7   faire.  And then they provide four to your Honor,
 8   which they say is their kryptonite against
 9   A 12(b)(6) dismissal.  But if you look at the four
10   that they highlight as their greatest hits of
11   original expression, each is patently insufficient
12   to get by 12(b)(6) under the case law in this
13   circuit.  And this circuit has perhaps the best
14   developed case law in the country on how to look at
15   copyrightable and non-copyrightable material.
16            And of course, Your Honor, just recently,
17   maybe one of the most recent decisions in the
18   circuit on this issue wrestled with this in the
19   Walkie Check Productions case with -- against
20   Viacom.  And so here, before they highlight, confirm
21   that this case is ripe for dismissal.  First, they
22   say they have the same hosts dressed the same way,
23   using the same catchphrases.  Well, A&E doesn't own
24   a copyright in Dan Abrams as a television host.  Dan
25   Abrams' clothing, which is pretty, as well dressed
```

Proceedings

1    as he is, unremarkable.  They don't -- I'm not just

2    saying they own copyrights in the design of his

3    suit, but they're not in the clothing business.

4            If they want to non-compete, preventing Dan

5    Abrams from going to a different network, they could

6    have bargained for that, as they bargained for the

7    one-year embargo.  They didn't.  And as far as the

8    way they're dressed, the screenshots referenced in

9    the complaint actually show the hosts wearing

10   completely different clothing.  But of course, no

11   one owns a copyright in jeans and jackets and

12   T-shirts and button down shirts and black T-shirts.

13           Catch phrases, I don't know what that

14   means.  They don't identify any original verbiage or

15   expression that is claimed to be owned by anyone.

16   And no one has exclusive rights over slogans and

17   phrases common to the English language.  Again, I

18   don't know what they mean by catch phrases, and it's

19   really not actionable.

20           That was their first example of original

21   protective elements.  And that doesn't get out of

22   the batter's box, certainly not even close to first

23   base.  The second one, they say it uses some of the

24   same segments.  And the examples they give are

25   Missing, Wanted, Crime of the Week.  Now Missing and

Proceedings

1    Wanted have been on signage from the Wild West to

2    milk cartons, sheriff's posters, and in fact, I

3    think there have been shows with those titles.  It's

4    hard to imagine anything more generic in the concept

5    of policing and crime than Missing and Wanted.  They

6    go hand in glove.  No one owns the right, under

7    copyright or otherwise, to use those scène à faire

8    words that are -- it would be like a show about a

9    graveyard, and you can't use the word mourner or

10   tombstone.  I mean, it's that silly.  Every police

11   department in the country has a wanted list.  Every

12   police department in the country has a missing

13   persons list.  So that's their second.

14          The third is that defendants follow the

15   same police departments and officers, but no one

16   owns the copyright to a specific police precinct any

17   more than someone owns a copyright and a show about

18   the Empire State Building or what tourists do when

19   they go there.  And what's ironic about that

20   argument, which is their third of four, is that

21   perhaps the seminal case in this area, the one that

22   I knew when I was much younger because it's been

23   around for a while, is Judge Feinberg's decision in

24   Walker vs. Time Life Films.  And the irony of that

25   decision is it involved police department, the 41st

Proceedings

1    Precinct in the Bronx.

2             In that case, the author of a book titled

3    Fort Apache sued the producers of a movie called

4    Fort Apache the Bronx for copyright infringement.

5    The District Court -- I can't remember which

6    judge -- dismissed it -- Edelstein.  Actually, it

7    was Judge Edelstein, I remember, dismissed it.  And

8    Judge Feinberg authored a decision saying that the

9    book and movie both depicted police officers in the

10   same precinct in the Bronx, and every element from

11   the vermin to the drug dealers and the pimps and

12   everything else were all scène à faire.  And so that

13   argument, I think, goes nowhere.

14            And A&E knows the Port Apache case.  And

15   this is not a "tit for tat" or "gotcha", but A&E is

16   usually on the defense side of these cases because

17   A&E is a flagship network, and they regularly argue

18   in this court and elsewhere exactly what we're

19   arguing here, which is our shows do not infringe

20   anyone.  And they cite all the same cases that we're

21   citing now.  And in fact, just recently, A&E

22   affirmed this principle in a brief in the Married at

23   First Sight case arguing, "foot cases and the morale

24   problems of policemen are common concepts and not

25   protectable."

Proceedings

1          So all the elements on the new show that

2     A&E claims were copied from the old show are like

3     police foot chases; they're tropes and generic two

4     shows on policing.  And it's not a coincidence,

5     therefore, given our fascination with crime and the

6     association of crime and police with our creative

7     mediums dating back to radio shows, and well before

8     that, we've identified 30 shows, at least, that

9     depict real police officers on the job Cops, Lone

10    Star Law, Alaska State Troopers.  The Court can take

11    judicial notice of all of those and compare and

12    contrast and they all basically are "clones," of one

13    another.

14          And so the final argument they make in

15    their opposition letter, your Honor, is they say

16    that our show is the first show in television

17    history to feature law enforcement activity in real

18    time in such a sustained fashion.  (A), I don't know

19    what that means, but (B), if I interpret it to mean

20    really fast, live depiction of cops, that's old,

21    tried and true.  MTV had a special of which the

22    Court can take judicial notice called Busted Live

23    that aired eight years before Live PD.  It was a

24    live show that followed real time police patrols in

25    a similarly sustained dynamic fashion.  And if

Proceedings

1    that's not enough, this Court can take further
2    judicial notice and we will provide the Court with
3    all this material in our motion of Border Live,
4    which filed law enforcement in border states on the
5    Discovery Channel in 2018, and First Responders
6    Live, which filed law enforcement on Fox in 2019,
7    all airing contemporaneously with Live PD.  These
8    two shows, like the A&E show, all had the same
9    hallmarks of unscripted police show, commentators in
10   a studio, narrating law enforcement activity in the
11   field in real time.  And A&E chose not to sue
12   Discovery or Fox.  And so we think that finding
13   refuge in the, "total concept and overall feel,"
14   which is where A&E goes, is the last refuge of every
15   deficient copyright claimant.  A concept is not
16   copyrightable.  A&E can't claim exclusive rights
17   over otherwise unprotectable generic elements by
18   wrapping them in a bow and calling it an overall
19   totalistic feel.  Standing alone or taken together,
20   their alleged original elements are unprotectable as
21   a matter of law.  And so I just want to close by
22   going back to where I started, which is the
23   contract.  And what they bargained for during the
24   party's negotiations, which makes this case actually
25   easier to decide, was a one-year embargo, as I said.

Proceedings

1    And this was beneficial to both parties.  It ensured
2    that for this one year, they both have time to
3    negotiate about "a substantially similar look and
4    feel and format; a clone."  And ensured that for
5    this one year, A&E having invested its time and
6    money on the show, would have a period of repose.
7    But once that expired, we were a free agent.  Free
8    to work with Reelz or anyone else on, yes, a new
9    unscripted police show.  And that's exactly what we
10   did.  And that's why they have no redress.
11        And the reason for this one-year embargo is
12   it reflects the commercial reality, the recognition
13   in the industry that you can't copyright generic
14   elements of an unscripted show about cops on the
15   beat.  That's why they needed to create a
16   contractual repose, because without that, we would
17   have become an immediate free agent.
18        And on the trademark claims, I'll just say
19   this:  Live PD or live anything is not cognizable
20   under the trademark laws; Saturday Night Live, Jimmy
21   Kimmel Live, Live with Regis and Kelly and then 100
22   lives since those well known shows.  They then say,
23   well, we misled people to believe that the show was
24   on the A&E network as the old show.  That is not a
25   plausible allegation on the face of the complaint,

Proceedings

1    because the people who watched Live PD knew it was

2    canceled by A&E because Live PD was off the air for

3    two years before the new show was on Reelz.  And

4    that was known because it was displayed prominently

5    on the very advertising that they say is misleading.

6           In fact, the irony here is they had to know

7    and understand the shows are coming from different

8    sources to even find the shows on the channel to

9    begin with.  And so the parties had every incentive

10   to make clear to audiences that this was coming from

11   a different source.  And it's confusion as to

12   source, which is the talisman of a sustainable

13   trademark claim.  And we'll cite cases and show,

14   Your Honor, why, as a matter of law, the complaint

15   fails to state a viable trademark claim, and then

16   the unfair competition claim is preempted by the

17   Copyright Act, and we think that goes as well.

18   So --

19           THE COURT:  All right.  If you can pause,

20   Mr. Snyder.  Thank you.

21           I guess you began -- you ended where you

22   began by speaking about the contract, and I wanted

23   to explore that with you a little bit more.  I

24   didn't understand you to be suggesting that the

25   contract itself somehow undercut or affected the

Proceedings

1   strength or the viability of any claims of copyright

2   infringement that A&E might have.  But maybe that is

3   what you're saying, because what you do is you began

4   by saying, look, contract, and contract says we can

5   do something substantially similar in form and

6   content which is evocative of copyright law.  And

7   then you go -- and then you start talking about

8   whether certain things are copyrightable or whether

9   they amount to a viable claim of infringement.

10       So I guess I'd like to understand a little

11   bit more.  What impact do you believe the contract

12   has on what otherwise would have been the copyright

13   protections that A&E had?

14       MR. SNYDER:  Excellent question and I'm

15   sorry for the confusion.  We believe without the

16   contract, meaning, if there were no one-year

17   exclusivity period and we went out and sold the show

18   the day -- on the last day of the A&E show, we would

19   be before the Court making these exact same

20   arguments.  So it does not impact the copyright law

21   analysis.  But because the plaintiffs embedded the

22   contract and the context into the case and we think

23   distorted some of the terms of the contract, we

24   wanted to provide the Court with the contract which

25   is incorporated by reference now in the complaint as

Proceedings

1    helpful context of what's happening here.  So it's

2    simply context factual background and frankly, to

3    give the Court comfort that the commercial reality

4    underlining this as a matter of context and

5    background is perfectly symmetrical with the legal

6    outcome of the copyright analysis.

7        So just to be clear, the contract doesn't

8    help or advance directly our motion to dismiss which

9    is based on Walker and its progeny but provides

10   valuable context for the Court to understand really

11   what's going on here.

12       THE COURT:  All right.  Now separately each

13   of you has focused on the way in which Big Fish made

14   mention or attempted to draw a connection at least

15   as alleged between the prior show and the current

16   show; the former show being Live PD and the current

17   one being On Patrol Live.

18       And I guess to listen to plaintiff's

19   counsel, the very fact that this connection was

20   drawn is what shows or what bolsters the

21   infringement claims that they wish to bring.  To

22   you, actually, you were sort of using it as a sword

23   by saying no, no, no, it confirms that it -- it

24   dispelled any confusion that might arise because it

25   made clear that the one show was over and that there

Proceedings

1   was going to be a new show on another network.  But
2   perhaps you could help me understand that a little
3   bit better.
4           MR. SNYDER:  Yes.  First, I want to say as
5   a framing, A&E has said to Your Honor in its letter
6   that likelihood of confusion analysis doesn't lend
7   itself to a motion to dismiss and courts in this
8   district routinely dismissed cases for failing
9   adequately or plausibly to allege likelihood of
10  confusion, and the recent cases -- there's a Nike
11  case that we cite.  And we believe that if you go
12  through the Polaroid factors which we're all
13  familiar with, the trademark claim just strikes out
14  on -- although I think they're eight, so that would
15  be two strikeouts and two strikes, so two outs with
16  two strikes.  The mark is not strong.  The only
17  similarity in the two marks is the word "live,"
18  which obviously is generic.  And what the instances
19  of alleged confusion in the complaint actually show
20  to you -- the point Your Honor just made in
21  summarizing my argument, the alleged confusion cited
22  in the complaint is a sword because it shows that
23  audiences understood these shows were, in fact,
24  coming from two networks, two different networks.
25  And even with the alphabet soup and morass of our

Proceedings

1    screens these days, where we have 100 channels on

2    three screens across our television, the source of

3    confusion analysis does look to what -- under the

4    Polaroid factor, what a reasonable viewer would

5    discern.  And people who watch Live PD would

6    discern, since it was clicked on their A&E button,

7    that it was aired by A&E.  Two years later, it shows

8    up on Reelz.  And in order to see it on Reelz, you

9    have to find it on Reelz and push the Reelz button.

10   So a consumer had to understand the source of the

11   show Reelz, not A&E in order to even watch it.

12          So we believe that if you plug in the

13   Polaroid factors, which we didn't do in our letter,

14   but would in our brief, this is an easy call to

15   dismiss as a matter of law on the face of the

16   pleading.

17          THE COURT:  All right.  Let me please hear

18   from Mr. Yohai in response.  I thank you, Mr.

19   Snyder.  Mr. Yohai?

20          MR. YOHAI:  Yes, Your Honor.  You know, as

21   we allege in paragraph 62 of the complaint, the

22   consumers are saying themselves that they're

23   confused.  They say, okay, I'm confused.  Is Live PD

24   back on the air, if so, how do I watch it?  They say

25   Live PD is back.  They say Live PD returns tonight.

Proceedings

1    That's our show, Live PD.  So when Mr. Synder says

2    they're not confused, they know where it is and

3    where to find it, and then it's a different show.  I

4    don't believe that's the case.

5         In addition, if you look at paragraph 48 of

6    our complaint, which is one of the advertisements

7    that Reelz put forth, it says, PD Live is now on

8    Reelz with all new live episodes.  PD Live, that was

9    the reverse of our name, Live PD is on Reelz with

10   all new live episodes.  So they are trading on this,

11   saying that they are making new episodes of our

12   show.

13        Mr. Snyder brought up, you know, Project

14   Runway.  I'm actually familiar with that situation.

15   And unlike this situation, there was an agreement

16   when that moved.  It wasn't that they just took the

17   show and put it on their network and used our

18   copyrights for free.  So I don't know what relevance

19   that is.  And he may be right that shows move, but

20   they move when there are agreements and licensing or

21   a contract terminates, none of which happened here.

22   And so, because we have the copyrights in

23   perpetuity, there would have to have been an

24   agreement, which is, by the way, why there was a

25   business discussion about what we should receive for

Proceedings

1    this, which was abruptly ended saying they would not

2    make us any proposal, and then they went ahead and

3    did it anyway.  And so the notion that we're not

4    entitled to compensation for what has happened here,

5    I think his client even knows that that's probably

6    not right.

7             THE COURT:  I want you -- sir -- sir, I

8    want you to stop right there.  First of all, I'm not

9    interested in pre-litigation discussions about

10   avoiding litigation.  Second of all, I'm also not

11   going to be making a determination that something is

12   or is not a viable claim based on whether the

13   parties, for any number of reasons, wanted to avoid

14   litigation.  So I think -- I don't think that's the

15   hook on which you want to hang your arguments to me.

16   Why don't you move on to something else?

17            MR. YOHAI:  Okay, your Honor.  I appreciate

18   that.  The only reason that I raised it was because

19   defense counsel brought up Project Runway and

20   suggested that that had relevance to this case,

21   where it really doesn't, given the situation here.

22   So I would suggest perhaps that neither has

23   relevance.  But that's why I was responding on that

24   point.

25            THE COURT:  I don't -- I don't see -- all

Proceedings

1    right.  And I'll just end the discussion by saying I
2    don't see how what happened to Project Runway
3    matters to what happened in this case.  I do think
4    you were trying to poison the well.  The well is not
5    poisoned.  Again, sir, please move on to another
6    argument.
7              MR. YOHAI:  Okay.  Well -- okay.  Thank
8    you, your Honor.  I will.
9              So in any event, your Honor, with respect
10   to the points that I was making, the consumers have
11   spoken as to their confusion.  I don't need to
12   create the evidence.  The evidence is there, and
13   it's cited in our complaint.
14             In terms of what else I can say about the
15   confusion point, it is clear that they engaged in a
16   marketing campaign to deliberately try to confuse
17   the shows, which is why they went out to the
18   marketplace, and we're saying it was back.  And
19   that's in spades in the complaint.  It's in spades
20   in pictures, it's in spades in things attached to
21   the complaint, which your Honor can read for
22   herself.  So I won't need to repeat all of that.
23             So I think the confusion is evident from
24   what I've already gone through.  And again, that's
25   not me saying, it's the consumers themselves saying

Proceedings

1    it.

2            THE COURT:  Let's just hypothesize for a

3    moment that there is out there some easily confused

4    consumer who is confused because of an element that

5    is not protectable.  Are you still saying that you

6    have a viable claim even if the confusion arises

7    from non-protectable elements?  I appreciate your

8    telling me that, oh, no, no, no, everything I've

9    been talking to you about is protectable.  But I'm

10   just trying to make sure I understand precisely how

11   consumer confusion warrants my consideration in any

12   motion.

13           MR. YOHAI:  Your Honor, I understand your

14   question.  I would be hard pressed to tell you that

15   if something was not at all protectable, that could

16   be a basis in and of itself to create a claim, I

17   think under either of the statutes.  Having said

18   that, as your Honor already alluded to, we do think

19   the elements are protectable, one example of which

20   is when the defendants, for example, mention the

21   Missing.  Missing is a stock concept.  Well, it may

22   be -- but when they cut to the same person at the

23   National Center for Missing People, rather than

24   doing something else, when they cut to the exact

25   same person to do the same thing, it starts to look

Proceedings

1    and feel a little bit like well, this is exactly the

2    same.  And that's how you, as your Honor said in her

3    case, you collect and arrange the elements.  And

4    that's why, you know, we think when you look at the

5    collection and arrangement and coordination of the

6    elements here, it is protectable.  And that's also

7    why there is this confusion, because when people

8    watch the show, they also are confused.  And, you

9    know, quite frankly, some of them, I think, have

10   said, as I said, even after watching the show, it's

11   great that Live PD is back on the air again.

12          So, you know, to me, again, they've put it

13   on their network.  This isn't our network.  But

14   that's exactly the problem here.  You can't take

15   what we've created, intentionally confuse people

16   into thinking it's the same show, and then claim it

17   for your own.  That's the problem.

18          THE COURT:  Do you believe you'd still have

19   these claims even if there weren't what you

20   described as efforts made to suggest a continuation

21   from Live PD to On Patrol Live?

22          MR. YOHAI:  Your Honor, we considered very

23   carefully whether to bring this case.  And so I

24   think if several of these elements were not present,

25   we wouldn't have brought the case.  I think here,

Proceedings

1    because of all of the factors, meaning that they did

2    try to trade on our show, plus the extreme

3    similarity -- you know, I could go on, they are

4    using the same director, for example.  When I heard

5    about from defense counsel about how well live

6    action is not something that's new original.  The

7    director, John Gonzalez, he was the director of some

8    of our Super Bowls, and they did have a unique way

9    of putting together this particular live action,

10   which is part of the look and feel of the show.

11           So, again, to answer your question

12   directly, if all of the factors were not present, we

13   probably wouldn't have brought the case.  But since

14   they did trade on our name and put that together

15   with all the similarities, we did bring the case.

16           THE COURT:  All right.  Thank you.

17           Mr. Snyder, my suspicion is there that I am

18   unable to dissuade you from bringing the instant

19   motion.  Am I correct?

20           MR. SNYDER:  Most respectfully, you are

21   correct, Judge.

22           THE COURT:  All right.  Thank you.

23           Sir, how much time would you like,

24   recognizing that I'm not interested in destroying

25   your associates Thanksgiving, to file your opening

Proceedings

1    brief?

2             MR. SNYDER:  I'm looking at my sad victim

3    right now, Ilissa and James.  How about -- what's

4    today, October 27th?  Could we file it, given the

5    Thanksgiving week, on December 9th?

6             THE COURT:  Yeah.  That's actually the date

7    I was looking at.

8             MR. SNYDER:  All right.

9             THE COURT:  Okay.  Thank you.

10            And, Mr. Yohai, again, recognizing that

11   there are some holiday observances in all of this.

12   May I have your response by January 20?

13            MR. YOHAI:  Yes, that's reasonable, your

14   Honor.

15            THE COURT:  Thank you.  All right.

16            And then can I have the reply by

17   February 3rd, Mr. Snyder?

18            MR. SNYDER:  Yes, of course.  Thank you.

19            THE COURT:  Okay.  All right.

20            MR. YOHAI:  Your Honor --

21            THE COURT:  Yes.  May I ask who's just now

22   speaking?

23            MR. YOHAI:  Yes, this is Mr. Yohai.  May I

24   ask a question?

25            THE COURT:  Thank you.  Of course, sir.

Proceedings

```
 1            MR. YOHAI:  We're assuming that this is one
 2     brief.  There are obviously three defendants, but we
 3     just wanted to make sure we understand what we're
 4     getting.
 5            THE COURT:  Oh, yes.  That's fair enough.
 6     I understood one brief.  I also understood one brief
 7     within the page limit.  So though, at some point,
 8     I'm confident Mr. Snyder is going to try and change
 9     that.
10            MR. SNYDER:  Maybe.  Maybe.
11            THE COURT:  I wouldn't ask.  I think you
12     should try and get it within the 25 pages.  And --
13     go ahead, Mr. Snyder.  Please finish your though.
14            MR. SNYDER:  We had one further request,
15     which is that because we believe this case should be
16     dismissed in full on the pleadings, we believe that
17     a short stay of discovery while the Court resolves
18     our motion makes the most sense for the Court and
19     the parties for all the obvious efficiency reasons.
20     And I'm very confident that Weil, Gotshal and Gibson
21     Dunn, if the motion dismissed is denied and the case
22     continues, can make up for lost time and promptly
23     and efficiently embark on discovery without any
24     prejudice to anyone, we believe there's good cause
25     for a stay.  And I can argue it, but I'm hoping my
```

Proceedings

1    colleague on the other side will agree that putting

2    the pause on discovery until the first quarter of

3    next year, if the case survives, makes sense.

4              For example, Amy's first set of requests

5    for production, Judge regrettably and painfully

6    include 288 requests to the three defendants

7    combined.  So that would be like 1,000 -- oh, 50

8    each.  And then six days ago, we got 56

9    interrogatories.  And leaving aside the sheer number

10   of requests at this early stage, they're overbroad.

11   We're going to need to have discovery litigation

12   before we narrow them.  And I'm happy to tell you

13   how broad and unreasonable they are, but there's

14   really no prejudice here at all.  There's no

15   injunction request, et cetera, et cetera.

16             THE COURT:  Okay.  Mr. Yohai, as a matter

17   of practice, for the past nine and three quarter

18   years, I have stayed discovery where the

19   contemplative motion would be fully dispositive.

20             Sir, I'll hear from you if you think I

21   should make this one exception, but I did want you

22   to know, if you weren't familiar with my individual

23   practices, that that is something I do as a matter

24   of course.

25             MR. YOHAI:  I appreciate that, your Honor.

Proceedings

```
 1    I was not aware that that was your consistent
 2    practice.  I would just say a couple of things.
 3    One, to the extent that the defendants are relying
 4    upon the contract, it couldn't possibly be
 5    dispositive against two out of the three defendants
 6    since they're not party to the contract.  I
 7    recognize that their arguments as to the other
 8    elements are arguably dispositive, if they're
 9    successful.  I don't think there would be any harm
10    in exchanging document request.  Sounds like we're
11    going to have a lot of issues about what is and is
12    not broad -- or not broad.  I would say that it is
13    not anywhere near 1,000.  It was 288 combined for
14    the three defendants, and many of them are similar.
15    And so I would suggest we exchange at least the
16    document requests and get started on what the
17    objections are going to be in parallel, so there is
18    no delay.  And, you know, I don't know how long Your
19    Honor will have to work on this and the Court's
20    schedule, but it seems to me we could do certain
21    things at least, and get the case moving without a
22    whole lot of delay.  At least it would help.
23            THE COURT:  All right.  Mr. Snyder, would
24    you just speak to the very limited issue of Mr.
25    Yohai's argument that your motion, however
```

Proceedings

1   thoughtfully it is presented, could not be

2   dispositive as to the two of three defendants who

3   were not signatories to the agreement?

4          MR. SNYDER:   Yeah.   There are three claims.

5   As I understand it, there's a copyright claim

6   against all three defendants, a trademark claim

7   against all three defendants, and an unfair

8   competition claim against all three defendants.   We

9   believe our motion, if granted, will dispose of all

10  three claims against all three defendants,

11  irrespective of who's a party to the contract.   For

12  the reasons I said earlier, the contract is context

13  and background, not an actual basis for dismissal.

14         THE COURT:   All right.   At this time, I am

15  going to keep my consistent practice of ordering the

16  stay.   So discovery is stayed pending further order

17  of the Court, and I certainly recognize the party's

18  desire to move this case forward.   Hopefully, my

19  schedule won't get in the way, but we'll see about

20  that.

21         We will be entering a minute entry, and

22  you'll be receiving that electronically that

23  reflects these dates.   From my perspective, these

24  were the issues that I did want to address in this

25  proceeding.

Proceedings

1          Mr. Yohai, is there anything else that you
2     or your colleagues would like to bring to my
3     attention this morning?
4          MR. YOHAI:  No, Your Honor.  We thank you
5     for your patience.
6          THE COURT:  Thank you very much, sir, for
7     yours.
8          And, Mr. Snyder, from you and your team, is
9     there anything else to discuss today?
10         MR. SNYDER:  No, Your Honor.  And as
11    always, thank you for your time and consideration.
12    We appreciate it.
13         THE COURT:  All right.  Well, I thank you
14    all.  I'm wishing you all continued safety and good
15    health during this pandemic and happy holidays to
16    the extent we won't be speaking before then.  Thank
17    you.  We are adjourned.
18         MR. SNYDER:  Thank you.
19         MR. YOHAI:  Thank you.
20
21
22
23
24
25

1                    C E R T I F I C A T E

2

3       I, Marissa Mignano, certify that the foregoing

4    transcript of proceedings in the case of

5    A&E Television Networks, LLC v. Big Fish

6    Entertainment, LLC, et al., Docket #1:22-cv-07411-KPF,

7    was prepared using digital transcription software

8    and is a true and accurate record of the proceedings.

9

10

11    Signature    _____
                        *Marissa Mignano*

12                    Marissa Miganano

13

14    Date:       12/15/22

15

16

17

18

19

20

21

22

23

24

25