**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| A&E TELEVISION NETWORKS, LLC, | |
| Plaintiff, | Case No. 1:22-cv-07411 |
| v. | Hon. Katherine P. Failla |
| BIG FISH ENTERTAINMENT, LLC, HALF MOON PICTURES, LLC, and REELZCHANNEL, LLC | |
| Defendants. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**<u>DEFENDANTS' MOTION TO DISMISS</u>**

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND ................................................................................. 3

    I.    AETN Owns All Copyright and Trademark Rights Related to its Hit Series *Live PD*. ..... 3

    II.   Defendants Publicly Announced They Were "Bringing Back" *Live PD* on REELZ ......... 4

    III.  Defendants Copied *Live PD* in its Entirety ........................................................ 5

LEGAL STANDARD ........................................................................................ 6

ARGUMENT ................................................................................................... 7

    I.    AETN Pleads Well-Supported Copyright Infringement Claims ....................................... 7

        a.    The Copyright Act Protects the Selection, Coordination, and Arrangement of Even Non-Protectable Elements to Create Live PD's Total Concept and Feel .............................. 8

        b.    Live PD's Individual Segments and Sequences Are Entitled to Copyright Protection and Defendants Copied Them Outright. ............................................................... 12

        c.    The Other Television Shows Referenced by Defendants are Outside the Complaint and Only Highlight Live PD's Originality. ............................................................. 16

        d.    The Series Agreement Did Not Authorize Defendants to Copy Live PD. .................. 17

        e.    Defendants Have No Response to AETN's Other Copyright Claims ......................... 17

    II.   AETN Pleads Well-Supported Federal Trademark and Unfair Competition Claims ....... 18

        a.    PD LIVE Infringes LIVE PD ................................................................... 18

        b.    The Use of LIVE PD is Trademark Infringement and Unfair Competition ................ 18

        c.    The Polaroid Factors are Fact-Intensive and All Favor AETN at This Stage ............. 20

        d.    The Nominative Fair Use Doctrine Does Not Apply ...................................... 24

    III.  AETN Pleads All Elements of a New York Law Unfair Competition Claim ................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...............................................................................................6

*Barris/Fraser Enters. v. Goodson-Todman Enters., Ltd.*,
  1988 WL 3013 (S.D.N.Y. Jan. 4, 1988) ..............................................................10

*BBC v. Stander*,
  2017 WL 1807592 (C.D. Cal. Mar. 18, 2017)......................................................22

*Betty, Inc. v. PepsiCo, Inc.*,
  283 F. Supp. 3d 154 (S.D.N.Y. 2017)...................................................................11

*Brennan's, Inc. v. Brennan's Rest., L.L.C.*,
  360 F.3d 125 (2d Cir. 2004)..................................................................................21

*Cap. Recs., LLC v. Vimeo, LLC*,
  2018 WL 1634123 (S.D.N.Y. Mar. 31, 2018) ......................................................25

*Car-Freshner Corp. v. Am. Covers, LLC*,
  980 F.3d 314 (2d Cir. 2020)..................................................................................20

*Castorina v. Spike Cable Networks, Inc.*,
  784 F. Supp. 2d 107 (E.D.N.Y. 2011) ..................................................................11

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002)..................................................................................16

*de Becdelievre v. Anastasia Musical LLC*,
  2018 WL 1633769 (S.D.N.Y. Apr. 2, 2018).........................................................12

*eScholar, LLC v. Otis Educ. Sys., Inc.*,
  2005 WL 2977569 (S.D.N.Y. Nov. 3, 2005)...........................................................7

*Feist Publ's, Inc. v. Rural Tel. Serv. Co., Inc.*,
  499 U.S. 340 (1991).............................................................................................8, 9

*Flat Rate Movers, Ltd. v. FlatRate Moving & Storage, Inc.*,
  104 F. Supp. 3d 371 (S.D.N.Y. 2015)..............................................................20, 23

*Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co.*,
  2022 WL 17851810 (S.D.N.Y. Dec. 22, 2022) ....................................................18

*Gen. Mills, Inc. v. Chobani, LLC*,
   158 F. Supp. 3d 106 (N.D.N.Y. 2016)..................................................................19, 20

*Guthrie Healthcare Sys. v. ContextMedia, Inc.*,
   826 F.3d 27 (2d Cir. 2016).................................................................18, 21, 22, 23

*Hermes Int'l v. Rothschild*,
   2022 WL 1564597 (S.D.N.Y. May 18, 2022) ........................................................20

*Horizon Comics Prods., Inc. v. Marvel Ent., LLC*,
   246 F. Supp. 3d 937 (S.D.N.Y. 2017)....................................................................10

*Int'l Council of Shopping Centers, Inc. v. Info Quarter, LLC*,
   2018 WL 4284279 (S.D.N.Y. Sept. 7, 2018)..........................................................24

*Int'l Info. Sys. Sec. Cert. Cons., Inc. v. Sec. Univ., LLC*,
   823 F.3d 153 (2d Cir. 2016)............................................................................22, 24

*Jorgensen v. Epic/Sony Recs.*,
   351 F.3d 46 (2d Cir. 2003)......................................................................................7

*Keeling v. Hars*,
   809 F.3d 43 (2d Cir. 2015)......................................................................................8

*Knitwaves, Inc. v. Lollytogs Ltd.*,
   71 F.3d 996 (2d Cir. 1995)......................................................................................9

*LaChapelle v. Fenty*,
   812 F. Supp. 2d 434 (S.D.N.Y. 2011)................................................................9, 12

*Littlejohn v. City of New York*,
   795 F.3d 297 (2d Cir. 2015)..................................................................................19

*Lone Wolf McQuade Assocs. v. CBS Inc.*,
   961 F. Supp. 587 (S.D.N.Y. 1997) ........................................................................11

*Lopez v. Nike, Inc.*,
   2021 WL 128574 (S.D.N.Y. Jan. 14, 2021) ...........................................................22

*Medisim Ltd. v. BestMed LLC*,
   910 F. Supp. 2d 591 (S.D.N.Y. 2012)....................................................................25

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
   545 U.S. 913 (2005)..............................................................................................17

*MyPlayCity, Inc. v. Conduit Ltd.*,
   2012 WL 1107648 (S.D.N.Y. Mar. 30, 2012) ........................................................25

*New York State Elec. & Gas Corp. v. U.S. Gas & Elec., Inc.*,
    697 F. Supp. 2d 415 (W.D.N.Y. 2010) ...................................................................21

*Nicosia v. Amazon.com, Inc.*,
    834 F.3d 220 (2d Cir. 2016) ...................................................................................6

*NYC Triathlon, LLC v. NYC Triathlon Club, Inc.*,
    704 F. Supp. 2d 305 (S.D.N.Y. 2010) ...................................................................23

*OMG Accessories LLC v. Mystic Apparel LLC*,
    2021 WL 1167528 (S.D.N.Y. Mar. 25, 2021) ..........................................7, 10, 15

*Polaroid Corp. v. Polarad Electronics Corp.*,
    287 F.2d 492 (2d Cir. 1961) ...................................................................................20

*Pulse Creations, Inc. v. Vesture Grp., Inc.*,
    154 F. Supp. 3d 48 (S.D.N.Y. 2015) ..............................................................19, 25

*RBC Nice Bearings, Inc. v. Peer Bearing Co.*,
    676 F. Supp. 2d 9 (D. Conn. 2009) .......................................................................25

*Rodriguez v. Heidi Klum Co., LLC*,
    2008 WL 4449416 (S.D.N.Y. Sept. 30, 2008) .......................................................11

*Savin Corp. v. The Savin Grp.*,
    391 F.3d 439 (2d Cir. 2004) ...................................................................................23

*Scotch & Soda B.V. v. Scotch & Iron LLC*,
    2018 WL 2224997 (S.D.N.Y. May 15, 2018) .......................................................20

*Scutti Ents., LLC. v. Park Place Ent. Corp.*,
    322 F.3d 211 (2d Cir. 2003) .....................................................................................7

*SHL Imaging, Inc. v. Artisan House, Inc.*,
    117 F. Supp. 2d 301 (S.D.N.Y. 2000) ...................................................................17

*The Sports Auth., Inc. v. Prime Hosp. Corp.*,
    89 F.3d 955 (2d Cir. 1996) ...............................................................................22, 24

*Tecnimed SRL v. Kidz-Med, Inc.*,
    763 F. Supp. 2d 395 (S.D.N.Y. 2011) ...................................................................18

*Tiffany (NJ) Inc. v. eBay, Inc.*,
    600 F.3d 93 (2d Cir. 2010) .....................................................................................24

*Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*,
    338 F.3d 127 (2d Cir. 2003) .....................................................................................9

*Viahart, LLC v. Creative Kids Online, LLC*,
  2022 WL 836431 (S.D.N.Y. Mar. 18, 2022) ...........................................................................23

*Walker v. Time Life Films, Inc.*,
  784 F.2d 44 (2d Cir. 1986)................................................................................................11, 16

*Walkie Check Prods., LLC v. ViacomCBS Inc.*,
  2022 WL 2306943 (S.D.N.Y. June 27, 2022) .......................................................7, 9, 10, 11

*Williams v. AETN*,
  No. 14-CV-9893 (S.D.N.Y.) ...........................................................................................10, 11

*Yurman Design, Inc. v. PAJ, Inc.*,
  262 F.3d 101 (2d Cir. 2001).....................................................................................................7

Plaintiff A&E Television Networks, LLC ("AETN") respectfully submits this Opposition to Defendants' Motion to Dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

Defendant REELZ needed a hit to jumpstart its strategy of creating a law enforcement network. Rather than create a new offering, Defendants Big Fish and Half Moon (together, "Big Fish") took a proven show—AETN's immensely popular *Live PD*—and cloned it. Defendants' actions were far from subtle. They copied *Live* PD's content, format, segments, pacing, camera angles, and even hired the same hosts and director. They initially called the show "*PD Live*"—an obvious inversion of *Live PD*—until AETN complained. The resulting program has an identical look and feel to *Live PD*, and Defendants repeatedly trumpeted to advertisers, *Live PD*'s fans, and the public that they were "bringing back" *Live PD* in order to generate interest in the show. That was, after all, the lynchpin of their marketing strategy. The allegations of the Complaint fully establish claims for copyright infringement, trademark infringement, and unfair competition.

Defendants acknowledge that AETN owns a valid copyright in *Live PD*. And they do not seriously dispute that *On Patrol: Live* is virtually identical to *Live PD*. Rather, Defendants hang their hat entirely on the notion that nothing Big Fish created as a work made-for-hire for AETN was copyrightable in the first place. Defendants are wrong: *Live PD* is protectable because the Copyright Act protects all original choices made in selecting, coordinating, or arranging elements in a work regardless of whether those elements are independently copyrightable. *Live PD*'s segments and sequences—including, *inter alia*, its opening sequence; studio segments featuring host commentary; recurring segments such as "Missing," "Wanted," and "Crime of the Week"; pre-recorded segments covering a single police encounter; transition sequences before and after commercial breaks and between different locales; and its end roll—were all carefully selected and

arranged, and Defendants copied A&E's selection and arrangement in toto. Moreover, even with respect to numerous individual elements, the particular expression in *Live PD* that Defendants copied involved creative choices that well exceed the minimal degree of original creativity required to establish protectability under copyright law.

Largely avoiding comparing the two shows,[1] Defendants instead point to other "police reality shows," such as *Cops* (which was not even a live show), and observe that AETN has not sued on any of them. AETN, however, is not trying to protect the *idea* of a police reality show, but rather the particular expression of that idea embodied by *Live PD*. In marked contrast to *On Patrol: Live*, these other shows look nothing like *Live PD*. If anything, they exemplify how many different and original ways exist to express the elements of a police reality show, and highlight just how blatantly Defendants went about copying AETN's original expression. They are also, in any event, all outside the Complaint and do not provide a basis for dismissal under Rule 12.

Again venturing outside the Complaint, Defendants assert that AETN regrets "cancelling" *Live PD* and that somehow this means the show is "free for the taking." Mot. at 1. That is a nonsensical non-sequitur as such assertions have no effect on AETN's copyrights and trademarks. And by claiming that this lawsuit is about a show that AETN "did not want," Defendants effectively concede that this was, indeed, AETN's show all along. Moreover, nothing in the "Series Agreement" between AETN and Defendant Big Fish grants Big Fish any affirmative right to use AETN's copyrights, a right which would have to have been granted explicitly and was not. The clause prohibiting Defendant Big Fish from authorizing the telecast of any program that is

---

[1] While Defendants avoid comparing the two shows, AETN invites that analysis and has submitted herewith a 14-minute video compilation, drawn from Exhibits C and D to the Complaint, comparing various virtually identical elements, segments, and features of the two shows. *See* Decl. of Fredrick T. Rhine Ex. A, which will be lodged with the Court.

substantially similar to *Live PD* for a one-year period is both inapplicable (because *On Patrol: Live* is virtually identical, not just substantially similar to *Live PD*) and also an obvious additional *constraint* on Defendant Big Fish, not a license. In any event, that argument could not excuse Half Moon and REELZ because neither is a party to the Series Agreement.

The Complaint's trademark and unfair competition claims also are well pled. There is no dispute that AETN owns trademark rights in LIVE PD. Defendants mischaracterize the dispute as one over the use of the word "*Live*" in the title of both shows, but that is not the gravamen of AETN's trademark claim. Defendants originally marketed their show using the name "*PD Live*," which itself was a trademark violation. And Defendants extensively used the full mark LIVE PD without AETN's consent by repeatedly proclaiming that they were "bringing back" *Live PD*. Merely changing the name to *On Patrol: Live* after AETN complained does not erase liability for the infringement. And by adding the word "Patrol"—which the public already associates with AETN's popular spin-off "*Live PD: Police Patrol*"—Defendants were again trading on AETN's brand and confusing the public about the show's source and origins.

This case is not about stifling competition. Big Fish is free to bring original television programming to REELZ or anyone else. What Defendants cannot do under the copyright and trademark laws is copy AETN's *Live PD* in its entirety, tell the market that they are "bringing back" *Live PD*, and try to pass off the resulting program as their own show. The motion should be denied.

## FACTUAL BACKGROUND

### I.    AETN Owns All Copyright and Trademark Rights Related to its Hit Series *Live PD*.

In July 2016, AETN hired Defendant Big Fish to produce *Live PD* as a work made-for-hire. Compl. ¶¶ 2, 20-21. AETN and Defendant Big Fish signed a "Series Agreement" which gave AETN sole ownership of all rights, including all copyrights and trademarks, in the *Live PD* series

in perpetuity. *Id.* ¶ 21. AETN registered copyrights in 24 representative episodes. *Id.* ¶ 19. AETN also registered federal trademarks related to the *Live PD* franchise, including the word mark "LIVE PD" for various entertainment services, including "a multimedia program series." *Id.* ¶¶ 26-30, Ex. E. AETN also has common law rights in the LIVE PD mark. *Id.* ¶ 28.

Live PD began airing in 2016 and was a major hit. *Id.* ¶ 33. *Live PD* followed police from across the country for three hours every Friday and Saturday night—the first show in history to show police activity in real-time in such a sustained fashion. *Id.* ¶ 107. *Live PD*'s appeal came from the unique way it mixed live footage with in-studio discussions between its three hosts (Dan Abrams, Sean "Sticks" Larkin, and Tom Morris, Jr.); pre-recorded clips; and recurring segments such as "Missing," "Wanted," and "Crime of the Week." *Id.* ¶¶ 32, 57. In 2018, *Live PD* was rated the No. 1 show on all of television 28 times in the key demographic of "Adults 25-54" (excluding sports). *Id.* ¶ 33. A year later, *Live PD* was the most-watched program on ad-supported cable television in its timeslot. *Id.* By 2020, *Live PD* had catapulted A&E® network to a No. 1 ranking on Friday and Saturday nights in primetime in key demographics. *Id.* The *Live PD* series spawned eight spin-offs, each of which AETN authorized and exclusively owns. *Id.* ¶ 34. AETN suspended production of new episodes of *Live PD* in June 2020 amid protests over police brutality, but it has continued to make *Live PD* and its spin-offs available on A&E®'s official YouTube channel, where they have garnered hundreds of millions of views. *Id.* ¶¶ 2, 29.

## II.    Defendants Publicly Announced They Were "Bringing Back" *Live PD* on REELZ

In early 2022, REELZ was mired in the rankings (placing 89th among cable networks in total viewers) and desperate for a hit show. *Id.* ¶ 1. Big Fish (*Live PD*'s former producer) seized on its access to an existing hit, cloned *Live PD*, and sold it to REELZ. *Id.* Although AETN never relinquished its copyright and trademark rights in and to *Live PD*, nor authorized Defendants to develop new episodes or a spin-off, Defendants nevertheless launched a coordinated multimedia

4

blitz promoting the "return," "relaunch," and "revival" of *Live PD* on REELZ. *Id.* ¶¶ 37-50. Barely bothering to cover its tracks, REELZ proclaimed to media advertising agencies that it was adding "*PD Live*" (the then-"working title" of the program) to its lineup and would have "all new episodes" of the "#1 TV Show." *Id.* AETN wrote to Defendants, demanding they cease and desist from airing the proposed show and from representations that they were "bringing back the show [*Live PD*]." *Id.* ¶ 51. Apparently recognizing that "PD LIVE" was too blatant an infringement, Defendants tweaked the name to *On Patrol: Live*—which was confusingly similar to AETN's mark LIVE PD: POLICE PATROL (a *Live PD* spin-off). *Id.* ¶ 52.

Defendants otherwise ignored the cease and desist and continued to mislead the public and *Live PD* fans by insisting that *On Patrol: Live* was a continuation of *Live PD*. Their campaign worked precisely as intended. The Wall Street Journal, for example, reported that "*Live PD* is coming back this summer as '*On Patrol: Live*,'" which REELZ then shared on Twitter. *Id.* ¶¶ 38, 46. Defendants repeated this tactic with numerous other publications. *Id.* Mr. Abrams, the executive producer, repeatedly "tweeted" that "***Live PD* is coming back this summer as *On Patrol: Live***" (quoting the Wall Street Journal) and "***Live PD* is back as *On Patrol: Live***" (quoting a New York Post article). *Id.* ¶ 43. REELZ and Half Moon issued a press release touting their connection to *Live PD* and using the LIVE PD mark to do so. *Id.* ¶ 47. REELZ also used the LIVE PD mark to publicly announce that *Live PD* would be returning on REELZ, and made similar statements directly to advertisers and media personnel. *Id.* ¶ 48. Defendants thus intentionally created widespread confusion of AETN's connection to *On Patrol: Live*, which allowed them to profit from the broad recognition and goodwill that AETN built in the LIVE PD mark. *Id.* ¶ 62.

## III.   Defendants Copied *Live PD* in its Entirety

*On Patrol: Live* premiered in July 2022. *Id.* ¶¶ 53, 57. Tellingly absent from the Motion is any description of the show, let alone an attempt to distinguish it from *Live PD*. Defendants'

reticence is understandable: *On Patrol: Live* replicates all of the creative choices that contribute to *Live PD*'s distinctive look and feel. *See* Rhine Decl. Ex. A (video compilation of numerous elements from the two shows, including their opening sequences; transition sequences; camera work and visual elements used with live footage; recurring segments such as "Missing," "Wanted," and "Crime of the Week"; a variety of host phrases; commercial break and location transitions; and end roll sequences). The similarities reflected in this video are so striking that there can be no doubt that Defendants made no attempt to create an original work of any kind.

Indeed, critics immediately recognized Defendants' show as "a clone of A&E's *Live PD*." *Id.* ¶ 61. As one reviewer put it, "***Live PD is back on the air***. Sure, it's got a new name and a new network in Reelz, but the reality TV series is ***almost exactly the same show***" as *Live PD*. *Id.* Viewers took to the Internet in droves to express their confusion (*e.g.*, "I'm confused. Is *Live PD* back on the air?"; "*Live PD* returns tonight"; and "So awesome to be spending Friday & Saturday nights watching *Live PD* again. I missed it!"). *Id.* ¶ 62. And Defendants benefited greatly from this consumer confusion. *Id.* ¶ 63. Despite significant technical difficulties, 3.5 million unique viewers watched *On Patrol: Live*'s first episodes, propelling REELZ into the top 25 cable networks for the first time. *Id.* But the reason REELZ now has a hit show was not happenstance or good fortune; it was the direct result of slavishly copying *Live PD* and taking advantage of AETN's reputation and goodwill. *Id.*

## LEGAL STANDARD

A complaint must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must "construe the complaint liberally [and] accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d

Cir. 2016) (quotation omitted). Claims should not be dismissed "unless it appears beyond doubt . . . that the plaintiff can prove no set of facts which would entitle [them] to relief." *Scutti Ents., LLC. v. Park Place Ent. Corp.*, 322 F.3d 211, 214 (2d Cir. 2003)*.*

## ARGUMENT

### I.   AETN Pleads Well-Supported Copyright Infringement Claims

AETN's Complaint establishes a copyright infringement claim because it alleges: "(1) ownership of a valid copyright and (2) infringement of the copyright by the defendant[s]." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 109 (2d Cir. 2001). Copyright ownership is not disputed; Defendants admit AETN owns valid copyrights in numerous registered episodes of *Live PD*. *See* Mot. at 12, n. 5. The second prong of the test "is generally resolved by the fact-finder" beyond the motion to dismiss stage. *OMG Accessories LLC v. Mystic Apparel LLC*, 2021 WL 1167528, at *2 (S.D.N.Y. Mar. 25, 2021); *Walkie Check Prods., LLC v. ViacomCBS Inc.*, 2022 WL 2306943, at *6 (S.D.N.Y. June 27, 2022) (Failla, J.) ("'[Q]uestions of non-infringement have traditionally been reserved for the trier of fact.'"); *eScholar, LLC v. Otis Educ. Sys., Inc.*, 2005 WL 2977569, at *28 (S.D.N.Y. Nov. 3, 2005) (early dispositive rulings have "traditionally been frowned upon in copyright litigation").

AETN's Complaint satisfies the infringement prong of the test, which requires allegations that (i) the defendant actually copied the plaintiff's work; and (ii) the copying was "illegal because a substantial similarity exists between the defendant's work and the protect[a]ble elements of plaintiff's [work]." *Yurman*, 262 F.3d at 110. To show actual copying, a complaint needs to allege the defendant "had access to the copyrighted material [and] that there are similarities between the two works that are probative of copying." *Jorgensen v. Epic/Sony Recs.*, 351 F.3d 46, 51 (2d Cir. 2003) (citation omitted). AETN's Complaint does just that. As the producer of both shows, Big Fish undeniably had access to *Live PD*. Compl. ¶¶ 3, 37-48, 66. Moreover, Defendants implicitly

acknowledge that *On Patrol: Live* is virtually identical to *Live PD*—well beyond "probative similarity." *See* Mot. at 7.

Rather than dispute any of the many similarities between the shows, Defendants only argue about *Live PD*'s "protectability." Mot. at 5. That argument fails. *First*, as Defendants ultimately concede at the end of their copyright section (Mot. at 12), a show can be protectable based on the creative "selection, coordination, and arrangement" of its constituent segments and sequences, which create the show's unique "total concept and overall feel." *Second*, even if the *idea* of elements such as live footage of particular police departments toggling between live police patrol action and studio commentary by the show's hosts and interspersed with weekly "segments" are common in police reality shows, the *expression* of these ideas in *Live PD* is protectable.

### a.  *The Copyright Act Protects the Selection, Coordination, and Arrangement of Even Non-Protectable Elements to Create Live PD's Total Concept and Feel*

Defendants acknowledge that "'the selection and arrangement' of preexisting, unprotected elements may itself be sufficiently original and creative to warrant protection." Mot. at 12 (quoting *Feist Publ's, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 349 (1991). Indeed, even telephone numbers in a directory "may be copyrighted if its non-copyrightable factual elements are arranged with the requisite 'minimal degree' of originality." *Id.* at 350-51.

The elements in *Live PD* are undisputedly more creative than telephone numbers. AETN has alleged that *Live PD*'s "total concept and overall feel" is a result of the creative selection, coordination, and arrangement of its constituent segments, including its opening sequence; in-studio commentary by the same hosts; recurring segments such as "Missing," "Wanted," and "Crime of the Week"; pre-recorded segments covering police encounters; transition sequences between commercial breaks and between locales; camera angles; and its end roll. Compl. ¶ 70; *Keeling v. Hars*, 809 F.3d 43, 50-51 (2d Cir. 2015) (theatrical production was protected based on

"the original way in which [the author] selected, coordinated, and arranged" stage directions and theatrical devices, even though those elements were not copyrightable); *LaChapelle v. Fenty*, 812 F. Supp. 2d 434, 445–46 (S.D.N.Y. 2011) (plaintiff's "selection and orchestration" of "angles, poses[,] lighting…themes, props, settings, wardrobes and colors" had requisite degree of original creativity). *Live PD*'s "overall feel" is further informed by the creative choice to focus on specific law enforcement departments (*e.g.*, the Richland County, SC Sheriff's Department) and on specific individual officers within those departments (*e.g.*, Addy Perez and Danny Brown of the Richland County Sheriff's Department). *Id*. ¶ 57. *On Patrol: Live* features these very same departments and officers. Compl. Ex. D.

The inquiry as to the total concept and overall feel is "holistic," and courts may not engage in the type of exercise that Defendants prefer—namely, to "dissect [works] into their separate components, and compare only those elements which are in themselves copyrightable." *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1003 (2d Cir. 1995). Rather, courts in this Circuit "compar[e] the contested design's 'total concept and feel' with that of the allegedly infringed work." *Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 133 (2d Cir. 2003). In *Tufenkian*, the Second Circuit found that a carpet design that combined two public domain designs with some minor changes was protectable because the plaintiff "engaged in a selective and particularized culling of a leaf here, a complex of leaves and flowers there, and so forth," and this "non-mechanical adaptation of individually unprotectible elements from the public domain is precisely the type of 'original selection' that the Supreme Court indicated was protectible expression in *Feist*." *Id.* at 135-36. The Second Circuit found infringement because defendant mimicked those creative choices. *Id.*

In *Walkie Check,* this Court recognized that the holistic approach "permits a finding of

copyright infringement where a defendant has 'parroted properties that are apparent only where numerous aesthetic decisions embodied in the plaintiff's work of art—the excerpting, modifying and arranging of unprotectible components—are considered in relation to one another.'" 2022 WL 2306943, at *7 (cleaned up). This Court denied a motion to dismiss, finding that plaintiff adequately pled its show treatment was entitled to protection because "the sum total of Plaintiff's artistic choices in the Treatment constitutes a protectable work under copyright law," even though it was made up of elements that were not themselves protectable on their own. *Id.* at *9.

Notwithstanding Defendants' attempts to distinguish *Walkie Check*, *see* Mot. at 14, AETN's case is even stronger because Defendants did not merely copy concepts from a treatment—they ripped off AETN's entire, fully developed show. Numerous courts have likewise refused to dismiss cases on far less egregious allegations of copying. *See, e.g.*, *Horizon Comics Prods., Inc. v. Marvel Ent., LLC*, 246 F. Supp. 3d 937, 941 (S.D.N.Y. 2017) (illustration showing a character in a "mechanized suit of armor" and "fighting pose" was protected even though those elements were *scenes a faire* of superhero media); *OMG Accessories*, 2021 WL 1167528, at *3 (the "cumulative effect" of elements in a unicorn design such as closed eyes, rainbow colored hair, glittered horn, and pink hearts was protectable even though the elements were not protectable individually); *Barris/Fraser Enters. v. Goodson-Todman Enters., Ltd.*, 1988 WL 3013, at *5 (S.D.N.Y. Jan. 4, 1988) ("[I]t cannot be said, as a matter of law, that there is no similarity of protectable material in the overall composition of the shows.").

Defendants' reliance on AETN's arguments as a defendant in *Williams v. AETN*, No. 14-CV-9893 (S.D.N.Y.), is similarly misplaced. Unlike this case—in which there are two full shows, the second a replica of the first—*Williams* concerned a mere treatment that was "significantly dissimilar" from AETN's show, including because the treatment focused on the "glamour of a

'dream house' and a 'dream wedding'" and allowed viewers to vote on which couples married, while the show depicted "a social experiment" in which experts "through science and research, match three couples" to determine if they will divorce. 122 F. Supp. 3d 157, 164-65 (S.D.N.Y. 2015). AETN expressly noted that even generic stock concepts receive copyright protection if they are "selected, coordinated or arranged" in an original way. ECF No. 33, No. 14-CV-9893 (S.D.N.Y. May 20, 2015).[2] By contrast to *Williams*, the two shows here are complete, and Defendants barely even try to differentiate between the total concept and feel of the two shows. Their sole contrasting screenshot, *see* Mot. at 9, merely shows a partial difference in the hosts' seating order. This type of slight difference is immaterial. *See Lone Wolf McQuade Assocs. v. CBS Inc.*, 961 F. Supp. 587, 594-95 (S.D.N.Y. 1997) (finding issues of fact precluded summary judgment as to similarities between the movie "*Lone Wolf McQuade*" and the series "*Walker, Texas Ranger*" and rejecting defendants' asserted differences as "exaggerated"); *Betty, Inc. v. PepsiCo, Inc.*, 283 F. Supp. 3d 154, 169-70 (S.D.N.Y. 2017) (denying motion to dismiss where a commercial's "total concept and overall feel" could be "substantially similar" to Plaintiff's treatment, despite key differences). Because the "sum total" of "artistic choices" that went into *Live PD* is protectable, *see Walkie-Check* 2022 WL 2306943, at *9, the Complaint sufficiently alleges a copyright violation.

---

[2] No case cited by Defendants suggests they can steal an entire show with no consequences. *See Castorina v. Spike Cable Networks, Inc.*, 784 F. Supp. 2d 107, 113 (E.D.N.Y. 2011) (Mot. at 13) (treatment in which contestants played sports against athletes, hosted by a federal agent and a biochemist, did not "remotely resemble" show without those host archetypes that pitted contestants against athletes in a variety of contests); *Rodriguez v. Heidi Klum Co., LLC*, 2008 WL 4449416, at *5 (S.D.N.Y. Sept. 30, 2008) (Mot. at 12) (treatment in which contestants created cheap clothing lines voted on by audience members was "plainly distinguishable" from *Project Runway*, which depicted contestants competing in *high-end* fashion contests for expert judges).

      **b.**   ***Live PD's Individual Segments and Sequences Are Entitled to Copyright Protection and Defendants Copied Them Outright.***

Not only is the total concept and feel of *Live PD* protectable, but its constituent segments and sequences are also individually entitled to copyright protection because they are expression due to creative choices and *On Patrol: Live* cloned them all. *See LaChapelle*, 812 F. Supp. 2d at 446 (finding substantial similarity where the defendant's music video shared various details with the plaintiff's photographs, including similar-colored room, furniture, and lighting). That Defendants must spend several pages attempting to excuse their conceded copying of **20** different elements of *Live PD* itself speaks volumes. They do so by boiling each element down to such abstract terms that they can then characterize it as either "standard" for a police show or otherwise insufficient to state a claim. Mot*.* at 7-12. But AETN has alleged specific expressions of elements, not abstractions. For example, it is neither "the act of narration" nor the "idea of a host" that AETN has sued upon, *see id.*, but rather identical phrasing from identical hosts describing identical live-police work. That is the opposite of "stock television."

Comparing *Live PD*'s and *On Patrol: Live*'s "Missing" segments is illustrative. Like *Live PD*'s other segments, "Missing" uses a specific sequence of shots, cuts, pacing, and visual and audio elements to create a distinct look and feel. *See de Becdelievre v. Anastasia Musical LLC,* 2018 WL 1633769, at *1 (S.D.N.Y. Apr. 2, 2018) (denying summary judgment and holding that the "substantial similarity" test requires courts to "pay attention" to various similarities that contribute to the "total concept and feel," including "sequence, pace, and setting")*. On Patrol: Live*'s "Missing" does not merely cover the same material; it uses an identical sequence of shots, cuts, pacing, and visual and audio elements to precisely mirror how *Live PD* presents the material. Both shows begin the segment with a close-up head shot of the host, with the "MISSING" title displayed on television screens behind him in a block font with black and white coloring.




*Live PD*                    *On Patrol: Live*

A dark slide then appears, showing: (1) a photo of the missing child; (2) the "MISSING" title; (3) the date the child was last seen; and (4) a description of the child's age, eye color, hair color, height and weight, in capital letters in sans-serif font.




*Live PD*                    *On Patrol: Live*

The view then cuts back to the host, who introduces Angeline Hartmann from the National Center for Missing and Exploited Children. The two appear side-by-side in split-screen, with the host on the left with a caption noting his location as "control" and Ms. Hartmann on the right, with a caption noting she is at "NCMEC Headquarters."




*Live PD*                    *On Patrol: Live*

13

Next, a slow montage of photos of the child plays, which Ms. Hartmann voices-over, followed by a near-identical exchange with the host featuring the same phrases—including "What's the theory here?" and "Let's take a good look at [the missing person]." At the end of the montage, the full-screen slide showing the child's photo and description appears again while the host repeats the description in voice-over. Another slide then appears, displaying the exact same text and phone numbers in both shows, in sans-serif text.

 

*Live PD*                                                       *On Patrol: Live*

Thus, even if a segment about a missing child is a "scène à faire" for a police reality show—and *Cops*, for example, does not have a "Missing" segment at all—*Live PD*'s segment contains numerous creative choices in expression that do not "necessarily flow" from an unscripted, live police show. Mot. at 12. While Defendants were free to produce a segment about missing children, they may not simply copy all of AETN's creative choices to create a "Missing" segment that is essentially indistinguishable from *Live PD*'s. *See* Rhine Decl. Ex. A at 02:42.

*Live PD*'s other constituent segments likewise involve original creative expression protected by copyright law and copied by Defendants. Examples include:

- Opening Sequence. Both shows open with an in-progress police encounter, and then cut to the in-studio hosts. Mr. Abrams uses the same phrasing (*e.g.*, "We've got more than fifty cameras following the action"), and introduces his co-hosts in the same way. Each opening also includes a fast-paced montage of clips from previous episodes, accompanied by similar-sounding fast-paced music and ends with an animated title screen graphic. *Id.* at 00:05.

14

- <u>Studio Segments</u>. Studio segments in both shows feature the same mix of wide and close-up shots and the same camera movements. The studio segments are also visually the same: the three hosts sit at a glass table with TV screens behind them, with a mix of red and blue background lighting the studio walls. In both shows, Mr. Abrams stands left of the table, Mr. Larkin sits in the middle, and the third host sits on the right. *Id.* (studio segments appear throughout).

- <u>"Wanted"</u>. Both shows feature this segment, using the same mix of shots, pacing, and visual elements: the host introduces the segment in a close-up shot, with the segment title displayed on screens behind him. Video footage of the wanted suspect then plays while the host narrates the crime. A slide is shown with a photo of the wanted person, the title of the segment at the top in all-capitals and block font, and a description of the suspect in an all-capital font. The segment ends with the suspect's photo, the segment title, and the phrase "ANYONE WITH INFO PLEASE CALL" followed by contact information for law enforcement, all in sans-serif font. *Id.* at 09:29.

- <u>"Crime of the Week"</u>. In both shows, the "Crime of the Week" segment begins with the host in a close-up shot, with the segment title displayed on screens behind him. Pre-recorded footage of a crime follows—with the crime often being a brazen heist caught by surveillance tapes—which the host narrates in a bemused voice-over, followed by a short studio segment. *Id.* at 07:35.

- <u>Live Police Footage</u>. During these segments, Mr. Abrams narrates the action with the same delivery and phrases (*e.g.*, "we'll keep an eye on that" before transitioning to another encounter, and "we want to show you something that happened earlier in" before playing recorded footage). Both shows use the same distinct text descriptions and cite locations in the bottom left corner while showing live footage (*e.g.*, "Evading Police"). *See, e.g.*, *id.* at 05:52.

- <u>Commercial Breaks</u>. In both shows, Mr. Abrams transitions to commercial by stating "let's get in a break" or "let's take a break." A title screen then appears, accompanied by a "whoosh" sound. When returning from commercial, both shows display a black screen with a very similar text disclaimer in a white font. The text is accompanied by fast-paced, percussive music that builds in intensity until a climactic "boom," after which the show resumes. *Id.* at 00:57.

- <u>End Roll</u>. The shows end identically: live footage shrinks into an inset box, bordered by a thin white line and surrounded by a dark background that is faintly illuminated by blurred blue and red blinking lights. Live footage plays as credits flash in white sans-serif font under the inset. Mr. Abrams then delivers the same lines: "We are out of time. I'm Dan Abrams. For Sergeant Sean "Sticks" Larkin, Tom Morris Jr., and everyone here at *Live PD*, thanks for watching" (*Live PD*); "We are out of time. For Sticks, Curtis, and everyone here at *On Patrol: Live*, thanks for watching" (*On Patrol: Live*). *Id.* 12:38.

These allegations of outright copying of protected expression, buttressed by AETN's video compilation, fully establish a copyright claim. *See OMG Accessories*, 2021 WL 1167528, at *3.

    **c.**  *The Other Television Shows Referenced by Defendants are Outside the Complaint and Only Highlight Live PD's Originality.*

Defendants refer to various "unscripted police shows" to support their arguments. Mot. at 6 and n. 3. Reliance on materials outside the Complaint is improper. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 150 (2d Cir. 2002). Should the Court wish to take judicial notice of these other shows, they simply underscore that it is possible to take elements associated with a police reality television show and express them in many different ways.[3] Indeed, none of these other shows feature *Live PD*'s creatively-selected mix of live footage (of the same law enforcement departments and officers) interspersed with studio commentary (featuring the same hosts) and original weekly recurring segments. For example, there was no live footage at all in *Cops* or *Police Videos*; *Cops* consisted of entirely ***pre-recorded*** footage of law enforcement activity, and contained no host voice-over narration, studio commentary, or scripted dialogue. *Cops* episodes were also far shorter, running only 30 minutes per episode. The shows with live footage and commentary made different creative choices and present that footage totally differently than *Live PD*. For example, the studio commentary portions of *First Responders Live* looked and felt nothing like *Live PD*: they featured a single host standing on a loft-like set with different coloring and lighting; included a group of experts seated in a separate part of the studio; and utilized a wall-size screen with computer graphics—all in a manner wholly unlike *Live PD.* As we show in a brief video comparison to be lodged with the Court (submitted only because Defendants raised these shows), these shows are wholly different from *Live PD* and they highlight (to the extent they are considered at all) how easily Defendants could have made their own original creative choices for

---

[3] Contrary to Defendants' strawman, AETN does not argue that "the concept of an unscripted police show" is copyrightable or that no new show can be created "about the police." Mot. at 6-7. Unlike *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986), which merely concerned certain tropes common to "police fiction," Defendants have wholesale copied at least 20 different unique ways in which AETN has expressed creativity and originality.

an unscripted police reality show rather than just copying AETN's show. Rhine Decl. Ex. B.

      **d.**   *The Series Agreement Did Not Authorize Defendants to Copy Live PD.*

Defendants' contractual arguments are also meritless. The Series Agreement makes clear that AETN owns all *Live PD* copyrights and trademarks in perpetuity. Snyder Decl. Ex. 1 (ECF No. 39-1) § 2(a). It does not grant Big Fish or any other party an express or implied license to use those copyrights or trademarks. *Id.* Defendants point to a clause in the Agreement, Section 2(f), which *prohibits* Big Fish from authorizing the telecast of any program produced by Big Fish that is substantially similar to *Live PD* for a one-year period and thus gives AETN additional contractual safeguards. Mot. at 15-16; Snyder Decl. Ex. 1 at § 2(f). It is a *constraint* on Big Fish— not an affirmative grant of rights. Nor did the Series Agreement grant valuable rights to Big Fish by mere implication given that an implied license "cannot arise out of the unilateral expectations of one party," but rather must be manifested through "objective conduct," and "can only exist where an author creates a copyrighted work with knowledge and intent that the work would be used by another for a specific purpose." *SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F. Supp. 2d 301, 317 (S.D.N.Y. 2000). None of that exists here. Moreover, the clause would be inapplicable in any event because *On Patrol: Live* is not merely substantially similar to *Live PD*, but virtually identical. Finally, Half Moon and REELZ are not even parties to the Series Agreement.

      **e.**   *Defendants Have No Response to AETN's Other Copyright Claims*

Defendants do not independently challenge either of the Complaint's other two counts of copyright infringement. Mot. at 16 n. 6. Count II (contributory infringement) requires that Defendants knowingly contributed to direct infringement by another; and Count III (intentional inducement of infringement) requires that Defendants intentionally induced direct infringement by another. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005). AETN has undisputedly alleged the underlying elements of these two Counts and they should survive.

II.     **AETN Pleads Well-Supported Federal Trademark and Unfair Competition Claims**

   a.     *PD LIVE Infringes LIVE PD*

Defendants intentionally confused consumers about the source and affiliation between *Live PD* and *On Patrol: Live* by initially naming their show "*PD LIVE*." *See* Factual Background, § II. REELZ strategically used that initial name to market the show to advertisers during the season of lucrative "upfront" ad sales presentations. *Id.* It was only after AETN complained that Defendants changed their "working title" to *On Patrol: Live. Id.* But that post-hoc admission of liability does not absolve Defendants of their prior trademark infringement. *See Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co.*, 2022 WL 17851810, at *29 (S.D.N.Y. Dec. 22, 2022) (finding trademark infringement even though defendants' "sales of infringing products stopped"); *Tecnimed SRL v. Kidz-Med, Inc.*, 763 F. Supp. 2d 395, 409 (S.D.N.Y. 2011) ("Although [defendants] stopped these deceptive practices after receiving [plaintiff's] cease-and-desist letter, these practices demonstrate…intent to capitaliz[e] on plaintiff's reputation and goodwill.").

   b.     *The Use of LIVE PD is Trademark Infringement and Unfair Competition*

Even after tweaking the name of their show, Defendants and their principals continued to misuse AETN's LIVE PD mark to promote *On Patrol: Live* and confuse consumers. *See* Factual Background, § II. Mr. Abrams, the Executive Producer, proclaimed repeatedly that "***Live PD* is coming back this summer as *On Patrol: Live*" and "*Live PD* is back as *On Patrol: Live*.**" *Id.* REELZ's CEO told the Wall Street Journal that Defendants' show was actually *Live PD*, resulting in an article titled "'***Live PD*' Is Coming Back on TV This Summer as '*On Patrol: Live.*'**" *Id.* This was not merely the use of the word "Live," as Defendants falsely assert; they used the full LIVE PD mark in order to generate interest in the REELZ show. *Compare id. with* Mot. at 2.

AETN has pled both elements of a trademark infringement claim: (1) a valid trademark, and (2) likelihood of confusion "as to the origin or sponsorship of [defendant's] goods." *Guthrie*

18

*Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 37 (2d Cir. 2016). AETN holds a valid registration for the word mark LIVE PD. Compl. Ex. E. And the Complaint pleads ample facts satisfying the "likelihood of confusion" prong through Defendants' repeated use of AETN's LIVE PD mark to promote their show. *See* Factual Background, § II.

Defendants' only responses are to cherry-pick amongst Mr. Abrams' multiple tweets cited in the Complaint; to try to distance themselves from those tweets by styling their executive producer and lead host Mr. Abrams as a "third-party"; and to pretend that AETN's trademark claim is merely a dispute over the use of the word "Live" in the shows' titles. Mot. at 17, 20, 22. This last excuse mischaracterizes the Complaint, which does not allege ownership of the word "Live" by itself, but instead takes issue with the initial name "*PD Live*" and alleges that *On Patrol: Live* infringes the *Live PD* spinoff "*Live PD: Police Patrol.*" *Id.* ¶¶ 34, 107. And none of these responses trumps AETN's well-pled allegations of consumer confusion, which must be accepted as true. *See Littlejohn v. City of New York*, 795 F.3d 297, 306 (2d Cir. 2015).

AETN has also adequately pled unfair competition claims under the Lanham Act. Section 43(a) of the Lanham Act provides a claim for "false designation of origin or source [and] 'false advertising.'" *Pulse Creations, Inc. v. Vesture Grp., Inc.*, 154 F. Supp. 3d 48, 56 (S.D.N.Y. 2015) (citation omitted). The Complaint pleads both. A false advertising claim requires: "(1) a false or misleading statement; (2) in connection with commercial advertising or promotion that (3) was material, (4) was made in interstate commerce, and (5) damaged or will likely damage the plaintiff." *Gen. Mills, Inc. v. Chobani, LLC*, 158 F. Supp. 3d 106, 115–17 (N.D.N.Y. 2016). Defendants made numerous false promotional statements in interstate commerce—specifically, that they were "bringing back" *Live PD* and that *On Patrol: Live* was affiliated with and sponsored by AETN. *See* Factual Background, § II. These statements were material—they went to the core

marketability of their show—and actually misled consumers. *Id.* The Complaint thus pleads a false advertising claim.

For false designation of origin claims, the standards "are the same as for trademark infringement claims under Section 32"—namely, that (1) the plaintiff has a mark entitled to protection, and (2) defendant's actions are likely to cause confusion as to the source, sponsorship, affiliation, or connection of the product. *Scotch & Soda B.V. v. Scotch & Iron LLC*, 2018 WL 2224997, at *2 (S.D.N.Y. May 15, 2018). Applying the same standards discussed below, the Complaint states a claim for false designation of origin.

### c.   *The Polaroid Factors are Fact-Intensive and All Favor AETN at This Stage*

Likelihood of confusion is analyzed using the "*Polaroid* Factors." *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961). "Applying the *Polaroid* factors is fact-intensive, and resolving the likelihood of confusion on a motion to dismiss posture is not appropriate." *Hermes Int'l v. Rothschild*, 2022 WL 1564597, *6 (S.D.N.Y. May 18, 2022). In any event, Defendants distort the *Polaroid* factors beyond any recognition. Mot. at 18-20. Applied correctly, they favor AETN, and the Motion should be denied as to Counts IV through VII.

#### 1.   <u>The Strength of the Mark</u>

This factor evaluates: (i) the degree to which the LIVE PD Mark is "inherently distinctive"; and (ii) the degree to which it is "distinctive in the marketplace." *Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 329 (2d Cir. 2020). Where, as here, a mark is registered, "its distinctiveness is presumed." *Flat Rate Movers, Ltd. v. FlatRate Moving & Storage, Inc.*, 104 F. Supp. 3d 371, 379 (S.D.N.Y. 2015). Moreover, the LIVE PD Mark "possess[es] strong secondary meaning among consumers" because AETN has continuously used the LIVE PD Mark since 2016, and spent substantial money promoting, advertising, and marketing *Live PD* using the mark, which gained wide recognition through both *Live PD* and several successful spin-offs. Indeed, in 2019

and 2020, *Live PD* was the most watched program on cable television during its timeslots, and video clips from the show have been viewed hundreds of millions of times on AETN's YouTube channel. Compl. ¶¶ 29-36, 100. Accepting these allegations as true, this factor favors AETN.

### 2. Similarity Between the Marks

"When evaluating the similarity of marks, courts consider the overall impression created by a mark." *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 133 (2d Cir. 2004). "Each mark must be compared against the other as a whole; juxtaposing fragments of each mark does not aid in deciding whether the compared marks are confusingly similar." *Id.* The similarity factor focuses on whether "a consumer who is familiar with the plaintiff's mark would likely be confused when seeing the defendant's mark alone." *New York State Elec. & Gas Corp. v. U.S. Gas & Elec., Inc.*, 697 F. Supp. 2d 415, 432 (W.D.N.Y. 2010) (citing *Louis Vuitton Malletier v. Dooney & Burke, Inc.*, 454 F.3d 108, 117 (2d Cir. 2006)). Defendants admit that they initially inverted AETN's Mark and pitched the show to advertisers with the title "*PD Live*." Mot. at 20. But simply "rearranging the order of the words" of a mark does not render it dissimilar. *N.Y. State Elec. & Gas Corp. v. U.S. Gas & Elec., Inc*., 697 F. Supp. 2d 415, 433 (W.D.N.Y. 2010). Moreover, Defendants have used the full mark LIVE PD extensively to market their show. And Defendants' next attempt—*On Patrol: Live*—still fails the similarity test because it is confusingly similar to AETN's trademark LIVE PD: POLICE PATROL. Compl. ¶ 52. This factor thus favors AETN.

### 3. Competitive Proximity and "Bridging the Gap"

Competitive proximity concerns "market proximity and geographic proximity." *Brennan's, Inc.*, 360 F.3d at 134. *Live PD* and *On Patrol: Live* are both national cable television programs, and thus have both market and geographic proximity. *Guthrie Healthcare Sys.*, 826 F.3d at 40. Tellingly, Defendants cite no caselaw to support their position that proximity means that two

television shows must air simultaneously, Mot. at 19, because they invented it specifically for this case. *See BBC v. Stander*, 2017 WL 1807592, at *7 (C.D. Cal. Mar. 18, 2017) (denying motion to dismiss Lanham Act claim based on *Dancing With the Stars* and finding proximity where "both parties produce[d] live dance shows" without reference to either show's time slot). As cable television programs, the shows are already in competitive proximity, so there is no "gap to bridge." *Lopez v. Nike, Inc.*, 2021 WL 128574, at *9 (S.D.N.Y. Jan. 14, 2021) ("when a plaintiff and defendant 'already occupy the same market[,] the gap has been bridged.'") (citation omitted) (cited in Mot. at 19). These factors thus favor AETN.

### 4.   Actual Confusion

Although AETN is not required to show "actual confusion [to] prevail under the Lanham Act," the Complaint alleges numerous instances of actual confusion, which "can be powerful evidence supporting a likelihood of confusion." *Guthrie*, 826 F.3d at 44-45. Defendants pretend the Complaint's myriad examples of consumer confusion somehow demonstrate "knowledge," but that does not pass the red-face test. *See* Mot. at 19-20. A consumer watching *On Patrol: Live* and tweeting, "So awesome to be spending Friday & Saturday nights watching *Live PD* again. I missed it!" is demonstrating obvious confusion. *Compare* Mot. at 19 *with* Compl. ¶ 62.

Defendants' attempt to redefine likelihood of confusion as a test about where to locate the show on a channel lineup also fails. Mot. at 20. Trademark law makes actionable confusion as to "source…sponsorship, affiliation or connection." *Int'l Info. Sys. Sec. Cert. Cons., Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 161 (2d Cir. 2016); *The Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 960 (2d Cir. 1996) ("source" means a mark's "tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source."). By repeatedly telling viewers and advertisers they were "***bringing back***" *Live PD* and "***[t]he show will be back*** on Friday and Saturday nights," Compl. ¶¶ 3, 62, Defendants have sowed confusion about the

source of the show and AETN's affiliation with it. *Guthrie*, 826 F.3d at 39 ("Given [the] similarity between Plaintiff's and Defendant's marks, together with [their] proximity…it would be surprising if ordinary viewers familiar with Plaintiff's mark did not draw the mistaken inference, on seeing Defendant's mark and message, that the message they were seeing came from Plaintiff"). Moreover, where a Complaint alleges an intent to confuse consumers, *see* Compl. ¶ 106, the Court may presume a likelihood of consumer confusion, and because Defendants have failed to rebut that presumption, this factor "strongly favors" AETN. *Flat Rate*, 104 F. Supp. 3d at 380.

### 5. Defendants' Bad Faith

The bad faith factor "considers whether the defendant adopted its mark with the intention of capitalizing on [the] plaintiff's reputation and goodwill and [on] any confusion between his and the senior user's product." *Savin Corp. v. The Savin Grp.*, 391 F.3d 439, 460 (2d Cir. 2004). Here, Defendants continuously used the LIVE PD Mark to promote their show and chose deliberately confusing titles to capitalize on *Live PD*'s popularity. *See* Compl. ¶¶ 8, 38-50, 107. Defendants did so willfully: they originally called their show *PD Live* and used this infringing name in external communications, including with one of the nation's largest media advertising agencies. *Id*. ¶ 48. But stopping an infringement when you are caught does not cure the initial bad faith. *See NYC Triathlon, LLC v. NYC Triathlon Club, Inc*., 704 F. Supp. 2d 305, 319 (S.D.N.Y. 2010) ("The defendant's awareness of plaintiff's mark may give rise to an inference of bad faith, which is bolstered if the defendant offers no credible explanation for its adoption of the mark."). This factor therefore favors AETN. *See Viahart, LLC v. Creative Kids Online, LLC*, 2022 WL 836431, at *10 (S.D.N.Y. Mar. 18, 2022) (bad faith factor favored plaintiff in trademark claim over "Brain Flakes" mark where defendants suggested to consumers their toy was designed to mirror plaintiff's).

### 6. Consumer Sophistication

Defendants conclusorily assert that *Live PD*'s viewers are "niche," "sophisticated," and

thus likely not to confuse the two shows. Mot. at 21. The consumer sophistication analysis, however, "consider[s] the general impression of the ordinary purchaser . . . in buying that class of goods.'" *The Sports Auth.*, 89 F.3d at 965. Defendants have made no showing that viewers of *Live PD* are "sophisticated" as that term is used in the caselaw, nor can they do so on a pleadings motion. Certainly, they are entitled to no presumption of "sophistication" in the face of the Complaint's ample evidence of consumer confusion. Compl. ¶ 62.

### d.  *The Nominative Fair Use Doctrine Does Not Apply*

Defendants distort the nominative fair use doctrine, but that doctrine cannot save them. Mot. at 21-22. To establish nominative fair use, Defendants must prove that: (1) their show is not "readily identifiable" without use of AETN's mark; (2) Defendants used only so much of AETN's mark as was necessary to identify its show; and (3) Defendants did nothing that would suggest sponsorship or endorsement by AETN. *See Int'l Info. Sys.*, 823 F.3d at 168. As an initial matter, Defendants' argument is rife with fact questions about their acts of misappropriation, which cannot be resolved on a Rule 12(b)(6) motion. *See Int'l Council of Shopping Centers, Inc. v. Info Quarter, LLC,* 2018 WL 4284279, at *5 (S.D.N.Y. Sept. 7, 2018) (courts "routinely reject[] nominative fair use arguments at the motion to dismiss stage because of its inherently factual inquiry.").

Defendants also fail to establish any of the three elements. *First,* Defendants offer no cognizable reason, let alone a need, to have referred to the LIVE PD Mark to market *On Patrol: Live* other than to trade on AETN's goodwill and reputation. Defendants' reliance on *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 102 (2d Cir. 2010) is misplaced because in *Tiffany*, it was extremely difficult to refer to the Tiffany silver jewelry sold on eBay without using the TIFFANY trademark. *Id.* at 103. By contrast here, Defendants could have marketed their show without using the LIVE PD mark. *Second*, Defendants went far beyond what was "necessary"; they made the LIVE PD mark the centerpiece of their deceptive marketing campaign. *See* Factual Background, § II. *Third*,

24

the whole point of telling the world that they were "bringing back" *Live PD* was to inform consumers that their show was identical to *Live PD* and mislead them into believing that AETN sponsored or was otherwise affiliated with Defendants' then-unknown show. *Id*. The motion should accordingly be denied as to Counts IV through VII.

### III.    AETN Pleads All Elements of a New York Law Unfair Competition Claim

Unfair competition claims under New York law "largely mirror those under § 43(a) of the Lanham Act," plus an allegation of bad faith. *Pulse Creations*, 154 F. Supp. 3d at 57. Here, Defendants deliberately misused the LIVE PD Mark to promote their show. *See* § II(b)(5), *supra*. This bad faith, combined with the resulting likelihood of confusion, states an unfair competition claim under New York common law. *Cap. Recs., LLC v. Vimeo, LLC*, 2018 WL 1634123, at *5 (S.D.N.Y. Mar. 31, 2018) (finding complaint sufficiently alleged bad faith at the pleading stage, where the Court "must accept these allegations as true and draw all reasonable inferences in Plaintiffs' favor.").

Defendants' preemption claim is meritless. Mot. at 23-25. The Copyright Act only preempts state law claims that seek to vindicate "rights that are equivalent to the bundle of exclusive rights already protected by copyright law." *RBC Nice Bearings, Inc. v. Peer Bearing Co.*, 676 F. Supp. 2d 9, 34 (D. Conn. 2009). But here, AETN's unfair competition claims are based upon Defendants' misuse of AETN's trademarks to promote their show, *not* copyright infringement. Compl. ¶¶ 141-43, 145-47. And because the Lanham Act does not preempt any state law claims, courts routinely reject arguments that state law claims like AETN's are preempted. *See Medisim Ltd. v. BestMed LLC*, 910 F. Supp. 2d 591, 619 (S.D.N.Y. 2012); *MyPlayCity, Inc. v. Conduit Ltd.*, 2012 WL 1107648, at *24 (S.D.N.Y. Mar. 30, 2012).

### <u>CONCLUSION</u>

For all of the above reasons, Defendants' motion should be denied in its entirety.

Dated: January 20, 2023
New York, New York

Respectfully submitted,


By: _/s/ David L. Yohai_
David L. Yohai
Benjamin E. Marks
Randi W. Singer
David E. Yolkut
Fredrick T. Rhine

**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, NY 10153
Tel: (212) 310-8000
Fax: (212) 310-8007
david.yohai@weil.com

*Attorneys for Plaintiff AETN*