UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

A&E TELEVISION NETWORKS, LLC,

                    Plaintiff,

        -v.-

BIG FISH ENTERTAINMENT, LLC, HALF MOON
PICTURES, LLC, and REELZCHANNEL, LLC,

                    Defendants.

22 Civ. 7411 (KPF)

**OPINION AND ORDER**

---

KATHERINE POLK FAILLA, District Judge:

A wise man once observed, "If you can't imitate him, don't copy him."[1]
The fine line between permissible imitation and wholesale duplication is at the
heart of this lawsuit.  Plaintiff A&E Television Networks, LLC ("A&E") owns the
trademark and registered copyrights of the hit television show "*Live PD*," which
for four years featured live feeds of law enforcement activity across America,
along with live narration and commentary from host Dan Abrams and others.
Plaintiff developed the show with the help of Defendant Big Fish Entertainment
LLC ("Big Fish Entertainment"), but both agreed that Plaintiff would retain
exclusive ownership over the rights in *Live PD* in perpetuity.  In 2020, as
America reckoned with police brutality after the death of George Floyd, the
show was taken off the air.  Two years later, and to Plaintiff's dismay, Big Fish
Entertainment, along with Defendant Half Moon Pictures, LLC ("Half Moon
Pictures," and with Big Fish Entertainment, "Big Fish"), its production arm,

---

[1]     Victor Mather and Katie Rogers, *Behind the Yogi-isms: Those Said and Unsaid*, N.Y.
TIMES, Sept. 23, 2015, https://www.nytimes.com/2015/09/24/sports/yogi-berra-yogi-
isms-quotes-explored.html.

developed "*On Patrol: Live*," which Plaintiff contends is virtually identical to its copyrighted work. *On Patrol: Live* launched on the REELZ Channel in July 2022. For this conduct, Plaintiff asserts claims for copyright infringement, trademark infringement, and unfair competition, in violation of federal and state law.

Big Fish and ReelzChannel, LLC ("REELZ," and together with Big Fish, "Defendants") now move to dismiss Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated in the remainder of this Opinion, the Court denies Defendants' motion.

## BACKGROUND[2]

### A.    Factual Background

#### 1.    The Parties

A&E is a Delaware limited liability media and entertainment company with its principal place of business in New York, New York. (Compl. ¶ 10). Big Fish Entertainment is a New York limited liability content production company

---

[2] This Opinion draws its facts from the Complaint ("Compl." (Dkt. #1)), the well-pleaded allegations of which are taken as true on this motion, *see Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009), and the exhibits attached thereto ("Compl., Ex. [ ]"). The Court also relies, as appropriate, on certain exhibits attached to the Declaration of Orin Snyder ("Snyder Decl., Ex. [ ]" (Dkt. #39)), including the Series Agreement between Plaintiff and Big Fish Entertainment ("Series Agreement" (Dkt. #39-1)), and to the Declaration of Fredrick T. Rhine ("Rhine Decl., Ex. [ ]" (Dkt. #45)). Among these exhibits are copies of representative episodes of Plaintiff's copyrighted work and materials comprising Defendants' allegedly infringing work, all of which the Court may consider on this motion. *See Effie Film, LLC* v. *Pomerance*, 909 F. Supp. 2d 273, 298 (S.D.N.Y. 2012) ("It is well established that courts may take judicial notice of the works at issue in a copyright case.").

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #38); to Plaintiff's memorandum of law in opposition to Defendants' motion to dismiss as "Pl. Opp." (Dkt. #44); and to Defendants' reply memorandum of law as "Def. Reply" (Dkt. #47).

with its principal place of business in New York, New York, and Half Moon
Pictures operates as its production arm. (*Id.* ¶¶ 11-12). Half Moon Pictures is
a Delaware limited liability company registered to do business in New Jersey
with its principal place of business in Beverly Hills, California. (*Id.* ¶ 12). Big
Fish produces various television programs, including, as relevant here, *Live PD*
and *On Patrol: Live.* (*Id.* ¶¶ 11-12). REELZ is a Delaware limited liability
company registered in New York with its principal place of business in
Albuquerque, New Mexico. (*Id.* ¶ 13). REELZ is a cable and satellite
entertainment network that airs *On Patrol: Live.* (*Id.*).

### 2.  The Making of *Live PD*

In 2016, Plaintiff hired Big Fish to produce the television show *Live PD* as
a work made for hire. (Compl. ¶ 2). As part of that relationship, Plaintiff and
Big Fish Entertainment entered into a "Series Agreement" on July 29, 2016.
(*Id.* ¶ 20). Pursuant to the terms of the Series Agreement, Plaintiff holds
exclusive, 100% ownership in all rights to the *Live PD* series (including
originally shot footage, newly created elements, format, and title) in perpetuity,
including any copyrights and trademarks held in connection therewith. (*Id.*
¶ 21). Conversely, the Series Agreement provides that Big Fish Entertainment
assigns to Plaintiff any and all of its rights and any and all of its title or interest
in the *Live PD* series in perpetuity. (*Id.* ¶ 22). The Series Agreement further
prohibits Big Fish from authorizing the telecast of any program produced by
Big Fish substantially similar in content and format to *Live PD* for a one-year
period without Plaintiff's prior written consent. (*Id.* ¶ 23).

*Live PD* ran on the A&E network from 2016 to 2020, with its first episode airing on October 28, 2016.  (Compl. ¶¶ 1, 31).  The show followed several police departments from across the country in real time as they patrolled their communities, while hosts Dan Abrams, Sergeant Sean "Sticks" Larkin, and a third host, discussed the footage from a studio.  (*Id.* ¶¶ 1, 32, 57).  This type of documentary-style series — combining carefully selected live footage from cameras mounted on police dashboards with in-studio commentary — was the first and only series to feature the work of law enforcement in real time over a sustained period.  (*Id.* ¶¶ 31-32).

Plaintiff applied to register the trademark "LIVE PD" on September 20, 2016, to cover various entertainment services; the registration was issued on May 29, 2018, as U.S. Patent & Trademark Office Reg. No. 5,478,306.  (Compl. ¶¶ 26-27 & Ex. E).  In June 2019, Plaintiff applied to register the LIVE PD mark in connection with additional entertainment media, including printed matter such as books, magazines, and pamphlets, as well as television programs.  (*Id.* ¶ 28).  Over the years, Plaintiff has advertised and promoted the LIVE PD mark through television, online, and print advertisements, including posting clips of the show on its YouTube channel, which had 8.66 million subscribers as of August 30, 2022, the date of the filing of the Complaint.  (*Id.* ¶¶ 29, 36).

Through such efforts, *Live PD* was ranked as the number one program (excluding sports programs) in the key demographic of adults aged 25-54 twenty-eight times in 2018; was the most watched program on ad-supported

4

cable television during prime time on Friday and Saturday nights in 2019; and rose to among the top spots in all of cable, drawing approximately three million viewers per weekend in 2020.  (Compl. ¶ 33).  The show was so successful that Plaintiff authorized the creation of numerous spin-offs, including *Live PD: Rewind*, *Live PD: Police Patrol*, *Live PD: Roll Call*, *Live PD Presents: Women on Patrol*, *Live PD Presents: PD Cam*, *Live Rescue*, *Live PD Presents: Top Ten Police Vehicles*, and *Live PD: Wanted*.  (*Id.* ¶ 34).  Plaintiff is the exclusive owner of all related copyrights and trademarks for each of these programs as well.  (*Id.*).

### 3.   The Development of *On Patrol: Live*

Despite the immense success of *Live PD*, Plaintiff suspended production of new episodes of the show in June 2020, amid nationwide protests against police brutality.  (Compl. ¶ 2).  At no point did Plaintiff assign or relinquish its rights in the show.  (*Id.*).  In May 2022, however, without notifying Plaintiff, Defendants launched a multi-media advertising "blitz" proclaiming "the return," "relaunch," and "revival" of *Live PD* on REELZ, a competitor network to A&E.  (*Id.* ¶ 37).  The new show, ultimately titled *On Patrol: Live*, is produced by the same producer as *Live PD*; shares many of the same executive producers; uses the same host and co-host (Dan Abrams and Sgt. Larkin); and, for its third host, features Curtis Wilson, who previously featured as a contributor on *Live PD*.  (*Id.* ¶ 39).  Plaintiff alleges that REELZ told advertisers that the "working title" of the show was "*PD Live*," an inversion of Plaintiff's LIVE PD mark, and went so far as to announce that "REELZ ADDS #1 TV SHOW TO OUR PROGRAMS LINEUP" with "ALL NEW LIVE EPISODES."  (*Id.* ¶¶ 48, 131).

Infuriated, Plaintiff instructed its counsel to send REELZ a cease and desist letter on June 7, 2022, warning that airing the proposed show without consent, particularly under the name "*PD Live*," would constitute, *inter alia*, trademark infringement and violations of unfair competition law.  (*Id.* ¶ 51; Snyder Decl., Ex. 2 ("June 7 Cease and Desist Letter")).[3]  Plaintiff further warned that

> airing or otherwise distributing such a show, in any format or media, with the name '*PD Live*' or any other name confusingly similar to [Plaintiff's] *Live PD* series title and trademarks, and/or containing elements of [Plaintiff's] copyrightable content … would be confusing in the marketplace and constitute an infringement of [Plaintiff's] trademark and intellectual property rights.

(June 7 Cease and Desist Letter 2).

Shortly thereafter, Defendants changed the show's title from *PD Live* to "*On Patrol: Live*," which name Plaintiff alleges the public already associates with the *Live PD* spinoff *Live PD: Police Patrol*.  (Compl. ¶ 52).  On June 8, 2022, multiple articles were released announcing — erroneously — that *Live PD* was making its return on REELZ, including a Wall Street Journal article declaring "*Live PD* is coming back this summer as '*On Patrol: Live*'" (*id.* ¶ 38 n.5 (citing, *e.g.,* Joe Flint, *'Live PD' is Coming Back on TV This Summer as 'On Patrol: Live,'* Wall St. J., June 8, 2022, https://www.wsj.com/articles/live-pd-is-coming-back-on-tv-this-summer-as-on-patrol-live-11654691401 (the "WSJ Article"))), and an Atlanta Journal-Constitution article proclaiming that *Live PD* would

---

[3]     Because the June 7 Cease and Desist Letter and a separate July 2022 cease and desist letter discussed *infra* are referenced at length in the Complaint (*see, e.g.*, Compl. ¶¶ 4, 51, 71-72, 107), the Court considers both documents to be incorporated by reference. *See Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

"soon be live once again" as *On Patrol: Live* on the REELZ network. (*id.* n.8
(citing Hunter Boyce, *'Live PD' Returns As 'On Patrol: Live' On New Network*,
THE ATLANTA JOURNAL-CONSTITUTION, July 20, 2022,
https://www.ajc.com/life/live-pd-returns-as-on-patrol-live-on-
newnetwork/2RYSWCMWHRGV7HKOE4AM4VV3NA (the "AJC Article")); *see
also id.* nn.6-7 (citing, *e.g.*, Michael Schneider, *'Live PD' To Be Revived on Reelz
This Summer as 'On Patrol: Live,' Hosted by Dan Abrams*, VARIETY, June 8,
2022, https://variety.com/2022/tv/news/live-pd-return-reelz-dan-abrams-
1235288210/; Alex Weprin, *'Live PD' Revived at Reelz, Producer Dan Abrams
Says "Environment Has Changed" Since 2020 Cancellation*, THE HOLLYWOOD
REPORTER, June 8, 2022, https://www.hollywoodreporter.com/tv/tv-news/live-
pdrevived- reelz-on-patrol-live-1235161208/; Denise Petski, *'Live PD' to Return
as 'On Patrol: Live' On Reelz*, DEADLINE, June 8, 2022,
https://deadline.com/2022/06/live-pd-return-on-patrol-live-reelz-dan-
abrams-1235040651/; Greta Bjornson, *'Live PD' to Return on Reelz, Will Be
Renamed 'On Patrol: Live'*, DECIDER, June 9, 2022,
https://decider.com/2022/06/09/live-pd-returning-renamed-on-patrol-live/)
(collectively, the "Return Articles"))).

Former *Live PD* host and current *On Patrol: Live* host and executive
producer Dan Abrams tweeted somewhat misleadingly on June 8, 2022, that
"*Live PD* is coming back" and "will be back on Friday and Saturday nights
sometime later this summer," while thanking "the #livepdnation" for its
"patience."  (Compl. ¶¶ 40-41 nn.9-10 (citing Dan Abrams (@danabrams),

7

Twitter (June 8, 2022, 8:51 a.m.),

https://twitter.com/danabrams/status/1534518543168987136; Dan Abrams

(@danabrams), Twitter (June 8, 2022, 9:00 a.m.),

https://twitter.com/danabrams/status/1534520779253207040)).  One month

later, Abrams announced a promotional tour for *On Patrol: Live* in a manner

that again suggested a continuation of the *Live PD* series, noting that it was

"hard to believe we are almost back!!" (*id.* ¶ 42 n.11 (citing Dan Abrams

(@danabrams), Twitter (July 18, 2022, 8:49 a.m.),

https://twitter.com/danabrams/status/1549013399249555457)), and linked

a New York Post article stating that "*Live PD* [was] back as *On Patrol: Live* two

years after being canceled" (*id.* ¶ 43 (citing Dan Abrams (@danabrams), Twitter

(July 19, 2022, 10:01 p.m.),

https://twitter.com/danabrams/status/1549575067713019910))).  In so

doing, Abrams was making good on his tweet of January 1, 2021, where he

expressed his "confiden[ce] that #LivePD will be back in 2021."  (*Id.* ¶ 44 n.14

(citing Dan Abrams (@danabrams), Twitter (Jan. 1, 2021, 10:30 a.m.),

https://twitter.com/danabrams/status/1345029565362659331)).

John Zito, an executive producer of both shows, perpetuated the

continuation theory by telling Entertainment Weekly that REELZ believed in

the *Live PD* show in its original format and did not seek to bring it back in a

completely different manner.  (Compl. ¶ 45 n.15 (citing Kristen Baldwin, *On

Patrol: Live Executive Produce Answers Burning Questions About the New

Version of Live PD*, ENTERTAINMENT WEEKLY, July 22, 2022,

https://ew.com/tv/on-patrol-live-reelz-premiere-burning-questions/)).
Furthermore, REELZ's official Twitter account retweeted the various articles
discussed above informing the public that *Live PD* would be returning on
REELZ, and issued a press release announcing the purportedly "new" series
"from the producers of *Live PD*," and quoting Abrams as being "thrilled" that
the "team is finally back together." (*Id.* ¶¶ 46-47). Following the media blitz,
social media users and fans of the show noted "we're back!!" and a Facebook
fan page with nearly 137,000 members changed its name from "A&E LIVE PD"
to "Reelz — On Patrol Live." (*Id.* ¶¶ 49-50).

### 4. *On Patrol: Live* Hits the Air

Plaintiff followed up with a second cease and desist letter on July 20,
2022, again ordering REELZ to refrain from referring to REELZ "bringing back
the show" or other similar comments. (Snyder Decl., Ex. 3 ("July 20 Cease and
Desist"); Compl. ¶ 51). Just two days later, on July 22, 2022, REELZ aired the
first episode of *On Patrol: Live*. (Compl. ¶ 53).

Plaintiff alleges that the new show was "virtually indistinguishable from
*Live PD*," and thus infringed upon its copyrights in the series. (Compl. ¶ 55).[4]
Like *Live PD*, *On Patrol: Live* is a crime-related series following police and
sheriff's departments in real time across the country (including some of the
same departments previously featured on *Live PD*), while hosts Dan Abrams

---

[4]     In presenting the allegedly infringing work, Plaintiff has submitted flash drives
        containing copies of twenty-four representative episodes of *Live PD* in which it holds
        registered copyrights (Compl., Ex. A-C), and a flash drive with representative episodes of
        *On Patrol: Live* (*id.*, Ex. D). The Court's description of the allegedly infringing work is
        derived, in part, from its review of these materials.

9

and Sgt. Larkin, along with former *Live PD* recurring guest Deputy Sheriff
Curtis Wilson of the Richland County Police Department, comment on the
action from a studio.  (*Id.* ¶¶ 56-57).  Also like *Live PD*, the three hosts are
seated around a table inside of a studio with large TV screens on the walls and
blue and red lights behind the screens, as depicted below.  (*Id.* ¶ 57).  The
hosts are each provided a black coffee mug bearing the name of the show.

<u>*Live PD* Hosts</u>                    <u>*On Patrol: Live* Hosts</u>
<u>Abrams, Larkin, and Morris</u>      <u>Abrams, Larkin, and Wilson</u>



The two shows bear many other similarities, including "Crime of the
Week" and "Missing" segments, during the latter of which Angeline Hartmann
of the National Center for Missing and Exploited Children comes on to discuss
the featured missing person.  (Compl. ¶ 57).  Both shows begin with nearly-
identical percussive, fast-paced music while a black screen displays a nearly-
identical message noting, in part, that "[a]ll suspects are presumed innocent
unless [or until] proven guilty in a court of law"; both display the location of the
law enforcement action in a rectangular box at the lower left-hand corner of the
screen; both display the tagline "earlier in" on the top corner of the screen
when airing pre-recorded footage; both utilize dual screens, particularly during

10

car chases with similar angles on each screen; both use similar logos that draw on largely the same marks and iconographies; both toggle between footage of live or pre-packaged police patrol action and the host's in-studio commentary; the time slots of both shows are identical (9:00 p.m. to 12:00 a.m. on Friday and Saturday nights); and the hosts utilize the same "catchphrases," among many other similarities.  (*Id.*).  Media critics readily observed that the new show was "a clone of A&E's *Live PD*," and, even more pointedly, that "*On Patrol: Live* is *Live PD.*"  (*Id.* ¶ 61 (quoting Brittany Frederick, *On Patrol: Live Doesn't Quite Live Up to Live PD — Yet*, CBR.COM, July 23, 2022, https://www.cbr.com/on-patrol-live-reelz-live-pd/.)).  As has become customary, fans took to social media after *On Patrol: Live*'s initial air date, expressing similar sentiments, and, for some, confusion.  (*See, e.g., id.* ¶ 62 n.22 (citing Carlon Gray, Facebook (July 30, 2022, 2:50 p.m.), https://www.facebook.com/groups/207593763141526/ ("Ok.  I'm confused.  Is *Live PD* back on the air?  If so, how do I watch?"); *id.* n.25 (citing @robyn @robynnisabyrd, Twitter (July 24, 2022, 1:34 a.m.), https://twitter.com/robynnisabyrd/status/1551078435014864896 ("Dan Abrams really got *Live PD* back on the air disguised under a new name and on a new channel."); *id.* n.26 (citing @JenSimmonsBooks, Twitter (July 23, 2022, 1:53 a.m.), https://twitter.com/JenSimmonsBooks/status/1550720700276563968. ("Watching *Live PD*.  Yeah, yeah ok.  *On Patrol* whatever!  @danabrams, this is the best Friday night in years!  Glad to have you back!")); *id.* n.27 (citing

@Heartie1990, Twitter (July 23, 2022, 9:44 p.m.),

https://twitter.com/Heartie1990/status/1551020450636976128 ("So

awesome to be spending Friday & Saturday nights watching *Live PD* again.  I

missed it!"))).

On July 27, 2022, REELZ announced that 3.5 million unique viewers

had watched the first telecasts of *On Patrol: Live* (despite a technical issue that

delayed the debut broadcast by seventy minutes), propelling REELZ into a top-

twenty-five cable network position for the first time in its history.  (Compl.

¶ 63).  *On Patrol: Live* was the most-watched show on cable in the

demographics of adults 25-54 on July 22 and 23, 2022 (the first and second

episodes, respectively), and, by the show's second week, REELZ was the

second-most-watched network among all ad-supported broadcast and cable

networks during the aired episodes.  (*Id.*).

## B.   Procedural Background

Plaintiff initiated this action with the filing of the Complaint on

August 30, 2022.  (Dkt. #1).  On October 24, 2022, Defendants filed a letter

indicating their intent to move to dismiss the Complaint.  (Dkt. #34).  Plaintiff

filed a responsive letter on October 26, 2022.  (Dkt. #36).  The following day,

the Court convened a pre-motion conference, during which it set a briefing

schedule for Defendants' motion to dismiss.  (*See* October 27, 2022 Minute

Entry).  Pursuant to that briefing schedule, Defendants filed their motion to

dismiss and supporting papers on December 9, 2022.  (Dkt. #37-39).  Plaintiff

filed its opposition papers on January 20, 2023.  (Dkt. #44-46).  Defendants

filed their reply brief on February 3, 2023.  (Dkt. #47).

## DISCUSSION

Plaintiff asserts three types of claims against Defendants for creating and

airing *On Patrol: Live*: copyright infringement, trademark infringement, and

unfair competition arising under state and federal law.  Specifically, Plaintiff

asserts (i) direct copyright infringement, contributory copyright infringement,

and intentional inducement of copyright infringement, each in violation of

Plaintiff's rights under the Copyright Act, 17 U.S.C. ch. 1-15; (ii) trademark

infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114(1),

and New York common law; and (iii) unfair competition, in the form of false

designation of origin and false advertising, in violation of Section 43(a) of the

Lanham Act, 15 U.S.C. § 1125(a), and New York common law.  The Court sets

forth the applicable legal standards for a motion to dismiss before assessing

the viability of each of Plaintiff's claims.

### A.     Motions to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell

Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  "A claim is facially plausible

'when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged.'"

*Allco Fin. Ltd.* v. *Klee*, 861 F.3d 82, 94-95 (2d Cir. 2017) (quoting *Iqbal*, 556

U.S. at 678).  "[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (internal quotation marks and citation omitted and alterations adopted); *see also Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (explaining that a court need not accept "conclusory allegations or legal conclusions masquerading as factual conclusions").

A court adjudicating a motion to dismiss under Rule 12(b)(6) "may review only a narrow universe of materials."  *Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).  This narrow universe includes the "facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken."  *Id.* (internal citation omitted and alternations adopted); *see also United States ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 106 (2d Cir. 2021).  Where the disputed works in a copyright action are attached to or incorporated by reference in the complaint, a district court can "consider the similarity between those works in connection with a motion to dismiss, because the court has before it all that is necessary in order to make such an evaluation."  *Peter F. Gaito Architecture, LLC* v. *Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010).

## B.    Plaintiff Has Sufficiently Pleaded Copyright Infringement

Plaintiff's first cause of action is for copyright infringement, pursuant to the Copyright Act, 17 U.S.C. § 501, based on Defendants' alleged unlawful

14

copying of the *Live PD* series.  For the reasons discussed below, this claim, along with Plaintiff's ancillary claims for contributory infringement and intentional inducement of copyright infringement, survives Defendants' motion to dismiss.

### 1.    Applicable Law

To state a claim for copyright infringement, a plaintiff must show both "[i] ownership of a valid copyright, and [ii] copying of constituent elements of the work that are original." *Feist Publ'ns, Inc.* v. *Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *accord Lipton* v. *Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995). In other words, federal law requires that "[i] the defendant has actually copied the plaintiff's work; and [ii] the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." *Peter F. Gaito*, 602 F.3d at 63 (quoting *Hamil Am. Inc.* v. *GFI*, 193 F.3d 92, 99 (2d Cir. 1999)).

With respect to the first prong of the copyright infringement analysis, a plaintiff "may prove copying by direct evidence, or by showing that the defendant had access to the plaintiff's work and that the works are similar enough to support an inference that the defendant copied the plaintiff's work." *Hines* v. *W Chappell Music Corp.*, No. 20 Civ. 3535 (JPO), 2021 WL 2333621, at *2 (S.D.N.Y. June 8, 2021) (quoting *Fisher-Price, Inc.* v. *Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 123 (2d Cir. 1994), *abrogated on other grounds by Salinger* v. *Colting*, 607 F.3d 68, 77 (2d Cir. 2010)); *see also Jorgensen* v. *Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) ("[A] plaintiff may establish copying

circumstantially by demonstrating that the person who composed the defendant's work had access to the copyrighted material, and that there are similarities between the two works that are probative of copying." (internal quotation marks and citations omitted)).

As to the second prong of the analysis, "questions of non-infringement have traditionally been reserved for the trier of fact." *Peter F. Gaito*, 602 F.3d at 63 (citations omitted). Nevertheless, "where the court has before it all that is necessary to make a comparison of the works in question, it may rule on substantial similarity as a matter of law on a Rule 12(b)(6) motion to dismiss." *King Zak Indus., Inc.* v. *Toys 4 U USA Corp.*, No. 16 Civ. 9676 (CS), 2017 WL 6210856, at *4 (S.D.N.Y. Dec. 8, 2017) (quoting *Effie Film, LLC* v. *Pomerance*, 909 F. Supp. 2d 273, 290-91 (S.D.N.Y. 2012)). This is because "[w]hen a court is called upon to consider whether the works are substantially similar, no discovery or fact-finding is typically necessary, because 'what is required is only a visual [or aural] comparison of the works.'" *Peter F. Gaito*, 602 F.3d at 64 (internal quotation marks omitted). If in making such a comparison, "the district court determines that the two works are 'not substantially similar as a matter of law,' the district court can properly conclude that the plaintiff's complaint, together with the works incorporated therein, do not 'plausibly give rise to an entitlement to relief.'" *King Zak Indus.*, 2017 WL 6210856, at *4 (quoting *Peter F. Gaito*, 602 F.3d at 64).

The substantial similarity prong entails a highly nuanced, detailed inquiry that is tailored to the works at issue. For this reason, courts have

acknowledged that "[t]he determination of the extent of similarity that will constitute a *substantial*, and hence infringing, similarity presents one of the most difficult questions in copyright law, and one that is the least susceptible of helpful generalizations." *Horizon Comics Prods., Inc.* v. *Marvel Ent., LLC*, 246 F. Supp. 3d 937, 940 (S.D.N.Y. 2017) (internal quotation marks omitted); *Hines*, 2021 WL 2333621, at *2 (same); *see also Peter Pan Fabrics, Inc.* v. *Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960) ("The test for infringement of a copyright is of necessity vague.").

The first step in determining whether substantial similarity exists is selecting the appropriate test. "Where the works in question contain entirely protectable elements, the standard test is whether 'an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal as the same.'" *King Zak Indus.*, 2017 WL 6210856, at *4 (quoting *Yurman Design, Inc.* v. *PAJ, Inc.*, 262 F.3d 101, 111 (2d Cir. 2001)). On the other hand, when works include a combination of protectable and unprotectable elements, the analysis is "more discerning." *Peter F. Gaito*, 602 F.3d at 66 (internal quotation marks omitted). This more discerning ordinary observer test calls for courts to "attempt to extract the unprotectible elements from … consideration and ask whether the protectible elements, standing alone, are substantially similar." *Id.* (quoting *Knitwaves, Inc.* v. *Lollytogs Ltd.*, 71 F.3d 996, 1002 (2d Cir. 1995)). "To apply the more discerning ordinary observer test, 'the Court looks to whether the alleged similarities are due to protected aesthetic expressions original to the allegedly

17

infringed work, or whether the similarity is to something in the original that is free for the taking.'" *King Zak Indus.*, 2017 WL 6210856, at *4 (quoting *Horizon Comics Prods.*, 246 F. Supp. 3d at 941).

Irrespective of which of the above tests applies, the Second Circuit has "disavowed any notion" that courts are "'required to dissect [the works] into their separate components, and compare only those elements which are in themselves copyrightable.'" *Peter F. Gaito*, 602 F.3d at 66 (quoting *Knitwaves, Inc.*, 71 F.3d at 1003). Rather, "[t]he inquiry is more holistic, as the Court 'compares the contested work's total concept and overall feel with that of the allegedly infringed work, as instructed by our good eyes and common sense.'" *Horizon Comics Prods.*, 246 F. Supp. 3d at 941 (quoting *Effie Film*, 909 F. Supp. 2d at 292) (alterations adopted); *see also Peter F. Gaito*, 602 F.3d at 66. This approach permits a finding of copyright infringement where a defendant has "'parrot[ed] properties that are apparent only when numerous aesthetic decisions embodied in the plaintiff's work of art — the excerpting, modifying, and arranging of unprotectible components — are considered in relation to one another.'" *Peter F. Gaito*, 602 F.3d at 66 (quoting *Tufenkian Imp./Exp. Ventures, Inc.* v. *Einstein Moomjy, Inc.*, 338 F.3d 127, 134 (2d Cir. 2003) (alterations adopted)).

The holistic inquiry championed by the Second Circuit necessarily focuses on whether the alleged infringer has misappropriated "the author's original contributions" to the subject work — that is, "the original way in which the author has 'selected, coordinated, and arranged' the elements of his or her

work," even if those elements, standing on their own, are not protectable. *Knitwaves, Inc.*, 71 F.3d at 1004 (quoting *Feist Publ'ns*, 499 U.S. at 358); *see also Peter F. Gaito*, 602 F.3d at 67. This includes stock concepts and *scènes à faire* (elements of an image that flow naturally and necessarily from the choice of a given concept), which, though unprotectable on their own, *see Lapine* v. *Seinfeld*, 375 F. App'x 81, 83 (2d Cir. 2010) (summary order), can be subject to protection when their selection, coordination, and arrangement reflect a particular expression of ideas, *see Castorina* v. *Spike Cable Networks, Inc.*, 784 F. Supp. 2d 107, 111 (E.D.N.Y. 2011); *see also Peter F. Gaito,* 602 F.3d at 67. Of potential significance to the instant motion, "if a work copies the original way in which the author has selected, coordinated, and arranged these unprotectable elements to such an extent that the copying work is substantially similar to the expression of ideas and total concept and overall feel of the copied work, infringement can occur." *Williams* v. *A & E Television Networks*, 122 F. Supp. 3d 157, 162-63 (S.D.N.Y. 2015) (internal quotation marks and citations omitted).

### 2.   Analysis

It is undisputed that Plaintiff possesses a valid copyright issued by the United States Copyright Office in at least twenty-four representative episodes of *Live PD*. (Compl., Ex. A-B; Def. Br. 12 n.5). Furthermore, Defendants appear to concede for purposes of this motion that Plaintiff has adequately alleged

their actual copying of Plaintiff's work.[5]  Accordingly, the focus of the Court's analysis is whether Plaintiff has sufficiently alleged Defendants' "copying of constituent elements of the work that are original," *Feist Publ'ns*, 499 U.S. at 361 — that is, whether the copying runs afoul of copyright law because "a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's [work]," *Peter F. Gaito*, 602 F.3d at 63.

The Court begins by discussing the originality of *Live PD*, and then assessing whether that show is substantially similar to *On Patrol: Live*.  Finding that *Live PD* is comprised of original expressions of non-protectable elements, the Court applies the more discerning ordinary observer test to its substantial similarity analysis, and considers whether the alleged similarities implicate those protected expressions, or whether they are limited to expressions and combinations of elements that are "free for the taking."  *Horizon Comics Prods.*, 246 F. Supp. 3d at 941 (quoting *Effie Film*, 909 F. Supp. 2d at 291).

### a.   *Live PD*'s Elements, Considered Together, Constitute Original Expression

Defendants argue that *Live PD* possesses no copyrightable element, such that its collective expression of elements is similarly unoriginal.  (Def. Br. 5-

---

[5]     Even if Defendants had explicitly challenged Plaintiff's allegations of actual copying, the Complaint includes allegations that Defendants, as creators of the show, "had access to the copyright material" and that "there are similarities between the two works that are probative of copying."  *See Jorgensen* v. *Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003); *see also, e.g.*, *Int'l Diamond Imps., Inc.* v. *Oriental Gemco (N.Y.), Inc.*, 64 F. Supp. 3d 494, 511 (S.D.N.Y. 2014) ("Similarities between the two works are probative [of copying] only if the similarities would not be expected to arise if the works had been created independently." (internal quotation marks omitted)).  (*See, e.g.*, Compl. ¶¶ 2, 66).  These allegations are sufficient to withstand a motion to dismiss.

15).[6]  As such, Defendants believe there is no basis for copyright protection.

Specifically, Defendants argue that the idea of an unscripted police show is not

itself copyrightable, nor are *scènes à faire* elements of a police or news show

such as police department footage, disclaimer banners, segments about

missing children or wanted lists, a three-host format, a view toggling between

live footage and in-studio hosts, or red and blue lights, all of which "necessarily

result from the choice of [that news and/or police] setting or situation" (*id.* at 6

(quoting *Walker* v. *Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986); *see also*

Def. Br. 8-10)), and "follow naturally from [the] theme" of an unscripted police

show "rather than from [the] author's creativity" (*id.* at 6 (quoting *Abdin* v. *CBS

Broad. Inc.*, 971 F.3d 57, 69 (2d Cir. 2020)).  They further argue that

"percussive, fast-paced music," time slots, host identities, and host clothing are

simply not copyrightable elements.  (*See* Def. Br. 7-12).

Plaintiff implicitly concedes that there are no protectable elements of its

show in isolation, and argues instead that the expression, "selection[,] and

arrangement" of these elements are "sufficiently original and creative to

---

[6]    In support of their arguments against protectability, Defendants point to the Series
Agreement's contractual embargo right, which they allege "reflects the mutual
awareness that [Plaintiff] otherwise could not have prevented Big Fish from making a
substantially similar show for another network."  (Def. Reply 2).  Specifically, the
provision provides that "[Big Fish] is prohibited from authorizing the telecast of any
program(s) [it produces] substantially similar in content and format to [*Live PD*] (*i.e.*, a
'live' television series following police units around the country, with hosts in studio to
guide the action, and pre-produced packages about the cops/areas/hot cases during
moments of quiet) until the end of the one (1) year period … without [Plaintiff's] prior
written consent."  (Series Agreement § 2(f)).  This contract has no bearing on the Court's
infringement analysis.  Plaintiff is not claiming that Defendants violated the Series
Agreement by creating and airing a new police procedural program; Plaintiff is instead
claiming that Defendants violated its intellectual property rights by creating and airing
an *identical* police procedural program.

warrant protection." (Pl. Opp. 8 (quoting Def. Br. 12 (then quoting *Feist Publ'ns*, 499 U.S. at 349))).[7] Indeed, not every aspect of every creative work is protected by copyright. The law regulates only the copying of the plaintiff's *original* expression. "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Feist Publ'ns*, 499 U.S. at 345 (citation omitted). "The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be," and no matter how similar they may be to other works, as long as "the similarity is fortuitous, not the result of copying." *Id.* (internal quotation marks and citations omitted).

"[A] work may be copyrightable even though it is entirely a compilation of unprotectable elements." *Knitwaves, Inc.*, 71 F.3d at 1003-04. In this setting, copyright can protect "the original way in which the author has selected,

---

[7]   Plaintiff argues that its individualized segments and sequences are entitled to copyright protection — namely, its "Missing" segment, "Wanted" segment, and "Crime of the Week" segment, along with the show's segments before and after commercial breaks. (Pl. Opp. 12-15 (citing *LaChapelle* v. *Fenty*, 812 F. Supp. 2d 434, 446 (S.D.N.Y. 2011)). In light of the thin degree of originality that inheres in *Live PD* as a whole, the Court will not find that each segment, on its own, is entitled to similar protection. *See Zalewski* v. *Cicero Builder Dev., Inc.*, 754 F. 3d 95, 107 (2d Cir. 2014) (noting that where, as here, protectability rests on a thin original contribution, the infringing work must involve "very close copying" to survive dismissal). In this regard, the segments at issue are wholly dissimilar from those in *LaChapelle*, where the court found that a world-renowned photographer's highly specific and creative use of "hot-pink and white striped walls; two single-hung windows in the middle of the back wall; windows with glossy hot-pink casings and interior framework, with opaque panes exhibiting a half-vector pattern of stripes against a yellow background; a solid hot-pink ceiling; hot pink baseboards; a hot-pink couch under the window; women wearing frizzy red wigs; a woman posed on top of a piece of furniture; black tape wrapped around a man," and a "woman's mouth open and a small object on her tongue" were each separate and protectable. *LaChapelle*, 812 F. Supp. 2d at 446-47.

coordinated, and arranged the elements of his or her work."  *Id.* at 1004
(internal quotation marks omitted).  For example, "uncopyrightable notes can
be assembled into a copyrightable melody."  *McDonald* v. *West*, 138 F. Supp. 3d
448, 455 (S.D.N.Y. 2015).  Such a compilation, while it enjoys copyright
protection, is considered "thin," *Zalewski* v. *Cicero Builder Dev., Inc.*, 754 F.3d
95, 107 (2d Cir. 2014); *see also Feist Publ'ns*, 499 U.S. at 349, and a
subsequent work will avoid infringement "so long as [it] does not feature the
same selection and arrangement" as the original, *Feist Publ'ns*, 499 U.S. at
349, 351.

　　　As noted, it is largely undisputed that the individual elements of *Live PD*
are not protectable.  However, the Court finds that the particular selection and
arrangement of the elements as a whole — namely, the mix of live police
footage and in-studio commentary; the black screen displaying a message
regarding a suspect's innocence in white text each time the show begins or
returns from a break; the red and blue lights to mirror police cars; the use of
hosts Dan Abrams and Sgt. Larkin, sitting around virtually identical tables
with virtually identical mugs; the sequencing of the "Missing" and "Crime of the
Week" segments and the guest on the "Missing" segment; the positioning of the
hosts; the specific and consistent camera angles used; and the following of
specific police departments across weeks — considered together, *are*
sufficiently creative to state a cognizable copyright claim.

　　　Defendants assert that Plaintiff's copyrights in twenty-four representative
episodes of *Live PD* are "not relevant" to the motion, and "do not dispute that

individual episodes on the whole may constitute protectable expression." (Def. Br. 12 n.5). Somewhat curiously, however, Defendants argue simultaneously that each episode of *Live PD* is the same, and contains no original expressions, but rather the same generic format and combination of elements across the board. (*See id.* at 14-15). Defendants cannot have it both ways. As a starting point, "certificates of registration constitute *prima facie* evidence of the validity not only of their copyrights, but also of the originality of their works." *Boisson* v. *Banian, Ltd.*, 273 F.3d 262, 268 (2d Cir. 2001). Plaintiff has those here. (*See* Compl. Ex. A-B). Further, as Defendants themselves acknowledge, twenty-four episodes with the same compilation of elements as the rest of the episodes of *Live PD* "may constitute protectable expression." (Def. Br. 12 n.5). The Court agrees.

In this case, the specific selection, coordination, and arrangement of the same elements across each episode are sufficiently creative and unique to *Live PD* that there exists sufficient originality — albeit thin — in every episode. *See Horizon Comics Prods.*, 246 F. Supp. 3d at 943-44 (denying defendants' motion to dismiss a copyright claim for a promotional poster that contained unprotectable stock elements of super heroes, and finding substantial similarity between, *inter alia*, characters' hair styles, the notches in the shoulders of the characters' suits of armor, and the presence of blue light in their suits); *OMG Accessories LLC* v. *Mystic Apparel LLC*, No. 19 Civ. 11589 (ALC) (RWL), 2021 WL 1167528, at *3 (S.D.N.Y. Mar. 25, 2021) (denying motion to dismiss because the cumulative effect of a unicorn's "closed eyes with

distinctive eyelashes, rainbow colored locks, glitter horn, and pink hearts on
the face or cheek of the unicorn" — while not protectable on their own as
general and common depictions of unicorns — was sufficiently original
expression to allow the court to determine that two works depicting the same
elements were substantially similar); *cf. Castorina, Inc.*, 784 F. Supp. 2d at 111
(noting that treatment of reality show contained "limited" original selection,
coordination, and arrangement of unprotectable stock elements and, further,
that its overarching protectability was undercut by the fact that treatment of
plaintiff's work left certain specifics "up in the air" and contained ambiguity
and lack of detail).

Additionally, Defendants assert that the consistency across episodes of
*Live PD* and *On Patrol: Live* suggests a "sameness attributable to the *generic*
format and combination of elements alleged," such that letting this Complaint
survive a motion to dismiss would mean that no entertainment company —
whether news, police shows, reality shows, or otherwise — would ever be able
to copy these stock concepts again. (Def. Br. 15). Not so. Plaintiff and
Defendants are uniquely situated in that the two shows are nearly identical
and use the same creative arrangement of the same hosts, lighting, guests,
camera angles, screen toggling, and other stock elements, and it is that
combination of identical elements that creates two works that are virtually
indistinguishable. *Abdin*, 971 F.3d at 69 ("As a matter of logic as well as law,
the more numerous the differences between two works the less likely it is that
they will create the same aesthetic impact so that one will appear to have been

25

appropriated from the other." (quoting *Durham Indus., Inc.* v. *Tomy Corp.*, 630 F.2d 905, 913 (2d Cir. 1980)).  After all, "the protection granted to a copyrightable work extends only to the particular expression of an idea and never to the idea itself."  *Id.* at 68 (internal quotation marks and citations omitted).  This is to say, there is no infringement issue with police shows involving a mix of live footage of police in the field and in-studio commentary.  Instead, it is the direct copying of the creative ordering of the segments, guests, colors, music, hosts, angles, camera toggling, and other elements in *Live PD* that render the show's expression original, and the nearly-exact copying by Defendants an infringement.  While "[t]he distinction between an idea and its expression is an elusive one," *id.* (quoting *Williams* v. *Crichton*, 84 F.3d 581, 587-88 (1996)), it is clear on these facts where Plaintiff explicitly takes no issue with other unscripted police reality shows, and instead focuses its argument on Defendants' wholesale "rip[] off" (Pl. Opp. 10, 16).

> **b.    There Exists Substantial Similarity Between the Subject Works**

Finding the requisite degree of originality in the work, the Court next assesses substantial similarity.  To do so, it compares the "total concept and overall feel" of *Live PD* with that of *On Patrol: Live*, as informed by its "good eyes and common sense."  *Horizon Comics*, 246 F. Supp. 3d at 941 (internal quotation marks and citation omitted); *see also Tufenkian*, 338 F.3d at 133. Specifically, the Court considers the degree to which Defendants' work has misappropriated the original way in which Plaintiff selected, coordinated, and arranged the individual elements in the show.  In such a case, the critical

26

inquiry is not just whether the two works look the same, but "whether 'an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work.'" *Peter F. Gaito*, 602 F.3d at 66 (quoting *Knitwaves, Inc.*, 71 F.3d at 1002).

Plaintiff alleges the following similarities between the shows, which, taken together, establish the requisite degree of originality:

- Both shows begin with nearly-identical percussive, fast-paced music playing while a black screen displays an introductory disclaimer in white letters with nearly identical language, and such music and display appears each time the show returns from commercial;



- Both shows toggle between footage of live or pre-packaged police patrol action and studio commentary by the show's hosts discussing the unfolding action;

- Dan Abrams is the primary host, and Sgt. Larkin the co-host, of both shows;

- Each show features a third host, which, for *On Patrol: Live* is Deputy Sheriff Curtis Wilson of the Richland County Police Department, a former recurring participant on multiple episodes of *Live PD*;[8]

---

[8]     Plaintiff also notes that "[a]ccording to press reports, Defendants wanted original *Live PD* analyst Tom Morris Jr. to return as the third [*On Patrol: Live*] co-host, and the only

27

- In both shows, the three hosts are dressed similarly and situated around a table with Abrams on the left, Larkin in the middle, and the third host on the right;




_Live PD_ Hosts
Abrams, Larkin, and Morris

_On Patrol: Live_ Hosts
Abrams, Larkin, and Wilson

- The studio in which the hosts sit features large TV screens on the walls and blue and red lights behind the screens;

- Abrams narrates the action on screen in both shows and uses the exact same catchphrases such as "What's the theory here?" and "Let's take a good look at [the missing person]";[9]

- Both shows feature several of the same law enforcement departments, including the Richland County Sheriff's Department in South Carolina, the Berkeley County Sheriff's Office in South Carolina, the Nye County Sheriff's Office in Nevada, and the Volusia County Sheriff's Office in Florida; and _On Patrol: Live_ even brings back some of the same individual officers from those counties;

- Both shows include "Crime of the Week" and "Missing" segments, with the latter segments for both shows

---

reason that did not happen was that '[t]he timing just didn't work out.'" (Compl. ¶ 57 n.17 (citing Michael Starr, _'Live PD' is Back as 'On Patrol: Live' Two Years After Being Canceled_, THE NEW YORK POST (July 19, 2022), https://nypost.com/2022/07/19/live-pd-is-back-as-on-patrol-live-two-years-after-being-canceled/).

[9]   While the Complaint merely referenced the overlapping of catchphrases without identifying any phrases in particular, the Court takes judicial notice of such phrases from its review of the shows.  _See Effie Film_, 909 F. Supp. 2d at 298.  (_See also_ Pl. Opp. 14).

cutting to Angeline Hartmann of the National Center for Missing and Exploited Children for a description of the circumstances behind the missing person;

*Live PD's "Missing" Segment*



*On Patrol: Live's "Missing" Segment*







*Live PD*                              *On Patrol: Live*

*Live PD*'s "Crime of the Week" Segment



*On Patrol: Live*'s "Crime of the Week" Segment



- Both shows include a segment featuring footage of a previously committed crime while one of the hosts explains the crime and describes the suspect for whom police officers are looking (the "Wanted" segment on *Live PD* and the "Wanted List" segment on *On Patrol: Live*);

- Both shows display the location of the law enforcement action in a rectangular box at the lower left-hand corner of the screen and, when officers speak to the camera, the shows both flash the officer's name and department;

- Both shows feature descriptions of the events in the lower left-hand corner (*e.g.*, "traffic stop") with the location of the event beneath the description;

*Live PD* Depicting a "Traffic Stop"      *On Patrol: Live* Depicting a "Traffic Stop"
in Berkeley County, SC          in Berkeley County, SC

- Both shows display the exact same "earlier in" tagline on the top corner of the screen when airing pre-recorded footage;

- Both shows at times utilize dual screens, particularly during car chases, with footage of the road displayed in a larger screen in the upper-right-hand corner and middle of the TV screen and a smaller, overlapping screen in the lower-left-hand corner displaying the officer in the car;

- When introducing footage for the first time from a specific location, both shows display a similar U.S. map on the screen that shows the viewer where the event is taking place;

31

- Both shows also use the same or nearly identical camera angles, motion theory (*i.e.*, how the graphics are zoomed in and out), process to settle on and highlight a location, and palette when featuring the U.S. map (including color choices, how the colors are used, and the relationship between the chosen colors);

- Both shows use strikingly similar logos that draw on the same marks and iconographies;

- When transitioning from one location to another, both shows first flash a screen with the city or county and state of the second location before cutting to law enforcement footage;

- Both shows end virtually identically, with footage of law enforcement action playing in a rectangular box in the middle of the screen while the credits flash beneath the footage in white letters and police lights flash on dark pavement in the background; and

- The time slots (and thus the time period covered by the live action) of both shows are the same — 9:00 p.m. to 12:00 a.m. on Friday and Saturday nights.

(Compl. ¶ 57).

Because *On Patrol: Live* copies nearly every single element in the same manner, coordination, and arrangement as *Live PD*, the Court does not hesitate to find that the works are substantially similar. On look alone, the two shows are virtually indistinguishable. The Court acknowledges that where, as here, protectability rests on a thin original contribution, the infringing work must involve "very close copying" to survive dismissal. *Zalewski*, 754 F. 3d at 107. In *Zalewski*, the Second Circuit affirmed the dismissal of a plaintiff architect's copyright claims, finding that the plaintiff's "slight" degree of originality in his contribution to colonial designs would only have survived had "very close copying" been alleged. *Id.* at 107 (citing *Nihon Keizai Shimbun, Inc.* v. *Comline*

*Bus. Data, Inc.,* 166 F.3d 65, 71 (2d Cir. 1999)).  Because it was not, and because the defendants' homes merely shared the plaintiff's general colonial style with multiple slight but significant differences, dismissal of the plaintiff's complaint was warranted.  *Id.* at 106-07.  This case, by contrast, presents the rare instance of "very close copying" of Plaintiff's original expression of elements that is nearly indistinguishable from the infringing work.

While Defendants are correct that Plaintiff cannot rest its substantial similarity argument on any one of these elements, that is not the analysis under the "total concept and overall feel" test.  For example, the Court agrees that one cannot own a copyright in an individual, like host Dan Abrams.  *See Bethea* v. *Burnett*, No. 04 Civ. 7690 (JFW), 2005 WL 1720631, at *13 (C.D. Cal. June 28, 2005) ("Plaintiffs cannot copyright the idea of having a well-known business leader, or even more specifically Donald Trump, host a reality television program."); *Fuzzy Logic Prods., Inc.* v. *Trapflix, LLC*, No. 15 Civ. 6203 (PA) (SSx), 2015 WL 12791508, at *4 (C.D. Cal. Nov. 20, 2015) (noting that the identity of the actors (each used across both works) was unprotectable). However, the Court may consider a host's identity as part of the substantial similarity analysis.  Thus the relevant inquiry is not the fact that Dan Abrams and Sgt. Larkin appear in both shows, but rather that they are used in the same fashion, around virtually identical desks with virtually identical mugs, and surrounded by nearly all of the same elements across both works.  *See Lone Wolf McQuade Assocs.* v. *CBS Inc.*, 961 F. Supp. 587, 594 (S.D.N.Y. 1997) (finding that a reasonable jury could conclude that the traits of character

33

Cordell Walker in one work were substantially similar to those of character J.J. McQuade in another, in part because both characters were portrayed by actor Chuck Norris).  Here, every single element of the show is nearly identical, which, based on the Court's "good eyes and common sense," suggests substantial similarities between the two works.

Defendants' awareness of their uphill climb on the substantial similarity prong is apparent in their cursory discussion of the differences between the two shows.  In contrast to the twenty nearly-identical — albeit non-protectable — features that Plaintiff identifies, Defendants focus on three distinctions: (i) that on *Live PD*, Dan Abrams and the other hosts wore suits and on *On Patrol: Live*, they wore polo shirts; (ii) that the three hosts do not always sit in the same positions; and (iii) that the textual iconographies of the "Crime of the Week" segments differ.  (Def. Br. 9, 11).  Otherwise, Defendants' substantial similarity argument rests on the notion that, while nearly identical, Plaintiff cannot prevent Defendants from using some or all of the elements in its general, stock work, for to do so would mean that "[c]reative expression would be chilled."  (Def. Br. 15).  A slight change of clothes, fonts, or seat positions does not engender substantial enough differences to stop an average lay observer from recognizing that the work, assessed as a whole, was copied from Plaintiff's work, even if the individual segments on their own are not substantially similar.  *See Peter F. Gaito*, 602 F.3d at 67; *Knitwaves, Inc.*, 71 F.3d at 1002.

And while the Court agrees that stock features of police life or basic elements of an unscripted television or news show are not protectable, this case is unlike *Rodriguez* v. *Heidi Klum Co.*, No. 05 Civ. 10218 (LAP), 2008 WL 4449416, at *5 (S.D.N.Y. Sept. 30, 2008), to which Defendants cite for the proposition that similarities in *scènes à faire* are unprotectable, because there, unlike here, the court found that there were substantial differences between the shows in their concept, feel, and theme. *Id.* (noting that design workroom with sewing machines, a specific number of contestants, professional models, weekly episodes, and the setting of New York, among others, were unprotectable as *scènes à faire* of the uncopyrightable idea of a fashion design reality show, and finding that *American Runway* was distinguishable from *Project Runway* because, *inter alia*, *American Runway* "is much more populist and inclusive; the viewer has a powerful voice in the outcome of the show, and the program caters to engaging the fashion sensibilities of its 'real American' audience"); *see also Abdin*, 971 F.3d at 70-71 (rejecting plaintiff's contention that tardigrade-human interaction in its video game was sufficiently original to be protected, and noting that independent comparison revealed numerous differences between game and allegedly infringing work that "tend to undercut substantial similarity"); *Castorina*, 784 F. Supp. 2d at 113 (dismissing on substantial similarity grounds because expression of potentially protectable elements in one work did not "remotely resemble" expression in other work). Here, while the shows are comprised of unprotectable, generic elements, the Court cannot find as a matter of law that the two expressions of these elements

35

are so different that "no reasonable jury, properly instructed, could find that the two works are substantially similar" based on their "total concept and overall feel." *OMG Accessories LLC*, 2021 WL 1167528, at *3 (determining that it would be premature to decide infringement issue on a motion to dismiss because works shared a "similarity of expression" or similarity in their concept and overall feel and the similar cumulative effect of unprotectable elements). In light of the foregoing, the Court finds that Plaintiff's expression of dozens of unprotectable elements, taken as a whole, contains the requisite originality to be protectable under copyright law, and denies Defendants' motion on the basis of substantial similarity.[10]

## C.  Plaintiff Has Sufficiently Pleaded Trademark Infringement and Unfair Competition

Plaintiff separately alleges claims of trademark infringement and unfair competition, arising under Section 32 of the Lanham Act, 15 U.S.C. § 1114(1), and Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),[11] respectively, as

---

[10]     As for Plaintiff's claims for contributory copyright infringement and intentional inducement of copyright infringement, Defendants make no challenges except to say that such claims fail because the direct copyright infringement fails.  (Def. Br. 16 n.6).  Finding that the direct copyright claim survives, and with no independent arguments for dismissal of the ancillary infringement claims, the Court finds that they too survive.

[11]     Defendants correctly note that the Complaint fails to specify whether the unfair competition claim is one for false designation of origin under Section 1125(a)(1)(A) of the Lanham Act or false advertising under Section 1125(a)(1)(B) of the same.  (Def. Br. 24 n.7).  Plaintiff clarifies its position in its opposition brief, arguing that it has successfully pleaded both.  (Pl. Opp. 19-20).  "While false advertising requires that a defendant make a false or deceptive statement misrepresenting an 'inherent quality or characteristic' of the product,'" *Pulse Creations, Inc.* v. *Vesture Grp., Inc.*, 154 F. Supp. 3d 48, 56-57 (S.D.N.Y. 2015) (quoting *Sun Trading Distrib. Co.* v. *Evidence Music, Inc.*, 980 F. Supp. 722, 727 (S.D.N.Y. 1997) (internal quotation marks and citations omitted)), no such statement is necessary for a claim brought under a false designation of origin theory.  Rather, false designation occurs when a defendant "attempts to sell its product with a false designation that suggests the product originated from the plaintiff."

well as under New York common law.  In brief, Plaintiff alleges that Defendants'

unauthorized use of its LIVE PD registered trademark in connection with the

promotion, advertising, and transmission of *On Patrol: Live*

> has caused and will continue to cause the consuming
> public to be confused, mistaken[,] or deceived into
> believing that [Plaintiff] has granted Defendants the
> right to use [the LIVE PD Mark] and/or that [Plaintiff] is
> otherwise associated, affiliated, or connected with
> Defendants' infringing series, all to the damage and
> detriment of [Plaintiff]'s reputation and good will.

(Compl. ¶ 102).  Plaintiff's claims rest on the allegations that (i) REELZ told

advertisers that the "working title" of the show would be "*PD Live*," an inversion

of Plaintiff's LIVE PD mark, and proclaimed that "REELZ ADDS #1 TV SHOW

TO OUR PROGRAMS LINEUP" with "ALL NEW LIVE EPISODES" (*id.* ¶¶ 48,

131); (ii) Defendants' cosmetic "fix" of the infringing "*PD Live*" title to "*On Patrol:

Live*," was a similarly infringing act because the public already associates

*"Patrol" and "Live"* with the *Live PD* spinoff *Live PD: Police Patrol* (*id.* ¶ 52); (iii)

REELZ retweeted several articles indicating that *Live PD* was making its return

on REELZ, including a Wall Street Journal article declaring "*Live PD* is coming

back this summer as '*On Patrol: Live*,'" (*id.* ¶ 46, 38 n.5 (citing the WSJ Article))

and an Atlanta Journal-Constitution article proclaiming that Live PD would be

"return[ing]" as *On Patrol: Live* on a new network (*id.* ¶ 38 n.8 (citing the AJC

Article); *see also id.* nn.6-7 (citing the Return Articles)), and separately issued a

press release announcing the purportedly "new" series "from the producers of

---

*Id.* (internal quotation marks and citations omitted).  For the reasons stated below, the
Court finds that Plaintiff has adequately pleaded both claims.

*Live PD*," and quoting Abrams as being "thrilled" that the "team is finally back together" (*id.* ¶ 47); and (iv) former *Live PD* host and *On Patrol: Live* host and executive producer Dan Abrams issued numerous tweets indicating that "*Live PD* is coming back," that "the show will be back on Friday and Saturday nights sometime later this summer," and that he was grateful to "the #livepdnation" for its "patience" as they awaited the return of *Live PD*. (Compl. ¶¶ 40-41 nn.9-10 (citing Dan Abrams (@danabrams), Twitter (June 8, 2022, 8:51 a.m., https://twitter.com/danabrams/status/1534518543168987136; Dan Abrams (@danabrams), Twitter (June 8, 2022, 9:00 a.m.), https://twitter.com/danabrams/status/1534520779253207040)).

As to the trademark infringement claims, Defendants argue, *inter alia*, that (i) there can be no consumer confusion because the *PD Live* working title was changed prior to any media blasts to the public (Def. Br. 20); (ii) the only potentially infringing word in the *On Patrol: Live* title is "Live," which is not protectable (*id.* at 17-18); (iii) at most, Defendants' use of the LIVE PD mark was permissible as nominative fair use (*id.* at 21-23). Defendants adopt the same arguments for the unfair competition claims and tack on two additional arguments for the state law unfair competition claim: *first*, that Plaintiff's claim, as premised on "imitation[]" and "malicious appropriation" (Compl. ¶¶ 139-50), is preempted by federal copyright law (Def. Br. 24), and *second*, that Plaintiff has failed to allege bad faith, and in fact has alleged evidence of Defendants' *good-faith* efforts to honor the one-year embargo on creating a substantially similar show before pursuing the new series (*id.* at 25). Because

38

the analysis under both provisions is the same, *see Starbucks Corp.* v. *Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 114 (2d Cir. 2009), the Court addresses the two sets of claims together and denies them both.

**1.    Applicable Law**

The Lanham Act's trademark infringement provision imposes civil liability on any person who, without the consent of the registrant,

> use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ....

15 U.S.C. § 1114(1)(a).  The Lanham Act's unfair competition provision prohibits:

> (1) [a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> > (A)    is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (B)    in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

> shall be liable in a civil action by any person who
> believes that he or she is or is likely to be damaged by
> such act.

*Id.* § 1125(a)(1).

"The infringement analysis under the trademark infringement and unfair competition provisions of the Lanham Act is the same." *Phoenix Ent. Partners, LLC* v. *J-V Successors, Inc.*, 305 F. Supp. 3d 540, 546 (S.D.N.Y. 2018) (citing *Starbucks Corp.*, 588 F.3d at 114). Furthermore, the standard under New York law is the same for both sets of claims, except the common law equivalents require an additional showing of bad faith. *See, e.g.*, *Lopez* v. *BigCommerce, Inc.*, No. 16 Civ. 8970 (JPO), 2017 WL 3278932, at *4 (S.D.N.Y. Aug. 1, 2017); *see also Adidas Am., Inc.* v. *Thom Browne Inc.*, 599 F. Supp. 3d 151, 158 n.3 (S.D.N.Y. 2022) ("It is well established that the elements necessary to prevail on causes of action for trademark infringement and unfair competition under New York common law and the Lanham Act are essentially the same and may be analyzed together." (collecting cases)).[12]

To prevail on either the trademark infringement or unfair competition claim, "a plaintiff must show ([i]) that it has a valid mark that is entitled to protection under the Act, and ([ii]) that use of the defendant's mark infringes, or is likely to infringe, the mark of the plaintiff," meaning that use of the mark "creates a likelihood of confusion." *Estee Lauder Inc.* v. *The Gap, Inc.*, 108 F.3d 1503, 1508-09 (2d Cir. 1997). "In order to be confused, a consumer need not

---

[12]    Because bad faith is one of the enumerated *Polaroid* factors discussed below, and applicable to both sets of claims, the Court does not separately analyze the New York claims from the federal claims.

believe that the owner of the mark actually produced the item and placed it on the market.  The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement."  *Star Indus., Inc.* v. *Bacardi & Co.*, 412 F.3d 373, 383 (2d Cir. 2005) (quoting *Dallas Cowboys Cheerleaders, Inc.* v. *Pussycat Cinema, Ltd.*, 604 F.2d 200, 204-05 (2d Cir. 1979) (internal quotation marks omitted)).  As to the first prong, a certificate of registration with the United States Patent and Trademark Office (the "PTO") is "*prima facie* evidence that the mark is registered and valid (*i.e.*, protectable), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce."  *Guthrie Healthcare Sys.* v. *ContextMedia, Inc.*, 826 F.3d 27, 37 (2d Cir. 2016) (internal quotation marks and citation omitted).

As to the second prong, courts consider the non-exhaustive factors set forth in *Polaroid Corporation* v. *Polarad Electronics Corporation*, 287 F.2d 492 (2d Cir. 1961).  These include:

> ([i]) strength of the trademark; ([ii]) similarity of the marks; ([iii]) proximity of the products and their competitiveness with one another; ([iv]) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; ([v]) evidence of actual consumer confusion; ([vi]) evidence that the imitative mark was adopted in bad faith; ([vii]) respective quality of the products; and ([viii]) sophistication of consumers in the relevant market.

*Int'l Info. Sys. Sec. Certification Consortium, Inc.* v. *Sec. Univ., LLC*, 823 F.3d 153, 160 (2d Cir. 2016) (internal quotation marks and citation omitted).

"Courts should not treat any one factor as dispositive, nor apply a mechanical

process awarding judgment to the party with the greatest number of factors weighing in its favor." *Guthrie Healthcare Sys.*, 826 F.3d at 37 (internal quotation marks and citations omitted). Rather, "a court should focus on the ultimate question of whether consumers are likely to be confused," *Nabisco, Inc.* v. *Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000) (internal quotation marks and citations omitted), and "may have to take still other variables into account," *Polaroid Corp.*, 287 F.2d at 495; *cf. Pirone* v. *MacMillan, Inc.*, 894 F.2d 579, 584 (2d Cir. 1990) (noting that claims may be dismissed as a matter of law at the summary judgment stage "where the court is satisfied that the products or marks are so dissimilar that no question of fact is presented" (internal quotation marks and citations omitted)).

"Normally, the likelihood of confusion is a factual question, centering on the probable reactions of prospective purchasers of the parties' goods." *Pirone*, 894 F.2d at 584; *see also Hermès Int'l* v. *Rothschild*, 603 F. Supp. 3d 98, 106 (S.D.N.Y. 2022) (noting that "[a]pplying the *Polaroid* factors is fact-intensive, and resolving the likelihood on a motion to dismiss posture is not appropriate"). Nevertheless, a complaint must contain sufficient facts to plausibly allege a probability of confusion between plaintiff's product or services and those of the alleged infringer. *See Guthrie Healthcare Sys.*, 826 F.3d at 37. Indeed, "'[i]n the context of a motion to dismiss, courts have disposed of trademark claims where simply looking at the work itself, and the context in which it appears, demonstrates how implausible it is that a [consumer] will be confused into believing that the plaintiff endorsed the

42

defendant's work.'" *OffWhite Prods., LLC* v. *Off-White LLC*, 480 F. Supp. 3d 558, 564-65 (S.D.N.Y. 2020) (quoting *Louis Vuitton Malletier S.A.* v. *Warner Bros. Ent. Inc.*, 868 F. Supp. 2d 172, 183 (S.D.N.Y. 2012)); *see also Gottlieb Dev. LLC* v. *Paramount Pictures Corp.*, 590 F. Supp. 2d 625, 635 (S.D.N.Y. 2008) (dismissing infringement claim where it was "simply not plausible" that ordinarily prudent consumers would be confused); *cf. Universal City Studios, Inc.* v. *Nintendo Co.*, 746 F.2d 112, 116 (2d Cir. 1984) ("[C]ourts retain an important authority to monitor the outer limits of substantial similarity within which a jury is permitted to make the factual determination whether there is a likelihood of confusion." (internal quotation marks omitted)).  This is so because trademark law is "not concerned with mere theoretical possibilities of confusion, deception, or mistake or with *de minimis* situations but with the practicalities of the commercial world." *Elec. Design & Sales, Inc.* v. *Elec. Data Sys. Corp.*, 954 F.2d 713, 717 (Fed. Cir. 1992) (citation omitted).

A likelihood of consumer confusion is a necessary element of both sets of claims.  "[T]he crucial issue in an action for trademark infringement is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods [or services] in question." *Savin Corp.* v. *Savin Grp.*, 391 F.3d 439, 456 (2d Cir. 2004) (internal quotation marks and alterations omitted) (quoting *Mushroom Makers, Inc.* v. *R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir. 1978)). Ultimately, "satisfaction of the likelihood-of-confusion standard requires a 'probability of confusion, not a mere possibility.'" *Guthrie Healthcare Sys.*, 826

F.3d at 37 (quoting *Nora Beverages, Inc.* v. *Perrier Grp. of Am., Inc.*, 269 F.3d 114, 121 (2d Cir. 2001)); *see also Tiffany & Co.* v. *Costco Wholesale Corp.*, 971 F.3d 74, 84 (2d Cir. 2020) ("[T]he mere possibility of confusion is not enough. To prevail in a trademark infringement action, a plaintiff must prove 'a probability of confusion affecting numerous ordinary prudent purchasers.'" (quoting *Star Indus., Inc.*, 412 F.3d at 383 (ellipsis omitted))); *Streetwise Maps, Inc.* v. *VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998); *Estee Lauder Inc.*, 108 F.3d at 1510.  At the motion to dismiss stage, the Court must determine whether the Complaint has alleged enough concrete facts that, if true, would satisfy this standard.  *See Iqbal*, 556 U.S. at 678.

## 2. Analysis

It is undisputed that Plaintiff owns the LIVE PD mark as Reg. No. 5,478,306 as a service mark for entertainment services through the PTO. (Compl. ¶ 98 & Ex. E).  Accordingly, the mark is presumed valid and entitled to protection under the Lanham Act.[13]  The Court proceeds to consider each of the *Polaroid* factors in turn.

---

[13]     Defendants aver that because the only overlapping word between the two show titles is "Live," a generic term, the mark is not protectable, and the claim thus fails as a matter of law.  (Def. Br. 17-18 (citing, *e.g.*, *CES Publ'g Corp.* v. *St. Regis Publ'ns, Inc.*, 531 F.2d 11, 13 (2d Cir. 1975) ("To allow trademark protection for generic terms, *i.e.*, names which describe the genus of goods being sold, … would grant the owner of the mark a monopoly, since a competitor could not describe his goods as what they are."); *Kendall-Jackson Winery, Ltd.* v. *E & J Gallo Winery*, 150 F.3d 1042, 1047 n.8 (9th Cir. 1998)).  Defendants further note that "Live" is at most a descriptive term that can only be eligible for protection if the primary significance of the term is to identify Plaintiff as the source of *Live PD*, which Defendants argue would be impossible given the numerous shows produced and aired by other sources using the same word (*e.g.*, *Saturday Night Live, Live with Regis and Kathie Lee, etc.*).  (*Id.* (citing *Inwood Lab'ys, Inc.* v. *Ives Lab'ys, Inc.*, 456 U.S. 844, 851 n.11 (1982))).  However, these arguments misconstrue the basis of Plaintiff's claims.  Plaintiff's trademark infringement and unfair competition claims are based on the following allegations: (i) REELZ used the name *PD Live* (an inverted

### a.    The Polaroid Factors

### i.    Strength of the Mark

"The first Polaroid factor focuses on the distinctiveness of the mark, or more precisely, its tendency to identify the goods as coming from a particular source." *Capri Sun GmbH* v. *Am. Beverage Corp.*, 595 F. Supp. 3d 83, 149 (S.D.N.Y. 2022) (internal quotation marks omitted).  The Complaint characterizes the LIVE PD mark as well-known, particularly given the show's prominence as the number one show on all of television (excluding sports) in the key demographic of adults aged 25-54 in 2018; the most-viewed show of the year on over-the-top platforms, video-on-demand, and digital video records the same year; the most watched program on ad-supported cable television during prime time on Friday and Saturday nights in 2019; and one of the most watched shows in 2020, drawing a total of approximately three million viewers per weekend.  (Compl. ¶ 33).  Indeed, the mark is unquestionably tied to the A&E network as consumers needed to tune into the channel to watch the show.  Additionally, Plaintiff has promoted the mark through television, online, print, and other media advertisements around the world.  (*Id.* ¶ 36).  These facts, along with Plaintiff's multiple spinoff shows, including, *inter alia*, *Live PD: Rewind*, *Live PD: Police Patrol*, *Live PD Presents: Women on Patrol*, and *Live PD:*

---

version of *Live PD*) to market the show to advertisers during the season of lucrative "upfront" ad sales presentations; (ii) despite changing the name to *On Patrol: Live*, Defendants continued to misuse the full LIVE PD mark to promote its show and confuse customers; and (iii) *On Patrol: Live* infringes on the *Live PD* spinoff *Live PD: Police Patrol*.  (Pl. Opp. 18-19).  Because none of these three arguments rests solely on the word "Live," and because Plaintiff does maintain a registered trademark in LIVE PD, the mark is presumed valid and protected under the Lanham Act.

*Wanted*, plausibly plead a strong mark.  (*See id.* ¶ 34).  *See First Nat'l Bank of Omaha, Inc.* v. *Mastercard Int'l, Inc.*, Nos. 03 Civ. 707 (DLC), 02 Civ. 3691 (DLC), 2004 WL 1575396, at *8 (S.D.N.Y. July 15, 2004) ("Distinctiveness in the marketplace, or acquired distinctiveness, gauges the degree of consumer recognition the mark has achieved among members of the purchasing public as the designator of the plaintiff's services."); *see also Weight Watchers Int'l, Inc.* v. *Noom, Inc.*, 403 F. Supp. 3d 361, 379 (S.D.N.Y. 2019) (noting, *inter alia*, that the fact that Weight Watchers spent substantial sums to promote its product and received unsolicited media coverage plausibly alleged that the mark was strong).

### ii.    Similarity of the Marks

The Second Circuit has recognized that

> [o]f salient importance among the *Polaroid* factors is the "similarity of the marks" test, which attempts to discern whether the similarity of the marks is likely to cause confusion among potential customers.  To apply this factor, courts must analyze the mark's overall impression on a consumer, considering the context in which the marks are displayed and the totality of factors that could cause confusion among prospective purchasers.

*Toni & Guy (USA) Ltd.* v. *Nature's Therapy, Inc.*, No. 03 Civ. 2420 (RMB), 2006 WL 1153354, at *6 (S.D.N.Y. May 1, 2006) (quoting *Malletier* v. *Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir. 2005) (internal quotation marks omitted)); *see also Nabisco, Inc.*, 220 F.3d at 47 ("[I]n determining whether two marks are confusingly similar, we must appraise the overall impression created by ... the context in which they are found and consider the

totality of factors that could cause confusion among prospective purchasers."
(internal quotation marks omitted)).  "The question that the court should
concentrate on is 'whether [the competing marks] create the same general
overall impression,' such that a consumer who is familiar with the plaintiff's
mark would likely be confused when seeing the defendant's mark alone." *N.Y.
St. Elec. & Gas Corp.* v. *U.S. Gas & Elec., Inc.*, 697 F. Supp. 2d 415, 432
(W.D.N.Y. 2010) (quoting *Malletier*, 426 F.3d at 538).

Defendants argue that the similarity between the LIVE PD mark and *On
Patrol: Live* begins and ends with the word "Live."  (Def. Br. 19).  In response,
Plaintiff argues (i) that Defendants' initial inversion of LIVE PD to *PD Live* in its
working title was sufficient to constitute similarity; (ii) Defendants have used
the *Live PD* mark directly to market their show; and (iii) *On Patrol: Live* bears a
striking similarity to *Live PD: Police Patrol.*  (Pl. Opp. 21).

LIVE PD and *On Patrol: Live* are plainly dissimilar.  And Plaintiff does not
cite to a single case — nor can the Court locate one — to support the
proposition that advertisers should be analyzed as consumers for purposes of
the likelihood-of-confusion test.  Plaintiff does not plead that the advertisers
who were privy to the *PD Live* name were in fact confused or confusable
consumers.  As pleaded, the fact that Defendants initially marketed their
product as *PD Live* to advertisers and then switched the name to *On Patrol: Live*
does not show a similarity of marks for consumer purposes, and is better
analyzed as evidence of bad and/or good faith below.  *See Int'l Info. Sys.*, 823
F.3d at 168 (noting that the *Polaroid* factors can be a "bad fit" for nominative

47

fair use cases).  Additionally, that the two share the word "Live" is insufficient, on the facts alleged in the Complaint, to suggest that a consumer would plausibly confuse the two.  Indeed, Plaintiff itself suggests that Defendants "deliberately fostered the misperception that *On Patrol: Live* was a continuation of *Live PD* by repeatedly using the LIVE PD mark to promote their new show," suggesting that Plaintiff did not think that consumers would confuse the two standing on their own.  (Compl. ¶ 40).

The Court's analysis is similar as to the titular word "patrol."  Both *On Patrol: Live* and *Live PD: Police Patrol* feature the words "live" and "patrol," but these words are commonplace in describing the activity of police departments and a show with live action.  On this record, the Court does not find that such marks, without any indication as to the two marks' shared appearance or other contextual factors, would be likely to confuse customers as to the nature of the mark.

### iii.    Competitive Proximity

"The proximity inquiry asks to what extent the two products compete with each other."  *Brennan's, Inc.* v. *Brennan's Rest., LLC*, 360 F.3d 125, 134 (2d Cir. 2004) (citation omitted).  The purpose of the inquiry, which considers both market proximity and geographic proximity, is "to determine whether the two products have an overlapping client base that creates a potential for confusion."  *Id.*  "[D]irect competition between the products is not a prerequisite to relief."  *E.A. Sween Co.* v. *A & M Deli Express Inc.*, 787 F. App'x 780, 785 (2d Cir. 2019) (summary order) (quoting *Mobil Oil Corp.* v. *Pegasus Petroleum Corp.*,

818 F.2d 254, 257 (2d Cir. 1987) (internal quotation marks omitted)).  Instead, the proximity inquiry asks whether "a purchaser could easily assume that, while the [products] themselves are different, they belong to the same genre of products and might well have the same source."  *Id.* (quoting *Arrow Fastener Co.* v. *Stanley Works*, 59 F.3d 384, 396 (2d Cir. 1995) (internal quotation marks omitted)).

Defendants allege that because the two shows never aired on cable television simultaneously, they cannot plausibly be alleged to have competed in the same market.  (Def. Br. 19).  While there is some confusion in the parties' submissions as to whether *Live PD* was "suspended" or "cancelled" in 2020 (*compare* Compl. ¶ 2 (noting that Plaintiff "suspended production of new episodes"), *with id.* ¶¶ 43-44 (citing to articles indicating that the show had been cancelled), *and* Def. Br. 19, 21 (noting same)), both Plaintiff's and REELZ's YouTube channels feature clips of or related to the *Live PD* and *On Patrol: Live* shows, respectively.[14]  In fact, in the Court's YouTube search of *On Patrol: Live*, at least two clips from *Live PD* appear on the first page.  *See* "On Patrol: Live" Search, YOUTUBE, https://www.youtube.com/results?search_query=on+patrol%3A+live (May 25, 2023, 12:33 p.m.).  Furthermore, REELZ has distributed *On Patrol: Live* on an on-demand basis through its REELZ NOW® app, an online video service.

---

[14]     While Plaintiff does not allege in the Complaint that REELZ maintains a YouTube channel with *On Patrol: Live* content, a simple Google search indicated as such.  *United States* v. *Bari,* 599 F.3d 176, 180 (2d Cir. 2010) (upholding judicial notice where "a judge need only take a few moments to confirm [her] intuition by conducting a basic Internet search").

(Compl. ¶ 73). Accordingly, the Complaint has plausibly alleged — at a minimum — that the products exist in the same online video market. Additionally, and because the Complaint plausibly alleges that the two shows serve the same purpose (television show broadcasting a live stream of law enforcement activity with in-studio commentary), fall within the same general class (shows about police at work), and share numerous viewers, the Court finds that this factor weighs in favor of Plaintiff. (*See* Compl. ¶ 101). *See Capri Sun GmbH*, 595 F. Supp. 3d at 168 (noting that competitive proximity can be found where parties share audience appeal) (citing *La Cibeles, Inc.* v. *Adipar, Ltd.*, No. 99 Civ. 4129 (AGS), 2000 WL 1253240, at *7 (S.D.N.Y. Sept. 1, 2000)).

### iv.   Bridging the Gap

Bridging the gap refers to "the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so." *Star Industries, Inc.*, 412 F.3d at 387. Where the products are already in competitive proximity, "there is really no gap to bridge." *Id.*; *see also Streetwise Maps, Inc.*, 159 F.3d at 743 (noting that when the products "already occupy the same market … the gap has been bridged"). Because the Court finds that the Complaint plausibly alleges that the two shows operate in at least one overlapping market, it deems the gap bridged, and this factor similarly weighs in favor of Plaintiff. *See Weight Watchers Int'l*, 403 F. Supp. 3d at 379 (same).

### v.   Actual Customer Confusion

"It is black letter law that actual confusion need not be shown to prevail on a trademark infringement claim, since actual confusion is very difficult to prove." *Nat'l Acad. of Television Arts & Scis., Inc.* v. *Multimedia Sys. Design, Inc.*, 551 F. Supp. 3d 408, 428 (S.D.N.Y. 2021) (quoting *Guthrie Healthcare Sys.*, 826 F.3d at 45 (internal quotation marks omitted)).  Accordingly, plaintiffs need only show "a likelihood of confusion."  *Id.*  Consumer confusion "enables a seller to pass 'off his goods as the goods of another.'"  *Lopez* v. *Nike, Inc.*, No. 20 Civ. 905 (PGG) (JLC), 2021 WL 128574, at *9 (S.D.N.Y. Jan. 14, 2021), *report and recommendation adopted*, No. 20 Civ. 905 (PGG) (JLC), 2021 WL 2207451 (S.D.N.Y. Feb. 16, 2021) (quoting *Lang* v. *Ret. Living Pub. Co.,* 949 F.2d 576, 582 (2d Cir. 1991)).

While typically raised at the motion for summary judgment stage (and after discovery has taken place), "[e]vidence of actual confusion may consist of anecdotal or survey evidence."  *Chanel, Inc.* v. *WGACA, LLC*, No. 18 Civ. 2253 (LLS), 2022 WL 902931, at *8 (S.D.N.Y. Mar. 28, 2022) (quoting *Paco Sport, Ltd.* v. *Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 319 (S.D.N.Y. 2000) (internal quotation marks omitted)).  Where, as here, Plaintiff alleges several instances of tweets and social media messages indicating customer confusion as to whether consumers were watching Plaintiff's work or Defendants', and in fact referencing the new show as "*Live PD*" (*see* Compl. ¶¶ 49, 62 (citing tweets such as: "Ok. I'm confused.  Is *Live PD* back on the air?  If so, how do I watch?"; "*Live PD* back!!!"; "So awesome to be spending Friday & Saturday

nights watching *Live PD* again.  I missed it!"; "@ReelzChannel Happy to have found your channel and enjoying *LIVE PD*.")), there is unquestionably a plausible and probable allegation of consumer confusion.

Defendants suggest that the above-noted viewer tweets were emblematic of consumers' knowledge that the two shows were *distinctive*, not that they were the same.  (Def. Br. 19-20).  That may ultimately prove to be the case; however, in light of the plausible allegations that such tweets indicated a likelihood that REELZ "pass[ed] off [its] goods as the goods of [A&E]," the Court finds that this factor weighs in favor of Plaintiff.  *Lopez*, 2021 WL 128574, at *9 (internal quotation marks and citation omitted).

### vi.   Bad Faith

The *Polaroid* bad faith factor "looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product."  *Lang*, 949 F.2d at 583 (quoting *Edison Bros. Stores, Inc.* v. *Cosmair, Inc.*, 651 F. Supp. 1547, 1560 (S.D.N.Y. 1987)).  While intentional copying can raise a presumption of consumer confusion, *see Fun-Damental Too, Ltd.* v. *Gemmy Indus. Corp.*, 111 F.3d 993, 1004 (2d Cir. 1997); *Paddington Corp.* v. *Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 586 (2d Cir. 1993), "[t]he intent to compete by imitating the successful features of another's product is vastly different from the intent to deceive purchasers as to the source of the product," *Streetwise Maps,* 159 F.3d at 745.  The *Polaroid* bad faith factor is concerned only with the latter.

This factor is nearly identical to the New York-specific requirement of bad faith for both trademark infringement and unfair competition claims, inasmuch as "bad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products."  *Chanel, Inc.* v. *RealReal, Inc.*, No. 18 Civ. 10626 (VSB), 2020 WL 1503422, at *14 (S.D.N.Y. Mar. 30, 2020) (quoting *Star Indus., Inc.*, 412 F.3d at 388).  Here, Plaintiff has alleged that Defendants advertised using the LIVE PD mark to exploit the show's good will and reputation, citing, in part, to REELZ's retweeting of various articles and headlines informing the public that *Live PD* would be "returning" on REELZ.  (*See, e.g.*, Compl. ¶ 46; *id.* ¶ 38 n.7 (citing "Denise Petski, *'Live PD' to Return as 'On Patrol: Live' On Reelz*, DEADLINE, June 8, 2022, https://deadline.com/2022/06/live-pd-return-on-patrol-live-reelz-dan-abrams-1235040651/; Greta Bjornson, *'Live PD' to Return on Reelz, Will Be Renamed 'On Patrol: Live'*, DECIDER, June 9, 2022, https://decider.com/2022/06/09/live-pd-returning-renamed-on-patrol-live/)).  Furthermore, REELZ issued a press release touting the series as the *de facto* successor to *Live PD*.  (*Id.* ¶ 47).

While it is true that Defendants changed the name of the show from *PD Live* to *On Patrol: Live* after being served with a cease and desist letter, that fact does not rule out bad faith as a matter of law, particularly because (i) Defendants continually retweeted articles indicating that *Live PD* would be coming back, and (ii) REELZ included quotes from Dan Abrams in its press

release that he was "thrilled" that the "team is finally back together," which, when viewed in conjunction with Abrams's repeated tweets about *Live PD*'s supposed return, suggests that Defendants were capitalizing on *Live PD*'s reputation and recognition (and that of its host) for their own gain.  (Compl. ¶¶ 40-41, 46-47).  Indeed, Plaintiff has sufficiently alleged that Defendants exploited the goodwill and reputation of *Live PD*, proclaiming to advertisers that "REELZ ADDS #1 TV SHOW TO OUR PROGRAMS LINEUP" with "ALL NEW LIVE EPISODES" (*id.* ¶¶ 48, 131), and making no effort to distinguish the two shows, as a means of attracting viewers (*see, e.g.*, *id.* ¶¶ 37-50).

### vii.    Quality of the *On Patrol: Live* Product

"If the quality of a junior user's product or service is low compared to the senior user, 'there is an increased chance of actual injury when there is confusion.'" *Flushing Bank* v. *Green Dot Corp.*, 138 F. Supp. 3d 561, 591 (S.D.N.Y. 2015) (quoting *Savin Corp.*, 391 F.3d at 461).  At the same time, however, a greater disparity in quality makes confusion less likely.  *Id.*  Put somewhat differently, a larger gap in quality between products increases the magnitude but decreases the likelihood of harm.  *AM Gen. LLC* v. *Activision Blizzard, Inc.*, 450 F. Supp. 3d 467, 483-84 (S.D.N.Y. 2020).  The Complaint cites to a 70-minute delay in the airing of *On Patrol: Live* and a conclusory statement that its programming was "inferior" to *Live PD*.  (Compl. ¶¶ 118-19).  This conclusory statement is insufficient for this factor to weigh in Plaintiff's favor.

### viii.   Sophistication of the Consumer Group

"Generally speaking, greater sophistication of consumers reduces the likelihood of confusion."  *SLY Magazine, LLC* v. *Weider Publ'ns L.L.C.*, 529 F. Supp. 2d 425, 442 (S.D.N.Y. 2007) (internal quotation marks omitted). Defendants cite to *Star Industries, Inc.* v. *Bacardi & Co.*, 412 F.3d 373, 390 (2d Cir. 2005), for the proposition that consumers (like those watching television at home) are "[u]nhurried" and "in the relaxed environment" of their home, and can be expected to exhibit sufficient sophistication as to what channel they turn on at a given time and, therefore, what show they watch.  (Def. Br. 21). Significantly, however, *Star Industries* arose from an appeal from a judgment following a bench trial, during which the parties had an opportunity to produce evidence as to consumer sophistication.  *See Star Indus., Inc.*, 412 F.3d at 380, 391.  That case is therefore inapposite.

At the motion to dismiss stage, the Court looks to the allegations in the Complaint, and reserves such questions of fact for summary judgment. Because the Complaint does not allege facts regarding consumer sophistication, the Court finds this factor to be neutral.  *See Hermès Int'l*, 603 F. Supp. 3d at 106 ("[a]pplying the Polaroid factors is fact-intensive, and resolving the likelihood on a motion to dismiss posture is not appropriate").

On balance, the *Polaroid* factors weigh in favor of the likelihood of consumer confusion as to the source or sponsorship of *On Patrol: Live*.  As the Second Circuit has made clear, however, the *Polaroid* factors can be an imperfect fit when, as here, a defendant invokes nominative fair use, and three

additional factors must be considered.  *See Int'l Info. Sys.*, 823 F.3d at 156, 168.  The Court considers those factors now.

### b.    The Nominative Fair Use Factors

The nominative fair use doctrine "allows a defendant to use a plaintiff's trademark to identify the plaintiff's goods so long as there is no likelihood of confusion about the source of the defendant's product or the mark-holder's sponsorship or affiliation."  *Tiffany (NJ) Inc.* v. *eBay Inc.*, 600 F.3d 93, 102 (2d Cir. 2010) (internal quotation marks and citations omitted and alterations adopted).  In other words, "a defendant may lawfully use a plaintiff's trademark where doing so is necessary to describe the plaintiff's product and does not imply a false affiliation or endorsement by the plaintiff of the defendant."  *Id.* at 102-03.  This doctrine most often comes up in the context of comparative advertising, as "[c]ourts permit defendants to use a trademarked name to convey to consumers what it is their product seeks to copy; in such cases, defendants are 'not trying to get the good will of the name, but the good will of the goods.'"  *Merck & Co.* v. *Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 413 (S.D.N.Y. 2006) (quoting *Saxlehner* v. *Wagner*, 216 U.S. 375, 380-81 (1910) (finding that trademark holders may not keep "manufacturers from telling the public in a way that will be understood ... what they are copying and trying to sell"), and citing *Societe Comptoir de L'Industrie* v. *Alexander's Dep't Stores, Inc.*, 299 F.2d 33, 36 (2d Cir. 1962) ("The Lanham Act does not prohibit a commercial rival's truthfully denominating his goods a copy of a design in the public domain, though he uses the name of the designer to do so.  Indeed it is

difficult to see any other means that might be employed to inform the consuming public of the true origin of the design.")); *see also Neutrik AG* v. *Switchcraft, Inc.*, No. 99 Civ. 11931 (JSM), 2001 WL 286722, at *3 (S.D.N.Y. Mar. 23, 2001) ("[C]laiming that one's product is ... a substitution for another's product is a common method of advertisement that encourages competition.").

Defendants allege that, at most, their use of the LIVE PD mark fell into the nominative fair use category.  (Def. Br. 21-23).  In assessing the legitimacy of such a theory, the Court must consider the following:

> ([i]) whether the use of the plaintiff's mark is necessary to describe both the plaintiff's product or service and the defendant's product or service, that is, whether the product or service is not readily identifiable without use of the mark; ([ii]) whether the defendant uses only so much of the plaintiff's mark as is necessary to identify the product or service; and ([iii]) whether the defendant did anything that would, in conjunction with the mark, suggest sponsorship or endorsement by the plaintiff holder, that is, whether the defendant's conduct or language reflects the true or accurate relationship between plaintiff's and defendant's products or services.

*Int'l Info. Sys.*, 823 F.3d at 156.

As to the first factor, Defendants assert that their desire to discuss their prior work on *Live PD* in connection with the advertisement of *On Patrol: Live* is sufficient to prove that *Live PD* was not readily identifiable without use of the mark (*see* Def. Br. 22; Def. Reply 10), and that "there is no way to identify *Live PD* without using its name, particularly given the many unscripted shows about policing" (*id.*).  *See also Int'l Info. Sys.*, 823 F.3d at 156.  Specifically, the Court understands Defendants to be referring to the REELZ press release indicating that *On Patrol: Live* was "from the producers of *Live PD*."  (Def.

Br. 22; *see also* Compl. ¶ 47).  Because it would be impossible to specifically reference *Live PD* without its mark, this factor weighs in favor of nominative fair use.  *See Weight Watchers Int'l*, 403 F. Supp. 3d at 379-80 (finding that Noom's advertisement alleging that "'millennials are calling' Noom either 'Weight Watchers® 2.0' or 'Weight Watchers®' for the 21st century'" met the first factor because it would be impossible to refer to Weight Watchers without its mark (internal citation omitted)); *see also Int'l Info. Sys.*, 823 F.3d at 165 (noting that the doctrine exists to protect the "use of another's trademark to identify, not the *defendant's* goods or services, but the *plaintiff's* goods or services" (emphases added) (internal quotation marks and citation omitted)).

The second factor, whether "the defendant uses only so much of the plaintiff's mark as is necessary to identify the product or service," *Int'l Info. Sys.*, 823 F.3d at 156, looks to whether the alleged infringer "stepped over the line into a likelihood of confusion by using the senior user's mark "too prominently or too often, in terms of size, emphasis, or repetition," *id.* (internal quotation marks and citation omitted and alterations adopted); *see also Nespresso USA, Inc.* v. *Afr. Am. Coffee Trading Co. LLC*, No. 15 Civ. 5553 (LTS), 2016 WL 3162118, at *5 (S.D.N.Y. June 2, 2016) (granting motion for default judgment as to trademark infringement claim because Libretto "stepped over the line into a likelihood of confusion by using the Nespresso mark too prominently in terms of emphasis" (internal quotation marks and citations omitted and alterations adopted)).

58

On this point, Plaintiff alleges that Defendants made the LIVE PD mark the "centerpiece of their deceptive marketing campaign," and thus went over the line as to what was necessary to identify the product. (Pl. Opp. 24). Defendants rejoin that Plaintiff's claims center around third-party articles and retweets that Defendants promoted, rather than Defendants' own words, to liken the show to *Live PD* or to suggest that *Live PD* was making its return. (Def. Br. 22). Defendants emphasize that their only alleged statements regarding *Live PD* were in a press release, wherein REELZ announced the "new" series as "from the producers of *Live PD*." (*Id.* (citing Compl. ¶ 131). The Court takes Defendants' point, but notes that, at least at the motion to dismiss stage, Defendants' retweets — *i.e.*, their public endorsements — of news articles claiming that *Live PD* was making its return, and REELZ's press release quoting Dan Abrams's statement that he was "thrilled" the "team is finally back together" (especially in light of Abrams's continued tweets indicating that the *Live PD* show was back), were unnecessary to identify the new show, and therefore excessive for purposes of this factor.

"When considering the third factor, courts must not consider only source confusion, but rather … confusion regarding affiliation, sponsorship, or endorsement by the mark holder." *Chanel, Inc.*, 449 F. Supp. 3d at 437 (internal quotation marks and citations omitted and alterations adopted). Plaintiff asserts that Defendants have failed to proffer a reason, let alone need, to refer to *Live PD* to market *On Patrol: Live* other than to trade on Plaintiff's goodwill and reputation. (Pl. Opp. 24-25). While Defendants claim that it was

merely a means of referencing their prior work, the Court deems as plausible Plaintiff's allegations that Defendants acted willfully and intentionally to confuse the public as to the affiliation and sponsorship of the work, including its allegations that "REELZ was telling advertisers and media industry personnel, including one of the nation's largest media marketing and advertising agencies, that it was adding 'the #1 TV show to [its] program lineup,' that 'all new live episodes' of that '#1 TV show' would be airing on REELZ," and that it otherwise monopolized on *Live PD*'s reputation as a means of confusing consumers. (Compl. ¶ 106).

It is often the case that "the invocation of the fair use doctrine necessary raises questions of fact that cannot be resolved on a motion to dismiss." *Gym Door Repairs, Inc.* v. *Young Equipment Sales, Inc.*, 206 F. Supp. 3d 869, 902 (S.D.N.Y. 2016) (internal quotation marks and citation omitted). This is one of those cases. On the face of the Complaint, the Court finds that nominative fair use does not apply. Accordingly, the Court denies Defendants' motion to dismiss the trademark infringement, unfair competition, and New York common law claims.[15]

---

[15]   Defendants further argue that Plaintiff's state law unfair competition claim is preempted by federal copyright law because it is based on allegations of "imitation[]" and "malicious appropriation." (Def. Br. 24-25 (quoting Compl. ¶¶ 139-150)). "[T]o survive preemption, the plaintiff must allege that the confusion forming the basis of the unfair competition claim was created by some act other than copying." *Wolstenholme* v. *Hirst*, 271 F. Supp. 3d 625, 642 (S.D.N.Y. 2017). Here, Defendants allege that "'the only source of alleged confusion stems from' alleged similarities between plaintiff's product and the defendant's product," and the claims are thus preempted. (Def. Br. 25 (quoting *Wolstenholme*, 271 F. Supp. 3d at 642-43)). This is simply not the case here. Plaintiff's unfair competition claims are based upon Defendants' "misuse of [its] trademarks to promote their show," and to capitalize on Plaintiff's reputation and goodwill as a means of promoting its show. (Pl. Opp. 25; *see also* Compl. ¶¶ 8, 51, 115-120). This plainly falls within the rights protected by the Lanham Act, and is not preempted by copyright

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is DENIED. The Court finds that Plaintiff has adequately stated claims for copyright infringement, trademark infringement, and unfair competition and may thus pursue discovery on these claims. Defendants are directed to file an answer to the Complaint on or before **July 7, 2023**. Further, the parties are directed to file a joint status letter regarding next steps in this case and a proposed case management plan on or before **July 21, 2023.**

The Clerk of Court is directed to terminate the pending motion at docket entry 37.

SO ORDERED.

Dated:      June 16, 2023
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

---

law. *See MyPlayCity, Inc.* v. *Conduit Ltd.*, No. 10 Civ. 1615 (CM), 2012 WL 1107648, at *24 (S.D.N.Y. Mar. 30, 2012), *adhered to on reconsideration,* No. 10 Civ. 1615 (CM), 2012 WL 2929392 (S.D.N.Y. July 18, 2012).